0089 qc

# PEDIATRIC CLINIC, L.L.C.
## Medical Arts Center of East Alabama
122 North 20th Street, Bldg. 23
Opelika, AL 36801-5442

IATRICS
AVID DRUHAN, M.D. FAAP

*PEDIATRICS & ADOLESCENTS*
ERON B. INGLE, JR., M.D. FAAP
DAVID B. SMALLEY, M.D. FAAP
G. RANDALL JONES, M.D. FAAP
LARRY E. THORNE, M.D. FAAP
KATHERINE K. NICHOLS, M.D. FAAP

*PEDIATRICS & ADOLESCENTS*
SARA L. SMITH T, M.D. FAAP
ASHLEY C. DAVIS, M.D.
LISA D. YOUNG, M.D. FAAP

*PEDIATRICS, ADOLESCENTS &
ENDOCRINOLOGY*
LINDA H. ANZ, M.D. FAAP

Telephone
(334) 749-8121

Facsimile
(334) 749-6166

July 5, 2001

Yarbi Cound
Lee County Department of Human Resources
P.O. Box 2425
Opelika, AL 36803-2425

Dear Ms. Counds:

I saw Autumn McLees on June 25, 2001. She was brought in by her grandmother and her mother. The chief complaint was that the child had been molested three years ago by the mother's previous boyfriend, Lee. They told me at that time the child was too afraid to tell anyone about the incident and she told her mother that she was hurt on the monkey bars. The mother had since moved to Virginia and the story came out that the previous boyfriend had abused the child and her sister. Autumn told me "He stuck his private part in my private part". She further stated that they were home alone with her sister watching TV. He took her and her sister and did it to them. He took them to a back bedroom, and again, they were too afraid at that time to tell anyone.

Physical exam was normal except for the vaginal area. The child was a Tanner one and no intact hymen on the right in the posterior portion. There was a notch on the left and the right the hymen was more than one centimeter in diameter, wide open and gaping. Please see accompanying diagram.

I feel that with the detail of the child's history and the abnormal physical exam, that this represents sexual abuse in the class three to four range. Apparently the child has also been examined by a forensic specialist in Virginia, and I agree with his or her assessment. It would be helpful to have that record as well.

Please feel free to contact me if there are any further questions.

Very truly yours,

Linda H. Anz, M.D.

DEFENDANT'S EXHIBIT
#1

Autumn McLeod                     Date: 6/25/01

___/___/___

SHAPE OF ANUS AND ANY LESIONS ON GENITALIA, PERINEUM, AND BUTTOCKS BUTTOCKS



SHAPE OF HYMEN AND ANUS AND ANY LESIONS ON GENITALIA, PERINEUM, OR BUTTOCKS



Type of hymen:
( ) annular
( ) redundant
( ) crescent
( ) estrogenized
( ) other_____

Hymenal edges
explored with a
swab?
( ) Y ( ) N

Woods lamp used:    ( ) Y  ( ) N    ( mark areas on diagram)
Fluorescence noted: ( ) Y  ( ) N

TRIRPT1.RPT                    CENTRAMAX.M                        Page 0091
                    Triage Call Documentation Report
                           Date:03/07/1999
Patient Name: AUTUMN MCLEES                    Call Date: 03/07/1999 20:3
-----------------------------------------------------------------------
    tient Name: AUTUMN MCLEES              PCP:  Katherine K. Nichols
   .tient Addr: 98 JANETTE STREET          Spec:
                                           PROVIDER#:
                                           PT.FIRST#:
            Opelika AL 36801               Age:  006 yrs. Sex: F
Phone: Day (205)  Eve. 334-749-1086            CHART#:
Birthdate: 11/04/1992                      Operator:  Krystin Lewis RN
Insurance: Alabama Medicaid MGD Care     PT1
PRESENTING PROBLEM
      FELL ON BALANCE BEAM
NURSING ASSESSMENT
      MOM STATES THAT CHILD FELL ON A BALANCE BEAM FRI AND HAS HAD SOME
      VAGINAL BLEEDING EVER SINCE. THEY ARE AWARE OF THIS AT THE OFFICE AND
      CHILD HAS A RETURN VISIT TOM. MOM STATES THAT THE BLEEDING HAS NOT
      INCREASED IN INTENSITY--JUST WORRIED BC CHILD NOW HAS A TEMP OF 103.
      WONDERS IF IT WOULD BE OK TO GIVE HER APAP. CHILD HAS NO OTHER NEW SYM
      TO NOTE.
GUIDELINE USED: Fever (Pediatric)
!  .SON FOR DISPOSITION:
  ʌll other patients  (Reason:  routine fever and all triage questions
negative)
RECOMMENDED DISPOSITION: Home Care With Follow Up prn
PATIENT/CALLER UNDERSTANDING
      Patient/care giver was able to repeat the instructions in his or her
      own words.
PATIENT/CALLER INTENDED ACTION
      Patient/Caregiver will comply with recommended disposition.
  OTES
      INST MOM THAT APAP WOULD BE FINE--SHE WILL KEEP HER APPT FOR TOM.

0092

# EPSDT

This patient _Autumn McTees_ DOB __/__/__ has had

an EPSDT screening on _12/18/98_ and has been approved for ___more visits

than the 14 allowed by Medicaid.  This referral is good for one year.  We can bill

Medicaid for extra days if you see this patient for any of the following conditions:

_Allergic Rhinitis_

_FB (L) Canal_

_____

_____

Please mark "EPSDT" on the front of the charge ticket so that the billing office

will know that you are billing for the extra visits and not the routine sick visits.

**(Please leave this as the front page of the chart.)**

REFERRED FROM:

| | |
|---|---|
| Mary Moron | (10) |
| EAMC | EAMC |
| LCHD | LCHD |
| Children's | CHIL |
| UAB | UAB |
| Alabama Council on Human Relations | ACHR |

TRIRPT1.RPT                  CENTRAMAX.M
                    Triage Call Documentation Report
                         Date:03/07/1999
Patient Name: AUTUMN MCLEES                    Call Date: 03/07/1999 20:
------------------------------------------------------------------------
Patient Name: AUTUMN MCLEES                    PCP: Katherine K. Nichols
Patient Addr: 98 JANETTE STREET                Spec:
                                               PROVIDER#:
                                               PT.FIRST#:
            Opelika AL 36801                   Age:  006 yrs. Sex: F
Phone: Day (205)  Eve. 334-749-1086                 CHART#:
Birthdate: 11/04/1992                          Operator:  Krystin Lewis RN
Insurance: Alabama Medicaid MGD Care      PT1
PRESENTING PROBLEM
      FELL ON BALANCE BEAM
NURSING ASSESSMENT
      MOM STATES THAT CHILD FELL ON A BALANCE BEAM FRI AND HAS HAD SOME
      VAGINAL BLEEDING EVER SINCE. THEY ARE AWARE OF THIS AT THE OFFICE AND
      CHILD HAS A RETURN VISIT TOM. MOM STATES THAT THE BLEEDING HAS NOT
      INCREASED IN INTENSITY--JUST WORRIED BC CHILD NOW HAS A TEMP OF 103.
      WONDERS IF IT WOULD BE OK TO GIVE HER APAP. CHILD HAS NO OTHER NEW SYM
      TO NOTE.
GUIDELINE USED: Fever (Pediatric)
REASON FOR DISPOSITION:
  All other patients  (Reason:  routine fever and all triage questions
negative)
RECOMMENDED DISPOSITION: Home Care With Follow Up prn
PATIENT/CALLER UNDERSTANDING
      Patient/care giver was able to repeat the instructions in his or her
      own words.
PATIENT/CALLER INTENDED ACTION
      Patient/Caregiver will comply with recommended disposition.
NOTES
      INST MOM THAT APAP WOULD BE FINE--SHE WILL KEEP HER APPT FOR TOM.

0094

Pediatric Clinic, 122 N 20th St #23, Opelika, AL 36801 (334) 749-8121

NAME: Autumn McLees 11-4-92

| Date | Temp | Age | Weight | Length | Immunization |
|---|---|---|---|---|---|
| MONDAY MAR 03 1999 | 101.0 | 6 yr | 41 1/2 | | |

rev private area - still bleeding
fever x 2 days
No [illegible] d/c
[illegible]
[illegible]
[illegible]
[illegible]

deep cleft small amt dried
blood No d/c but has
an odor.
[illegible] Vaginal Lac.
[illegible]
Sitz Baths BID
Bactroban ointment BID
[illegible]

Pediatric C   , 122 N 20th St #23, Opelika, AL 3    1 (334) 749-8121

NAME: Autunn McLees

| Date | Temp | Age | Weight | Length | Immunization |
|------|------|-----|--------|--------|--------------|
| 1-6-99: | | | | | |

At 1st EK referral done for 12-18-98 RU

**Phone Consult**

MAR 05 1999     887-2577

Fell on playground on Wed. (at school) mom. noticed
blood on toilet seat & on her panties this morning
Mom examined child, a bruise was noted in
vag-rectal area. Child denies pain, mom did
not see any cuts, scratches or any reason
for her to bleed. Appt made. D. Hallim

| DATE | | TEMP | AGE | WT. | LENGTH | |
|------|---|------|-----|-----|--------|---|
| FRIDAY | MAR 05 1999 | 100.4 | 6 yr | 42 | | |
| | | 90.1 | | | | |

fell on balance beam and is bleeding

#2

large bleeding lac
Still bleeding
Refer to N-L tscg

At 1st final done RU

*Patient 1st*
Health Care Close To Home

EPSDT REFERRAL FOR SERVICES

Date of screening: WEDNESDAY DEC 16 1998

## TO BE COMPLETED BY REFERRAL PROVIDER

| Name and address of CONSULTANT | Name, address & telephone number of screening provider |
|---|---|
| ENT | PEDIATRIC CLINIC #23 MEDICAL ART CENTER OPELIKA, AL 36802 |
| | Screening provider no. and signature 39000 360 |
| Provider phone number | Appointment date & time | Medical record number |
| Name of patient Autumn McLeou | Date of Birth 11-4-92 | Medicaid number 000 395 11 27 01 |
| Patient address | | Phone number |
| Reason for referral r B(L) Ear | Additional health problems |

This referral is valid for 12 months from date of screening. (maximum of 12 months)

Printed Name and title of PMP J. Davidson, MD

Referral/PMP Provider No. 000 01944

Signature of PMP

TO THE REFERRING PROVIDER - FORWARD WHITE AND YELLOW COPIED TO CONSULTANT. RETAIN PINK COPY FOR YOUR FOLLOW-UP

Date of Examination or service

Diagnosis/es

CONSULTANT'S REPORT - Please write below or attach report to assure payment: Include summary of treatment rendered, treatment plan and duration, and estimated number of visits.

Printed Name and title of consultant

Signature of consultant

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 1 is difficult or impractical, I hereby attach said State's Exhibit No. 1 to this page of the transcript and certify the same as a part of the record.

                             *Corinne Hurst*

                             Corinne Hurst, Circuit Clerk
                             Lee County

0098

# PEDIATRIC CLINIC, L.L.C.
## Medical Arts Center of East Alabama
122 North 20th Street, Bldg. 23
Opelika, AL 36801-5442

Telephone
(334) 749-8121

Facsimile
(334) 749-6166

*TRICS*
*...VID DRUHAN, M.D. FAAP*

*PEDIATRICS & ADOLESCENTS*
*ERON B. INGLE, JR., M.D. FAAP*
*DAVID B. SMALLEY, M.D. FAAP*
*G. RANDALL JONES, M.D. FAAP*
*LARRY E. THORNE, M.D. FAAP*
*KATHERINE K. NICHOLS, M.D. FAAP*

*PEDIATRICS & ADOLESCENTS*
*SARA L. SMITH T. M.D. FAAP*
*ASHLEY C. DAVIS, M.D.*
*LISA D. YOUNG, M.D. FAAP*

*PEDIATRICS, ADOLESCENTS &*
*ENDOCRINOLOGY*
*LINDA H. ANZ, M.D. FAAP*

July 5, 2001

Yarbi Cound
Lee County Department of Human Resources
P.O. Box 2425
Opelika, AL 36803-2425

Dear Ms. Counds:

I saw Autumn McLees on June 25, 2001. She was brought in by her grandmother and her mother. The chief complaint was that the child had been molested three years ago by the mother's previous boyfriend, Lee. They told me at that time the child was too afraid to tell anyone about the incident and she told her mother that she was hurt on the monkey bars. The mother had since moved to Virginia and the story came out that the previous boyfriend had abused the child and her sister. Autumn told me "He stuck his private part in my private part". She further stated that they were home alone with her sister watching TV. He took her and her sister and did it to them. He took them to a back bedroom, and again, they were too afraid at that time to tell anyone.

Physical exam was normal except for the vaginal area. The child was a Tanner one and no intact hymen on the right in the posterior portion. There was a notch on the left and the right the hymen was more than one centimeter in diameter, wide open and gaping. Please see accompanying diagram.

I feel that with the detail of the child's history and the abnormal physical exam, that this represents sexual abuse in the class three to four range. Apparently the child has also been examined by a forensic specialist in Virginia, and I agree with his or her assessment. It would be helpful to have that record as well.

Please feel free to contact me if there are any further questions.

Very truly yours,

Linda H. Anz, M.D.

STATE'S
EXHIBIT

Autumn McLeos          Date: 6 ⟋ 25 ⟋ 01

_____ / ____ / _____

SE OF ANUS AND ANY LESIONS ON GENITALIA, PERINEUM, AND BUTTOCKS BUTTOCKS



W SHAPE OF HYMEN AND ANUS AND ANY LESIONS ON GENITALIA, PERINEUM, OR BUTTOCKS



Type of hymen:
( ) annular
( ) redundant
( ) crescent
( ) estrogenized
( ) other_____
_____

Hymenal edges
explored with a
swab?
( ) Y ( ) N

notch          notch

1 cm

no tags

Woods lamp used:   ( ) Y ( ) N   ( mark areas on diagram)
Fluorescence noted: ( ) Y ( ) N

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's Exhibit No. 2 is difficult or impractical, I hereby attach said State's Exhibit No. 2 to this page of the transcript and certify the same as a part of the record.

*Corinne Hurst*

Corinne Hurst, Circuit Clerk
Lee County

0101

DATE    : 06/25/01
VICTIM  : Autumn McLees
SUBJECT: Forensic Interview

On 06/25/01, at approximately 1:00 p.m., I met with Autumn McLees, her mother, Dawn Beheshtzaden, her step-maternal grandmother, Princess Hepner, Lee Co. DHR social worker, Yarbi Cound, and Opelika Police Department Det. Shane Healey at the Child Advocacy Center in reference to a sexual abuse report. The report concerned Autumn disclosing that Lee Kirby, her mother's ex live-in boyfriend, had touched her private parts. The incident occurred approximately two years ago when the family was living in Opelika. The family has moved to Virginia.

Autumn is 8 years old and just completed the second grade. Autumn said she went to school at Butts Road Primary School in Chesapeake, Virginia. Autumn said she had two teachers, Ms. Johnson and Ms. Ranefelt. I asked Autumn her favorite subject in school. Autumn said she liked art the best. I asked Autumn if there was anything she didn't like about school. Autumn said she liked everything about school. I asked Autumn who all she lives with. Autumn said she lives with her grandma, her Papa, her mom, two sisters, Lillian and Elizabeth, and her two cousins, Robbie and Carlton. I asked Autumn if she knew why she had been brought to the center to talk to me. Autumn said it was about some bad things Lee did to her when they lived in Opelika. I told Autumn that was what we would be talking about. I then told Autumn that we would only talk about things that had really happened and not pretend things. I used several examples in explaining truth and lies and Autumn responded appropriately and said she would tell the truth. I asked Autumn who Lee was. Autumn said Lee lived with them when they lived in Opelika and he was her mom's boyfriend. I told Autumn to tell me everything she could remember about what happened. Autumn said that Lee did some bad things to her and her sister, Lillian. Autumn said that Lee choked her until she passed out. I told Autumn to tell me more about that. Autumn said she couldn't remember why Lee did that or anything else about it. Autumn said a friend of her mother's had given her mother a pair of handcuffs for a birthday or Christmas present. Autumn said Lee put the handcuffs on her hands behind her back and then he would dunk her in the water in the bathtub. Autumn said Lee would hold her head under the water in the bathtub. Autumn said Lee did that to Lillian but most of the time he just did it to her. Autumn said Lee would hold her head under the water in the toilet and then would flush the toilet. Autumn said Lillian told her that Lee did that to her too. Autumn said she believed Lee did that to Lillian because she would hear Lillian screaming in the bathroom. I asked Autumn if there was anything else Lee did to her. Autumn said Lee stuck his private part in her private part. I asked Autumn to point to her private part that she was talking about. Autumn pointed to her butt. I asked Autumn if she had a name for that part of her body. Autumn said she thought it was called a gluteus maximus. I asked Autumn if she had another name for it and she said her back private part. I asked Autumn if she had name for Lee's private part and Autumn said she called it a winkie. I asked Autumn if Lee put his winkie against her back private part or inside and she said he put it inside and it hurt her. I asked Autumn if her clothes were on or off when this happened. Autumn said Lee would tell her to take her clothes off and she did. Autumn said she took all her clothes off even her panties. I asked Autumn if anything happened to Lee's clothes. Autumn said Lee would

STATE'S EXHIBIT

# 2

0102

take all his clothes off. Autumn said Lee wore boxer underwear most of the time. I asked Autumn if Lee did anything else with his winkie. Autumn said Lee put his winkie inside her mouth. I asked Autumn if Lee's winkie felt hard, soft or some other way. Autumn said it felt hard. I asked Autumn if she felt anything come out of Lee's winkie when it was inside her mouth and she said no. I asked Autumn where this happened. Autumn said it happened when they were all living in Opelika in a trailer. Autumn said the trailer was past Golden Corral. I asked Autumn who all would be at home when this happened. Autumn said it always happened when her mom was at work and she, Lilllian and Elizabeth would be at home with Lee. Autumn said Lee kept them while her mom worked. I asked Autumn if anything else happened. Autumn said one time Lee had his winkie inside her back private part and it slipped and went inside her pie. I asked Autumn what her pie was. Autumn said it was her front private part and she pointed to her vaginal area. Autumn said Lee put her in the bath tub. Autumn said Lee knew he had hurt her because there was blood coming out of her pie. Autumn said when Lee saw the blood he put her in the bath tub. I asked Autumn if she told anyone about that. Autumn said she told her mom that she had fallen off the balance beam at school. Autumn said that was what Lee told her to tell her mom. I asked Autumn if she went to the doctor because of this. Autumn said she didn't think she did but she couldn't remember for sure. Autumn said she didn't think Lee meant to hurt her pie but his winkie slipped when he had it inside her back private part. I asked Autumn what grade she was in when all this happened. Autumn said she was in kindergarden. I asked Autumn if she remembered the name of her school and she said no. I asked Autumn if there was anything else she could remember. Autumn said one time Lee slammed her head against the wall in the trailer. Autumn said she didn't know why Lee did that but it left a hole in the wall. Autumn said that happened in her bedroom. Autumn said she shared a bedroom with Lillian and Elizabeth. I asked Autumn if Lee put his winkie inside her back private part one time, two times, or a bunch of times and she said a bunch of times. I asked Autumn if Lee put his winkie inside her mouth one time, two times, or a bunch of times and she said a bunch of times. I asked Autumn if Lee put his winkie inside her pie one time, two times, or a bunch of times and she said that only happened one time. Autumn said Lee's full name was William Lee Kirby. Autumn said her mother told her that today. I asked Autumn if there was anything else she could remember. Autumn said Lee would kick and punch her and Lillian and leave marks and bruises on their legs and belly. I asked Autumn if that happened one time, two times, or a bunch of times and she said a bunch of times. I asked Autumn if there was anything else she could remember and she said no. Autumn said she wanted me to know that everything she had told me was the truth. I thanked Autumn for talking to me and ended the interview.

Interview Began: 1:10 p.m.
Interview Ended: 1:55 p.m.

Brenda Moss
Brenda Moss
Forensic Interviewer
Child Advocacy Center of East Al., Inc.

0103

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 3 is difficult or impractical, I hereby attach said State's Exhibit No. 3 to this page of the transcript and certify the same as a part of the record.

_Corinne Hurst_

Corinne Hurst, Circuit Clerk
Lee County

0104

DATE:      06/25/01
VICTIM:    Lillian Judith McLees
SUBJECT:  Forensic Interview

On 06/25/01, at approximately 1:00 p.m., I met with Lillian McLees, her mother, Dawn Beheshtzaden, her step-maternal grandmother, Princess Hepner, Lee Co. DHR social worker, Yarbi Cound, and Opelika Police Department Det. Shane Healey at the Child Advocacy Center in reference to a sexual abuse report. The report concerned Lillian disclosing that William Lee Kirby, her mother's ex live-in boyfriend, had touched her private parts. The incident occurred approximately two years ago when the family was living in Opelika. The family has moved to Virginia.

Lillian is 10 years old and just completed the 4th grade at Butts Road Intermediate School. Her teacher was Mr. Birkie. I asked Lillian about her favorite subject. Lillian said she liked math the best and didn't like English and reading. I asked Lillian who all she lives with. Lillian said she lives with her grandparents, Princess and Robert Hepner, her sisters, Autumn and Elizabeth, and her cousins, Robbie and Carlton. Lillian said her mom and step-dad live in Chesapeake but they visit each other a lot. I asked Lillian if she knew why she had been brought to the center to talk to me. Lillian said it was about the bad things Lee Kirby did to her. I told Lillian that was what we would be talking about. I then explained the rules to Lillian as follows: you know more than I about what happened; always tell the truth; no guessing; if you don't know or don't remember, say so; if I repeat a question, it doesn't mean your first answer was wrong; and, you can correct me if I get something wrong. Lillian said she understood and would follow the rules. I told Lillian to tell me everything she could remember about what happened. Lillian said Lee hurt her and touched her in ways she didn't like. Lillian said it didn't feel right when he touched her. I asked Lillian where Lee touched her. Lillian said he touched her private parts, her pie and her butt. Lillian said her pie was her front private part and her butt was her back private part. I asked Lillian where this happened. Lillian said it happened at their trailer when they were all living in Opelika. Lillian said it happened in the living room and in her mom's bedroom. I asked Lillian if her clothes were on or off. Lillian said Lee told her to take her clothes off. Lillian said she took all her clothes off. I asked Lillian if anything happened to Lee's clothes. Lillian said Lee took all his clothes off and then touched her privates with his hands and his private part. I asked Lillian if she had name for Lee's private part and she said it was his penis. Lillian said Lee put his penis inside her butt and inside her pie. I asked Lillian if Lee did anything else with his penis. Lillian said Lee put his penis inside her mouth. I asked Lillian what his penis felt like. Lillian said it was hard and felt awful. I asked Lillian if she felt anything come out of Lee's penis when it was inside her mouth. Lillian said something came out and it was white but she didn't know what it was. I asked Lillian who all was at home when this happened. Lillian said her sisters, Autumn and Elizabeth, were there and her mother would be at work. I asked Lillian if Lee put his penis inside her butt one time, two times, or a bunch of times and she said that happened a bunch of times. I asked Lillian if Lee put his penis inside her pie one time, two times, or a bunch of times and she said it happened a bunch of times. I asked Lillian if Lee put his penis inside her mouth one time, two times, or a bunch of times and she said a bunch of times. Lillian said after he touched her that way, he would

**STATE'S EXHIBIT**

4 2

put her in the bathtub and bath her. I asked Lillian if Lee did anything to her when she was in the bathtub. Lillian said sometimes Lee would hold her head under the water and it would scare her. Lillian said Lee would spank her and Autumn and leave bruises on them for days. I asked Lillian if Lee ever said anything to her when he was touching her in these ways and she said no, not that she could remember. I asked Lillian if she ever told anyone about this. Lillian said she remembered talking to Autumn about it. Lillian said she never told anyone until a while long ago. Lillian said she told her best friend, Jackie Newman, and then her counselor in Virginia. I asked Lillian what grade she was in when Lee did these things to her. Lillian said she was in the 2nd grade. Lillian said she went to a school in Opelika but she couldn't remember the name of the schoo. I asked Lillian if there was anything else she could remember and she said no. I thanked Lillian for talking to me and ended the interview.

Interview Began: 2:00 p.m.
Interview Ended: 2:40 p.m.

Brenda Moss
Forensic Interviewer
Child Advocacy Center of East Al., Inc.

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 4 is difficult or impractical, I hereby attach said State's Exhibit No. 4 to this page of the transcript and certify the same as a part of the record.

Corinne Hurst, Circuit Clerk
Lee County



DORIE MILFORD DREW
BATHTUB + SPIGOT —

CHILD (AUTUMN) DREW
WHERE HER BODY WAS
A X IS WHERE LEE
WAS BESIDE THE
TUB,
CHILD IS "LAYING
ON MY TUMMY".

PICTURE OF    MAN'S
PRIVATE

LEE'S BODY
WITH
PRIVATE
PART

DRAWN BY AUTUMN McLEES

STATE'S
EXHIBIT

OCT 11 2

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's Exhibit No. 5 is difficult or impractical, I hereby attach said State's Exhibit No. 5 to this page of the transcript and certify the same as a part of the record.

*Corinne Hurst*

Corinne Hurst, Circuit Clerk
Lee County



# Children's Hospital
## *of* The King's Daughters

**Forensic Pediatric Clinic**

Name:   Lillian Mclees                          City:   Chesapeake
DOB:    5-11-91                                  MR#:  446273
                                                MA#:  225302

Date:  4-13-01

## History of Presentation

Lillian was referred for a forensic evaluation by CPS in conjunction with an ongoing
police investigation in Alabama. According to CPS, Lillian's younger sister has had a
previously abnormal genital exam. It was noted however, by the doctor, that her injury
was consistent with a straddle injury. Lillian and her younger sister have disclosed
chronic vaginal/rectal penetration by mother's former fiancé.

## Social History

History provided by maternal step-grandmother, Princess Hepner. She states that Lillian
and two siblings have lived with her since 6/99. She reports Lillian's mother lives locally
with a new husband. Ms. Hepner states she has concerns with her step-daughter's
judgment and feels the girls need the stability and support she can provide. Ms. Hepner
reports developmental and age appropriate behaviors, however Lillian has a history of
extreme mood swings and aggressiveness when touched. These issues have been
effectively addressed in psychotherapy and do resurface on occasion. She states Lillian is
a good student and does not experience behavioral problems in the school setting. It was
reported by CPS that Lillian and her younger sister made a pact to not speak to anyone of
their abuse.

    Sandra Fernandez, MSW

## Past Medical History

History is obtained from Ms. Hepner. Grandmother states that Lillian is a medically
healthy child. She has had no serious illnesses and no surgeries. She is on no
medications and has no allergies to medications. She is seen regularly by her primary
care provider. Grandmother has noted no problems with vaginal discharge or bleeding.
There has been no constipation or diarrhea. She has not exhibited any somatic
complaints such as headaches or stomachaches.

Grandmother does state that within the past year Lilly has had problems with aggression
and mood swings. She also had a period where she was grinding her teeth approximately
three years ago. Grandmother states that she has done some lying and stealing recently as
well. She was also in therapy with a therapist here in town until recently.

*Child Abuse Program*

935 Redgate Avenue • Norfolk, Virginia 23507 • 757-668-6100 • Fax 757-
www.chkd.org

CONFIDENTIAL

STATE'S
EXHIBIT

#5

Physical Examination

Lilly is a very pleasant cooperative nine year eleven month old white female in no distress. She preferred to be unaccompanied during the examination. Also present was our clinic nurse. Vital signs: Respiration 20, pulse 73, blood pressure 104/46, weight 31.3 kg, 50th percentile, height 131cm, 25th percentile. Pupils are equally round and reactive to light, extraocular movements are intact. Nose and throat are clear. Dentition is normal. Tympanic membranes are normal bilaterally. Neck is supple with shotty anterior lymphadenopathy. Lungs are clear to auscultation bilaterally. Cardiovascular exam regular rate and rhythm without murmur, pulses are 2+ and equal. Abdomen is soft without hepatosplenomegaly. Bowel sounds are positive. Musculoskeletal: good strength and tone in extremities. Neurologically, cranial nerves 2-12 appear to be intact, reflexes are 2+ and equal bilaterally. Skin: Other than a mild sunburn on her arms bilaterally, her skin is clear.

Genitalia: Lilly is a Tanner stage I female. She was examined in the supine frog leg position with colposcopy as a diagnostic aid. Her labia majora and minora are normal bilaterally. Her hymen is very thin and translucent. It shows two openings separated by a small tissue band. The margins of both openings are crisp without evidence of trauma. There are also prominent bilateral peri-urethral bands. The posterior fourchette and fossa navicularis are both normal. Her anus has a tag in the twelve o'clock position. Otherwise there are no tears, lesions or fissures in her anal area.

Assessment

1. Lilly has a normal genital examination. A normal exam neither confirms nor excludes the possibility of sexual contact.
2. There are allegations of penile anal and penile vaginal penetration that Lilly and her sister have disclosed to CPS.

Plan

1. Colposcopic photographs were taken.
2. The results of the examination were discussed with Lilly's grandmother.
3. Lilly has an appointment at the Child Abuse Program for therapeutic intervention.
4. A copy of this report will be forwarded to the Chesapeake authorities for further investigation.

Suzanne P. Starling, MD
Medical Director, Child Abuse Program

Sandra Fernandez, MSW
Medical Social Worker

SPS/lj

OCT 11 2000

CHILD ABUSE PROGRAM/CHKD. THIS REP STRICTLY CONFIDENTIAL AND IS FOR THE PROFESSIONAL USE OF THE PERSON TO WHOM IT IS ADDRESSED. THIS INFORMATION IS NOT TO BE RE-RELEASED TO ANY OTHER PERSON, INCLUDING THE PATIENT, UNDER ANY CIRCUMSTANCE.

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's Exhibit No. 6 is difficult or impractical, I hereby attach said State's Exhibit No. 6 to this page of the transcript and certify the same as a part of the record.

*Corinne Hurst*

Corinne Hurst, Circuit Clerk
Lee County



## Children's Hospital
### *of* The King's Daughters

### Forensic Pediatric Clinic

Name:   Autumn Mclees            City:  Chesapeake
DOB:    11-4-92                 MR#:  700759
                                           MA#:  225301

Date:  4-13-01

### History of Presentation

Autumn was referred for a forensic evaluation by CPS in conjunction with an ongoing police investigation in Alabama. According to CPS, Autumn had a previous genital exam in 1998 completed in Alabama with abnormal findings. It was noted however, by the doctor that the "split vagina" was consistent with a straddle injury. Autumn and her older sister have disclosed chronic vaginal/rectal penetration by mother's former fiancé.

### Social History

History provided by maternal step-grandmother, Princess Hepner. She states Autumn and two siblings have lived with her since 6/99. She reports Autumn's mother lives locally with a new husband. Ms. Hepner states she has concerns with her step-daughter's judgment and feels the girls need the stability and support she can provide. Ms. Hepner reports developmental and age appropriate behaviors, however Autumn has a tendency to become depressed and cry excessively. She states Autumn is a good student and does not experience behavioral problems in the school setting. It is reported by CPS that Autumn and her older sister made a pact to not speak to anyone concerning their abuse.

Sandra Fernandez, MSW

### Past Medical History

History is obtained from Ms. Hepner. Grandmother states that Autumn was a full term birth without complications. She has been a relatively healthy child. She is on no medications and has no allergies to medications. She has never had a serious illness or overnight hospitalization. Grandmother does state that she was seen in approximately 1998 for a genital injury. She states that Autumn had told the physicians that she had straddled a balance beam, but that grandmother believes this was the presentation of her abusive episode. She states that at that emergency room visit that she had a "jagged tear" in her genitals that the physicians apparently attributed to the straddle injury. Other than this injury she has had no further injuries or Emergency Department visits.

**CONFIDENTIAL**

*Child Abuse Program*

935 Redgate Avenue • Norfolk, Virginia 23507 • 757-668-6100 • Fax 757-668-6109
www.chkd.org

Grandmother states that she is otherwise healthy. She does have some environmental allergies. She has had occasional episodes of vaginal discharge but no bleeding. She has had mild constipation but no diarrhea. She complains of frequent stomachaches. She has had occasional nightmares that have really not increased in number over the past several years. Grandmother describes her as very withdrawn with excess crying and fearfulness. Her grandmother states that she is the more withdrawn of the two siblings.

Physical Examination

Autumn is a very pleasant and cooperative eight year five month old white female in no distress. She is accompanied in the examination by her grandmother. Also present in the exam was our nurse. Vital signs: Respiration 22, pulse 89, blood pressure 105/51, weight 32.1 kg, 75th percentile, height 122.5 cm, 25th percentile. Pupils are equally round and reactive to light, extraocular movements are intact. Nose and throat are clear. Dentition is normal. Tympanic membranes are normal bilaterally. Neck is supple with shotty anterior lymphadenopathy. Lungs are clear to auscultation bilaterally. Cardiovascular exam regular rate and rhythm without murmur, pulses are 2+ and equal. Abdomen is soft without hepatosplenomegaly. Bowel sounds are positive. Musculoskeletal: good strength and tone in extremities. Neurologically, cranial nerves 2-12 appear to be intact, reflexes are 2+ and equal bilaterally. Skin: Autumn has a healing abrasion of her left elbow, and a sunburn on the back of her neck. Otherwise her skin examination is normal. Genitalia: Autumn is a Tanner stage I female. She was examined in the supine frog leg position with colposcopy as a diagnostic aid. She has normal labia majora and minora. She has a hyperpigmented area on the clitoral hood which appears to be a freckle. She has a significantly abnormal hymen. There is a scant amount of hymenal tissue present from approximately two to a four o'clock. The hymen is absent between four and seven. There is a small amount of hymenal tissue between seven and nine. In the five to six o'clock position there is an avascular area that is consistent with a scar. This area extends from the margin of the vagina through the hymen into the fossa navicularis. There is also an avascular area in the posterior fourchette. There is a vaginal column that is clearly seen in the six o'clock position. This column appears to be transected by the avascular area as well. There are very prominent peri-urethral bands bilaterally. Her anus has good tone. There are no tags, tears, fissures or other lesions in the anal area.

Assessment

1. Autumn has a very abnormal genital examination. She has a complete lack of hymenal tissue at the base. Additionally, there is an avascular area consistent with a scar that extends from the distal vagina into the posterior fourchette. This injury is consistent with a penetrating injury to the genitals. It is consistent with her stated history of penile vaginal penetration.
2. According to CPS, Autumn has given a history of penile vaginal penetration as well as penile anal penetration.

CHILD ABUSE PROGRAM/CHKD. THIS REPORT IS STRICTLY CONFIDENTIAL AND IS FOR THE PROFESSIONAL USE OF THE PERSON TO WHOM IT IS ADDRESSED. . . . . . . . . . . . . . . . . TO BE RE-RELEASED TO ANY CLIENTS INCLUDING THE PATIENT . . . . . . . CIRCUMSTANCE.

OCT 11 2001

Plan

1. Colposcopic photographs were taken.
2. The results of the examination were discussed with Autumn's mother.
3. Autumn has an appointment at the Child Abuse Program for therapeutic intervention.
4. A copy of this report will be forwarded to the Chesapeake authorities for further investigation.


Suzanne P. Starling, MD
Medical Director, Child Abuse Program

SPS/lj

Sandra Fernandez, MSW
Medical Social Worker

CHILD ABUSE PROGRAM/CHKD. THIS REPORT IS STRICTLY CONFIDENTIAL AND IS FOR THE PROFESSIONAL USE OF THE PERSON TO WHOM IT IS ADDRESSED. THIS INFORMATION IS NOT TO BE RE-RELEASED TO ANY OTHER PERSON, INCLUDING THE PATIENT, UNDER ANY CIRCUMSTANCE.

OCT 11 2001

<u>VOLUME ONE</u>
STATE OF ALABAMA
IN THE CIRCUIT COURT FOR THE COUNTY OF LEE
THIRTY-SEVENTH JUDICIAL CIRCUIT
CRIMINAL

STATE OF ALABAMA,

      PLAINTIFF,

    VS.                  CASE NOS. CC-01-1001
                                     CC-01-1002
WILLIAM LEE KIRBY,                CC-01-1003
                                     CC-01-1004

      DEFENDANT


<u>REPORTER'S OFFICIAL TRANSCRIPT OF</u>
<u>INDEX AND EXHIBITS</u>

Before:
      HON. ROBERT M. HARPER, Circuit Judge, in Courtroom Number Four of the Lee County Justice Center located at Opelika, Alabama, on the 3rd of December, 2001, and being concluded on the 4th day of December, 2001.

A P P E A R A N C E S

    **HON. VANCE NICHOLAS ABBETT,** District Attorney for the 37th Judicial Circuit of Alabama, and **HON. DAVID GLANZER,** Assistant District Attorney for the 37th Judicial Circuit of Alabama, appearing for the State of Alabama.

    **HON. KENNETH FUNDERBURK:** Attorney at Law, appearing for the Defendant.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

2

## I N D E X

PAGE

TRIAL IN CHIEF ON 12-3-01                                6

OPENING STATEMENTS                                       64

STATE'S WITNESSES:

    BRENDA MOSS (Hearing outside jury's presence):
        Direct Exam by Mr. Glanzer                 34
        Cross Exam by Mr. Funderburk               39

    LINDA ANZ:
        Direct Exam by Mr. Glanzer                 43
        Cross Exam by Mr. Funderburk               47
        Redirect Exam by Mr. Glanzer               55

    AUTUMN McLEES:
        Direct Exam by Mr. Glanzer                 79
        Cross Exam by Mr. Funderburk               87
        Redirect Exam by Mr. Glanzer              104
        Recross Exam by Mr. Funderburk            111
        Further Redirect by Mr. Glanzer

    LILLIAN McLEES:
        Direct Exam by Mr. Glanzer                116
        Cross Exam by Mr. Funderburk              123
        Redirect Exam by Mr. Glanzer              138
        Recross Exam by Mr. Funderburk            142

    DAWN BEHESHTZADEH:
        Direct Exam by Mr. Glanzer                144
        Cross Exam by Mr. Funderburk              154
        Redirect Exam by Mr. Glanzer              181
        Recross Exam by Mr. Funderburk            184
        Further Redirect by Mr. Glanzer           186

    LINDA ANZ (Recalled):
        Redirect Exam by Mr. Glanzer              191
        Cross Exam by Mr. Funderburk              200
        Redirect Exam by Mr. Glanzer
        Recross Exam by Mr. Funderburk

    SHANE HEALY:
        Direct Exam by Mr. Glanzer                218

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

3

I N D E X (CONTINUED)

PAGE

**DEFENDANT'S WITNESSES:**

BRENDA MOSS (In front of the jury):
    Direct Exam by Mr. Glanzer         218
    Cross Exam by Mr. Funderburk    242
    Redirect Exam by Mr. Glanzer    249
    Recross Exam by Mr. Funderburk   251
    Further Redirect by Mr. Glanzer   253

JERRY BUSH:

    Direct Exam by Mr. Funderburk   256
    Voir Dire Exam by Mr. Glanzer   260
    Direct resumed by Mr. Funderburk  262
    Cross Exam by Mr. Glanzer      271
    Redirect Exam by Mr. Funderburk  277
    Recross Exam by Mr. Glanzer    279

ERICKA KIRBY:
    Direct Exam by Mr. Funderburk   280
    Cross Exam by Mr. Glanzer      287

CAROL KIRBY:
    Direct Exam by Mr. Funderburk   288
    Cross Exam by Mr. Glanzer      289
    Redirect Exam by Mr. Funderburk  290

JOSEPH KIRBY:
    Direct Exam by Mr. Funderburk   291
    Cross Exam by Mr. Glanzer      295

ROY J. FERRELL:
    Direct Exam by Mr. Funderburk   296
    Cross Exam by Mr. Glanzer      299

JACKIE LEWIS:
    Direct Exam by Mr. Funderburk   302
    Cross Exam by Mr. Glanzer      305

JUDY ALLEN:
    Direct Exam by Mr. Funderburk   309
    Cross Exam by Mr. Glanzer      312
    Redirect Exam by Mr. Funderburk  314

ELLEN HOWELL:
    Direct Exam by Mr. Funderburk   315
    Cross Exam by Mr. Glanzer      318
    Redirect Exam by Mr. Funderburk  321
    Recross Exam by Mr. Funderburk  322

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

4

## I N D E X (CONTINUED)

PAGE

DEFENDANT'S WITNESSES CONTINUED:

    BILLY BECKWITH:
        Direct Exam by Mr. Funderburk      323
        Cross Exam by Mr. Glanzer          325

    MATTHEW HOWELL:
        Direct Exam by Mr. Funderburk      328
        Cross Exam by Mr. Glanzer          331

CLOSING ARGUMENTS      337

COURT'S CHARGE      365

SENTENCE HEARING (4-11-02)      375, 379

REPORTER'S CERTIFICATES      188, 383

5

## E X H I B I T S

STATE'S EXHIBITS AT TRIAL:

| NUMBER | MARKED | RECEIVED |
|--------|--------|----------|
| 1 | 58 | 58 |
| 2 | 231 | 232 |
| 3 | 58 | 238 |
| 4 | 58 | 109 |
| 5 | 172 | 173 |
| 6 | 172 | 173 |

DEFENDANT'S EXHIBITS AT TRIAL:

| NUMBER | MARKED | RECEIVED |
|--------|--------|----------|
| 1 | 206 | 206 |

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

STATE OF ALABAMA
IN THE CIRCUIT COURT FOR THE COUNTY OF LEE
THIRTY-SEVENTH JUDICIAL CIRCUIT
CIVIL

STATE OF ALABAMA,

       PLAINTIFF,

   VS.                  CASE NOS.  CC-01-1001
                                     CC-01-1002
WILLIAM LEE KIRBY,            CC-01-1003
                                     CC-01-2004

       DEFENDANT

**REPORTER'S OFFICIAL TRANSCRIPT OF THE**
**TRIAL IN CHIEF BEFORE THE COURT AND JURY**

Before:

       HON. ROBERT M. HARPER, Circuit Judge, in the Courtroom Number Four of the Lee County Justice Center located at Opelika, Alabama, on the 3rd of December, 2001, and being concluded on the 4th day of December, 2001.

**A P P E A R A N C E S**

   HON. **VANCE NICHOLAS ABBETT**, District Attorney for the 37th Judicial Circuit of Alabama, and HON. **DAVID GLANZER**, Assistant District Attorney for the 37th Judicial Circuit of Alabama, appearing for the State of Alabama.

   HON. **KENNETH FUNDERBURK**, Attorney at Law, appearing for the Defendant.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

7

1              <u>P R O C E E D I N G S</u>

2              (WHEREUPON, the following proceedings were

3              had and done out of the jury venire's

4              presence and hearing, to-wit:)

5         THE COURT:  State versus Kirby.  Which case does

6    the State intend to proceed on?

7         MR. GLANZER:  The State has already consolidated

8    all four.  There's two child victims, two charges each

9    case and they're out of Virginia, so we wanted to take

10   care of all of that at once.  And I believe the Court

11   has already consolidated them?

12        MR. FUNDERBURK:  Yes, sir.

13        THE COURT:  All right.  Do you have proposed voir

14   dire questions you want to ask?

15        MR. GLANZER:  Yes, sir.

16        MR. FUNDERBURK:  Yes, sir.

17        THE COURT:  Let me see what you've got.

18             All right.  The State's requested voir dire,

19   I would strike 4, 10 and 12.  If you want to be heard

20   on that I'll listen to you.

21             Do you have some, Mr. Funderburk?

22        MR. FUNDERBURK:  You struck 4, 10 and 12?

23        THE COURT:  Right.

24        MR. GLANZER:  4, 10 and 12?

25        THE COURT:  Right.

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

8

1        MR. FUNDERBURK: Your Honor, the only different

2    one I have written out here is whether, this is a case

3    where there may be a difference in the physical

4    testimony and the testimony -- the physical evidence

5    and the testimony of the child. I need to know if

6    anyone would be, would tend to believe a child's

7    testimony even if it doesn't agree with the physical

8    testimony.

9        THE COURT: Well, that's an argumentative

10   question. I don't think I'd let you ask that, not in

11   that form anyway.

12       MR. FUNDERBURK: Okay.

13       THE COURT: Do you have any other questions you

14   want to ask?

15       MR. FUNDERBURK: No, sir, not different than what

16   I've seen on his list.

17       THE COURT: Okay. So that's all you -- so you

18   don't have anything to ask then?

19       MR. FUNDERBURK: No, sir.

20       THE COURT: Okay.

21       MR. FUNDERBURK: Do you read the questions or do

22   you, do we --

23       THE COURT: You ask them yourself, but you don't

24   have any to ask.

25       MR. FUNDERBURK: Well, that was the main one.

9

1    THE COURT: Now the main one, this is the time if

2    you've got any voir dire questions, now is the time

3    that you run them by me. I'm not going to let you ask

4    anything that I haven't pre-cleared.

5    MR. FUNDERBURK: Okay. Well, let me run down the

6    list, I think it's covered here, but I'll run down

7    them anyway.

8    I want to ask the jury if they've ever had

9    a child tell them a fib or make believe things to

10    them. Essentially if they've ever had a child tell

11    them a fib.

12    THE COURT: Well, that's not going to elicit

13    anything. Everybody knows that a kid is going to tell

14    you a fib every once in a while. I'll deny that one.

15    MR. FUNDERBURK: Okay. I was going to ask them

16    if any of them believe that it's possible to have

17    vaginal penetration and rectal penetration without

18    leaving some physical evidence.

19    THE COURT: That kind of question, all that does

20    is generate questions to try to explain, try to find

21    out what you're talking about. I don't think you need

22    to ask that question. I think that's a matter of

23    evidence that -- so I'm not going to let you ask that

24    question.

25    MR. FUNDERBURK: I think the final one, and Your

10

1    Honor usually asks this question but in case you don't

2    I was going to ask if any of the venire believe that

3    they could not be fair in a child abuse case for any

4    reason, even though they would not want to express --

5         THE COURT:  You can ask that.

6         MR. FUNDERBURK:  -- to the Court.

7         THE COURT:  You can ask that.

8         MR. FUNDERBURK:  All right.  That would be my

9    only question then.

10         THE COURT:  Okay.  Anything else by either side

11    then?

12         MR. FUNDERBURK:  I have one dealing with, what my

13    client wants to do this morning, whether he wants to

14    be pro se or --

15         THE COURT:  Well, that's up to you and the

16    client, so you need to talk to him.

17         MR. FUNDERBURK:  Give me two seconds and let me

18    see if he can tell me.  I've been waiting for a while.

19         THE COURT:  All right.  These four cases involve

20    two different victims?

21         MR. GLANZER:  Two victims.  Sodomy is one and

22    rape is one.  And one is about two years older than

23    the other.

24         THE COURT:  All right.

25         MR. GLANZER:  As far as their ages.

11

1      THE COURT:  Okay.

2      MR. GLANZER:  We did file a motion for the child

3  hearsay exception and we didn't do those hearings

4  before --

5      THE COURT:  How old are the alleged victims?

6      MR. GLANZER:  Now they're probably say in the

7  area of maybe 8 and 10, but they were probably 5 and

8  7 at the time.

9      MR. FUNDERBURK:  6 and 8, something like that,

10  Judge, during the time.  The statements were given,

11  what, 8 and 10, ages 8 and 10?

12      MR. GLANZER:  Uh-huh (affirmative response.)

13      THE COURT:  Okay.  Anything else?  Let me know,

14  otherwise, they'll be qualifying the jury in the other

15  courtroom.  And we'll come back in here and get

16  started.

17      MR. FUNDERBURK:  All right.  Could I take two

18  minutes and see?  I've been informed that I was not

19  the attorney, but --

20      THE COURT:  Well, you go talk to them.  If

21  there's any problem that comes up you let me know and

22  I'll come back out here and deal with it.

23      MR. FUNDERBURK:  All right.  Thank you.

24          (WHEREUPON, proceedings were in a brief

25          recess, after which the following occurred,

12

1    to-wit:)_

2    MR. FUNDERBURK: Your Honor, it's my

3    understanding that they want another lawyer and not

4    me, but I guess I'll let him explain what else he

5    wants.

6    THE COURT: You're Mr. Kirby?

7    THE DEFENDANT: Yes, sir. We were seeking to get

8    another lawyer, because what he was wanting me to do

9    was to plead to something I did not do. And I have

10   not done this and I don't think it would be right for

11   me to plead to something, you know, that I'm innocent

12   on. We had talked to another lawyer and we was going

13   to fire him Monday or Tuesday. We just felt like

14   we're being misrepresented because we had evidence

15   we've brought to him. It's been lost. Had to get it

16   back up and bring back. I've been up here at hearings

17   before you at nine o'clock in the morning and you

18   asked me where my lawyer was and I couldn't tell you

19   and I had to stay the whole day until one and have

20   someone else sent up here from their firm. None of

21   the eyewitnesses, character witnesses have been

22   contacted at all, none. Nobody is ready for this

23   case. And I've just found this out.

24   THE COURT: Mr. Kirby, this case has been pending

25   a while. You hired a lawyer, I guess it was your

13

1    father that came up here Friday and told me that you

2    had a problem with your lawyer.  Now you do not get a

3    case continued because you fire a lawyer on the

4    morning of trial.  It doesn't work that way.

5         THE DEFENDANT:  Well, would you --

6         THE COURT:  Listen to me.  If you wanted another

7    lawyer you should have decided to do this weeks ago

8    and hired him and had him ready to try the case today.

9    Now we have witnesses that have been brought in from

10   out of state, is that not true?

11        MR. GLANZER:  Yes, sir.

12        THE COURT:  This case is going to be tried today,

13   with or without a lawyer.  So you'll either have Mr.

14   Funderburk or some other lawyer that comes in here

15   this morning or you'll try it by yourself.  But the

16   case will not be continued because you want to fire a

17   lawyer.  It just does not work that way.  If I let any

18   criminal defendant come up here on the morning of

19   trial and fire his lawyer and I continued the case, I

20   wouldn't get any cases tried, because that would be a

21   real easy way to get cases put off.  It simply doesn't

22   work that way.

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  So you need to go talk to Mr.

25   Funderburk and see if you want him to represent you or

14

1  you want to represent yourself.  It will be either one

2  way or the other.

3           THE DEFENDANT:  Yes, sir.

4           THE COURT:  All right?

5           THE DEFENDANT:  Yes, sir.

6                (WHEREUPON, proceedings were in a brief

7                recess, after which the following occurred,

8                to-wit:)

9           MR. GLANZER:  The child hearsay hearings, we've

10  got Brenda Moss up here that has statements from both

11  of them.

12           THE COURT:  Well, we'll do that after we get the

13  jury empaneled.  We'll wait and do that at that point.

14                (WHEREUPON, proceedings were in a brief

15                recess, after which the following

16                proceedings were had and done in the jury

17                venire's presence and hearing, to-wit:)

18           THE COURT:  Good morning, ladies and gentlemen.

19  I'm Judge Harper, I'll add my welcome to that of Judge

20  Walker.  We're happy to have you here this morning.

21                We'll be trying criminal cases this week.

22                All right.  The Court is calling for trial

23  the case of State versus William Lee Kirby, cases

24  number 1003, 04, 1001 and 02.  Now, ladies and

25  gentlemen, these are four separate charges against the

15

1    Defendant, William Lee Kirby that have been

2    consolidated for trial.  And I'm going to read these

3    indictments to you first and then I'll ask you some

4    questions.  So please give me your attention while I

5    do that.

6              The first indictment says this:  The Grand

7    Jury of Lee County charge that before the finding of

8    this indictment William Lee Kirby whose true Christian

9    name is otherwise unknown to the Grand Jury, did

10   engage in deviant sexual intercourse with Lillian J.

11   McLees, who was less than twelve years of age.  He,

12   the said William Lee Kirby being sixteen years of age

13   or older, in violation of Section 13A-6-63 of the Code

14   of Alabama, against the peace and dignity of the State

15   of Alabama.  This indictment charges the offense of

16   sodomy in the first degree.

17             The second indictment reads as follows:  The

18   Grand Jury of Lee County charge that before the

19   finding of this indictment William Lee Kirby whose

20   true Christian name is otherwise unknown to the Grand

21   Jury, did engage in deviant sexual intercourse with

22   Autumn Rose McLees, who was less than twelve years of

23   age, he the said William Lee Kirby being sixteen years

24   of age or older, in violation of Section 13A-6-63 of

25   the Code of Alabama, against the peace and dignity of

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

16

1     the State of Alabama.  This indictment also charges

2     the offense of sodomy in the first degree.

3            The third indictment reads as follows:  The

4     Grand Jury of Lee County charge that before the

5     finding of this indictment William Lee Kirby whose

6     true Christian name is otherwise unknown to the Grand

7     Jury, a male, did engage in sexual intercourse with

8     Autumn Rose McLees, a female, who was less than twelve

9     years of age, he the said William Lee Kirby, being

10    sixteen years or older, in violation of Section 13A-6-

11    61 of the Code of Alabama, against the peace and

12    dignity of the State of Alabama.  This indictment

13    charges the offense of rape in the first degree.

14           The final indictment reads as follows:  The

15    Grand Jury of Lee County charge that before the

16    finding of this indictment William Lee Kirby whose

17    true Christian name is otherwise unknown to the Grand

18    Jury, a male, did engage in sexual intercourse with

19    Lillian J. McLees, a female, who was less than twelve

20    years of age, he the said William Lee Kirby being

21    sixteen years or older, in violation of Section 13A-6-

22    61 of the Code of Alabama, against the peace and

23    dignity of the State of Alabama.  And this indictment

24    charges the offense of rape in the first degree.

25           The Defendant has entered pleas of not

17

1    guilty to each of these charges and that brings the

2    case here for you, the jury, to try.

3        Now, I'm going to ask you some qualifying

4    questions, ladies and gentlemen.  The oath that Judge

5    Walker gave you this morning will apply to your

6    answers to these questions.  If any of the questions

7    apply to you it's very important that you let us know.

8    If any of the questions that I ask or any of the

9    attorneys ask call for information that's personal or

10   you don't want to answer out loud for any reason, I'll

11   give you a chance to come up here and reply quietly at

12   the bench.  We don't want to embarrass anyone.  But

13   otherwise, if the question applies to you just let me

14   know by raising your hand.

15            Have any of you been indicted within the

16   last twelve months for the offenses of sodomy in the

17   first degree or rape in the first degree?

18            (No responses.)

19        THE COURT:  Were any of you a member of the Grand

20   Jury which indicted this Defendant, and that's the

21   Grand Jury that met on, in October of this year?

22            (No responses.)

23        THE COURT:  Do any of you have any interest in

24   either the conviction or the acquittal of this

25   Defendant?

18

1          (No responses.)

2          THE COURT:  Do you know anything about this case

3     that would effect your ability to serve as a juror in

4     any way?

5          (No responses.)

6          THE COURT:  Has anyone talked to you about this

7     case?

8          (No responses.)

9          THE COURT:  Do any of you have a fixed opinion as

10    to the guilt or the innocence of this Defendant?

11         (No responses.)

12         THE COURT:  Are any of you a surety on the

13    Defendant's bond?

14         (No responses.)

15         THE COURT:  Do any of you have a fixed opinion

16    against penitentiary punishment?

17         (No responses.)

18         THE COURT:  Do any of you think that a conviction

19    should not be had on circumstantial evidence?

20         (No responses.)

21         THE COURT:  Are any of you related by blood or

22    marriage to the Defendant or do you know him, William

23    Lee Kirby?

24         Mr. Kirby, would you stand and face the

25    jury, please?

19

1          (Defendant complying.)

2          (No responses.)

3          THE COURT:  All right.  You may be seated.

4          Are any of you related by blood or marriage

5     or do you know either of the alleged victims, the

6     first is Lillian J. McLees, that's M-C-L-E-E-S?

7          (No responses.)

8          THE COURT:  And the other is Autumn Rose McLees?

9          (No responses.)

10          THE COURT:  Did Judge Walker qualify on the

11     D.A.'s?

12          MR. GLANZER:  Yes, sir.

13          THE COURT:  All right.  Are any of you related to

14     or do you know or are you clients of the attorney for

15     the Defendant, Kenneth Funderburk from Phenix City?

16          (No responses.)

17          MR. ABBETT:  He asked if anybody knew my staff.

18     I don't know if he asked if anybody was related.  I

19     don't think anybody --

20          THE COURT:  Are any of you related to the

21     District Attorney, Nick Abbett, or to any member of

22     his staff, David Glanzer, or any of the others that he

23     mentioned this morning?

24          (No responses.)

25          THE COURT:  Do any of you have any reason at all

20

1    that you think you could not serve as an impartial

2    juror in the trial of these cases?

3             (One response.)

4         THE COURT:  Yes, sir?  Mr. Pink, come up just a

5    minute.

6             (WHEREUPON, the following proceedings were

7             had and done at the bench, in the presence

8             of the jury venire but out of its hearing,

9             to-wit:)

10        THE COURT:  Michael Pink?

11        VENIRE MEMBER PINK:  Yes, sir.  I work for the

12   OPD and I'm familiar with a lot of this through the

13   police department.

14        THE COURT:  Okay.  I'm going to excuse you from

15   this case.  You need to call in on the code-a-phone

16   after five.

17        VENIRE MEMBER PINK:  All right.

18        THE COURT:  We'll take Mr. Pink, 49, off.

19             (WHEREUPON, the following proceedings

20             were had and done in the jury venire's

21             presence and hearing, to-wit:)

22        THE COURT:  Anyone else?

23             (No responses.)

24        THE COURT:  All right.  Now, the lawyers have the

25   right to ask you some additional questions to secure

1  information that will assist them in selecting this

2  jury, ladies and gentlemen. What I've said with

3  reference to my questions applies to theirs, so please

4  give them your attention. Mr. Glanzer?

5  MR. GLANZER: As mentioned earlier, my name is

6  David Glanzer, I work for Nick Abbett. We're

7  prosecuting this case. I'm going to ask, all these

8  questions are kind of related, but it's going to have

9  to do with child victims and sex acts, but keep in

10  mind the victims at the time of this act were around

11  five to six for one and about seven to eight years old

12  for the other. So when I ask these just put it in

13  that terms.

14  Does anyone feel that the presumption of

15  innocence or burden of proof should be higher or lower

16  because this is a case involving child rape and/or

17  sodomy? Do you think the criminal justice system

18  should treat the case any differently?

19  (No responses.)

20  MR. GLANZER: Does anyone have experience through

21  courses or work with sexual abnormalities?

22  (No responses.)

23  MR. GLANZER: Will anyone here have any

24  difficulty in sitting and listening to testimony from

25  a young child concerning matters of a graphic sexual

22

1    nature?

2              (No responses.)

3        MR. GLANZER:  Everybody can sit and listen to it

4    and be objective?

5              (No responses.)

6        MR.  GLANZER:   Does  anyone  here  have  any

7    difficulty with my asking questions concerning graphic

8    sexual acts to the witnesses?

9              (No responses.)

10        MR. GLANZER:  Is there anyone who feels because

11    there may be testimony of a graphic and sexual nature

12    that you might be inclined to turn off and not listen

13    to the questions or answers concerning such testimony?

14    Again, stay open and listen?

15              (No responses.)

16        MR. GLANZER:  Has anyone here been the victim of

17    sexual abuse or have a close friend or family member

18    who has, and if you want to just tell the Judge, that

19    will be fine.

20        THE COURT:  Yeah, you can wait and tell me that

21    up  here  at  the  bench  if  any  of  you  want  to.

22    Otherwise,  you  can  answer  it.    You've  got  a  hand

23    there.

24        MR. GLANZER:  Okay.  What's your name?  Oh, do

25    you want to go up to the Judge?  Okay.

23

THE COURT:  Okay.

MR. GLANZER:  Just hold it and then when we get through we'll do that.  And then, on any of these questions if somebody wants to just tell the Judge, feel free and at the end just go up there.

Has anyone ever reported a case of possible sexual abuse?

(No responses.)

MR. GLANZER:  Do you or a close friend or family member have a background or training in nursing, medicine, child care or emergency medicine?

(Several hands raised.)

MR. GLANZER:  Some names?  Okay.

VENIRE MEMBER COX:  Sonya Cox.  My aunt is an RN.

VENIRE MEMBER BULLEY:  Cheryl Bulley, and I'm an RN.

VENIRE MEMBER HENDEN:  Jeanine Henden, my daughter-in-law is an RN.

VENIRE MEMBER SHAVERS:  Rhonda Shavers, and I'm an RN.

VENIRE MEMBER CHANCE:  Linda Chance, and my mother is a retired LPN.

VENIRE MEMBER JERNIGAN:  Deborah Jernigan, I'm an RN.

VENIRE MEMBER SMITH:  Jodie Cook, and I have

24

1    several relatives that are RN's and LPN's.

2           A VENIRE MEMBER:  I have a son that's an RN.

3           MR. GLANZER:  And what was your name?

4           A VENIRE MEMBER:  Jay Taylor.

5           MR. GLANZER:  And somebody else down there?

6           VENIRE MEMBER BUGHAM:  Trent Bugham, I've got two

7    first cousins and a mother-in-law that is an RN and in

8    the pharmacy in the hospital.

9           A VENIRE MEMBER:  My wife is a nurse.

10          MR. GLANZER:  And what is your name?

11          A  VENIRE  MEMBER:    Rick  Phillips,  Richard

12   Phillips.

13          MR. GLANZER:  Okay.  Anybody over here?

14               (No further responses.)

15          MR. GLANZER:  Would anyone automatically believe

16   an adult over a child who testifies?

17               (No responses.)

18          MR.  GLANZER:   Is  there  anyone  here  who  is  a

19   member in any group or organization that advocates on

20   behalf of the crime victims?

21               (No responses.)

22          MR.  GLANZER:   Is  there  anyone  here  who  is  a

23   member of any group or organization that advocates on

24   behalf of domestic violence or sexual abuse victims or

25   is  a  member  of  the  Rape  Crisis  organization  or  a

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

25

1    victim counseling program?

2            (No responses.)

3       MR. GLANZER:  Is there anyone here who is a

4    member of any group or organization that advocates on

5    behalf of those accused of crimes and that in our

6    correctional system, such as prisoner rights groups or

7    legal services or prison ministries or ACLU and stuff

8    like that?

9       A VENIRE MEMBER:  My sister is a clinical

10   psychologist that deals with abused children.  I don't

11   know if that's relevant.

12      MR. GLANZER:  Anybody else?

13      A VENIRE MEMBER:  I'm a pastor and I do have

14   visits, you know --

15      MR. GLANZER:  What was your name again?

16      VENIRE MEMBER WILLIAMSON:  Russell Williamson.

17      MR. GLANZER:  Prison ministry and that type

18   thing?

19      VENIRE   MEMBER   WILLIAMSON:       (Nodding

20   affirmatively.)

21      MR. GLANZER:  Is there anyone who is a member of

22   a group or organization that has as its goals, a

23   purpose, or as part of its agenda changing the laws of

24   our criminal justice system or the laws in the area of

25   sexual assault, the law of age of consent or the

FORM CSR - LASER   REPORTERS PAPER & Mrg. CO.   800-626-6313

26

1    operation of our correctional systems?

2         (No responses.)

3    MR. GLANZER:  Let me approach.  I've got one

4    question I need to --

5         (WHEREUPON, the following proceedings were

6         had at the bench, in the presence of the

7         jury venire but out of its hearing, to-

8         wit:)

9    MR. GLANZER:  To know who's a parent and who's

10   not, as far as having children.

11   THE COURT:  You mean young children or older?

12   MR. GLANZER:  Just had children sometime in their

13   life.  As far as young children, is what I'm really

14   looking for.

15   THE COURT:  All right.

16        (WHEREUPON, the following proceedings were

17        had and done in the jury venire's presence

18        and hearing, to-wit:)

19   MR. GLANZER:  And this might be easier to ask

20   from the reverse direction.  How many have never had

21   small children?

22        What's your name?

23   A VENIRE MEMBER:  Katherine Temple.

24   MR. GLANZER:  Temple?

25   A VENIRE MEMBER:  Glenn Howard.

27

1    A VENIRE MEMBER:  Pat Dowdell.

2    MR. GLANZER:  Anybody else?

3        (No further responses.)

4    MR. GLANZER:  All righty.  Nothing further.

5    THE COURT:  Mr. Funderburk?

6    MR.  FUNDERBURK:    Good  morning,  ladies  and

7    gentlemen.  My name is Kenneth Funderburk and I just

8    have  one  additional  question  other  than  those  you've

9    already  heard.   And  it's  part  of  what  you've  already

10   heard.

11       I  need  to  know  if  any  of  you  believe  that

12   you  could  not  serve  in  a  case  like  this  where  there's

13   a  child  abuse  charge,  for  any  reason,  for  either

14   reasons  you've  already  given  or  any  reason  you'd  like

15   to  tell  the  Judge  outside  the  presence  of  the  public.

16   So  if  you  have  any  reasons  whether  it's  stated  or  not

17   at  this  point  why  you  could  not  serve  or  feel  like  you

18   could  not  serve  on  a  child  abuse  case,  if  you  would

19   just  raise  your  hand  and  we'll  deal  with  it  that  way.

20       I  have  one,  two.

21       Your  Honor,  could  they  speak  to  you?

22   THE  COURT:    Yeah.    All  right.    Ladies  and

23   gentlemen,  if  you  have  any  responses  to  any  of  these

24   questions,  if  you'll  move  to  the  sides  I'll  bring  you

25   up  one  at  a  time.

28

1              (WHEREUPON, the following proceedings were

2              had at the bench, inside the presence of

3              the jury venire, but out of its hearing,

4              to-wit:)

5         THE COURT:  Yes, sir, tell me your name?

6         A VENIRE MEMBER:  Kenneth Howard.

7         THE COURT:  Howard?  Yes, sir.  What did you want

8    to tell me?

9         VENIRE MEMBER HOWARD:  I was sexual abused when

10   I was a little kid, sir.

11        THE COURT:  Okay.  Do you think that would make

12   it difficult for you to serve as a juror in this case?

13        VENIRE MEMBER HOWARD:  Yes, sir.

14        THE COURT:  All right.  I'm going to excuse you,

15   Mr. Howard.  I appreciate you coming.  If you'll call

16   in on the code-a-phone it will tell you when we need

17   you back.

18        VENIRE MEMBER HOWARD:  Okay.  Thank you, sir.

19        THE COURT:  Good morning.  Tell me your name?

20        A VENIRE MEMBER:  Jodie Cook.

21        THE COURT:  Ms. Cook?  What did you want to tell

22   me?

23        VENIRE MEMBER COOK:  I have a first cousin that

24   was accused and served time for raping his daughter.

25        THE COURT:  Your ex-husband?

29

1     VENIRE MEMBER COOK:  First cousin.

2     THE COURT:  First cousin.  Okay.  Do you think

3     that would effect your ability to serve as a juror in

4     any way?

5     VENIRE MEMBER COOK:  I'm afraid it might.

6     THE COURT:  Okay.  Ms. Cook, I'm going to excuse

7     you and ask you to call in on the code-a-phone and it

8     will tell you when we need you back.

9     VENIRE MEMBER COOK:  Okay.

10    THE COURT:  We'll excuse Ms. Cook, number eleven.

11    VENIRE MEMBER COOK:  Thank you.

12    THE COURT:  Good morning.  Tell me your name?

13    A VENIRE MEMBER:  Frank Piper.

14    THE COURT:  All right.  Mr. Piper, what did you

15    want to tell me?

16    VENIRE MEMBER PIPER:  I have got four grand kids,

17    Judge, I don't know if I can sit there and listen to

18    him or not.  Two of them are little girls and my

19    sister lives with abused kids on a daily basis, some

20    of them raped, some of them just physical abuse.  And

21    I talk to her on a regular basis.

22    THE COURT:  Do you think that would make it

23    difficult for you to be objective in this case and

24    decide it?

25    VENIRE MEMBER PIPER:  It would be very difficult.

30

1   It's one of the worst crimes you can do as far as I'm

2   concerned.

3       THE COURT:  Okay.  I'm going to excuse you from

4   this case and ask you to call in on the code-a-phone

5   after five today and it will tell you when we need you

6   back.  All right?

7       VENIRE MEMBER PIPER:  All right.

8       THE COURT:  Mr. Piper is excused.

9           (WHEREUPON, the following proceedings were

10          had and done in the presence and hearing of

11          the jury venire, to-wit:)

12      THE COURT:  Anyone else have anything they need

13  to tell me about this?

14          (No responses.)

15      THE COURT:  We'll be selecting this jury, ladies

16  and gentlemen.  That usually takes around twenty-five,

17  maybe thirty minutes.  So I'm going to let you go back

18  over to the jury assembly room and we will send for

19  you as soon as the jury is selected.  So you may go at

20  this time.

21          (WHEREUPON, the jury venire retired from

22          the courtroom and the following proceedings

23          were had and done out of its presence and

24          hearing, to-wit:)

25      THE COURT:  All right.  We will, after we select

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

31

1    this jury we will let them go to lunch and I'll have

2    the hearing on the victims' statements.  So any

3    witnesses that you need here  for that purpose you

4    need to go ahead and round up and have them here by

5    about 11:15 or so.  Anything else?

6                    (WHEREUPON, Court and counsel struck a jury

7                    without the presence of the court reporter,

8                    after which the following occurred in the

9                    presence and hearing of the jury venire,

10                   to-wit:)

11   THE COURT:  When your name is called, ladies and

12   gentlemen, please come around and have a seat in the

13   jury box.

14                   (WHEREUPON, the Clerk called the jury to

15                   the jury box.)

16   THE  COURT:   I'll  give  you  the  oath  that's

17   required, ladies and gentlemen.  Please raise your

18   right hands.

19                   (Jury duly sworn.)

20   THE COURT:  I'm going to let you step out with

21   the bailiff for just a minute.  I'll get you right

22   back in very shortly.

23                   (WHEREUPON, the  jury  retired  from  the

24                   courtroom and the remaining jury venire

25                   members  were  dismissed,  after  which  the

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

32

1    following occurred, to-wit:)

2    THE COURT:  All right.  I'm going to bring the

3    jury back and let them go until, let's see, this

4    hearing will take about how long?

5    (WHEREUPON,  the  jury  returned  to  the

6    courtroom and the following occurred in its

7    presence and hearing, to-wit:)

8    THE COURT:  Ladies and gentlemen, I've got some

9    legal matters to take up with the lawyers in this case

10    before we get started, so I'm going to let you go to

11    lunch early and ask you to be back here at 1:15.  We

12    should be able to get through with everything we need

13    to do between now and then and have a short time for

14    lunch for the folks here in the case.

15    Now we have an arrangement that you can park

16    on the sides of the building so you do not have to

17    come back through the metal detector and through the

18    lobby.  Most jurors prefer to do it that way.  And the

19    bailiff will show you what we do.  Now, what you'll do

20    is when you come back after lunch you'll park on the

21    north side of the building.  That's the side closest

22    to the hospital.  And he'll have a side door there

23    that you can come in and out of.  And when you come

24    back come back up here to the second floor to the jury

25    room that's right behind you.  And when you get back

33

1    about 1:15 we should be ready to go at that time.  So

2    Mr. Jones will show you where that is and we'll take

3    you right out that door.  You may go.

4                    (WHEREUPON, the jury retired from the

5                    courtroom and the following proceedings

6                    were had and done out of its presence and

7                    hearing, to-wit:)

8         THE COURT:  All right.    The jury is out of the

9    courtroom.  Now, what's is the State expecting to do

10   under this statute?  Is this going to be a situation

11   under (1) or (2A) of Section 15-25-32?   In other

12   words, is the child going to testify here in court or

13   not?

14        MR. GLANZER:  Yes, sir.  We are going to have

15   both children in here to testify, but we do want to

16   get to their hearsay statements, particular Brenda

17   Moss who was the forensic interviewer that interviewed

18   both of those children.  And then they made, one of

19   the children in particular, made a brief statement to

20   Dr. Anz.

21        THE COURT:  Okay.

22        MR. GLANZER:  So we want to get to both of those.

23        THE COURT:  All right.  Call your first witness.

24        MR. GLANZER:  Brenda Moss.

25             Valerie did indicate that Dr. Anz may be

34

1        able to make it here by 11:35.

2        THE COURT:  All right.

3                        **BRENDA MOSS,**

4    a witness, having first been duly sworn to speak the truth,

5    the whole truth and nothing but the truth, was examined and

6    testified as follows, to-wit:

7

8                     <u>DIRECT EXAMINATION</u>

9    By Mr. Glanzer:

10    Q.    What is your name?

11    A.    Brenda Moss.

12    Q.    And where are you employed?

13    A.    The Child Advocacy Center of East Alabama.

14    Q.    And what kind of duties do you perform for them?

15    A.    I'm the forensic interviewer.

16    Q.    And what kind of education and training do you have to

17    perform those duties?

18    A.    I have a BS degree in family and child development and

19    I  have  26  years  experience  as  a  law  enforcement

20    investigator and I've been working at the center for three

21    years.

22    Q.    And during that three year period approximately how

23    many children have you interviewed?

24    A.    Approximately 250.

25    Q.    And  have  you  previously  testified  in  cases  in  this

35

1    particular county?

2    A.    Yes, I have.

3    Q.    And approximately how many times?

4    A.    During law and enforcement and this probably 50 or 75

5    times.

6    Q.    Okay.  We would offer as an expert for the purposes of

7    her child interviews, interviewing child victims.

8              THE COURT:  All right.

9              MR. FUNDERBURK:  For the record, we would object.

10             THE COURT:  Objection overruled.

11   Q.    Brenda, did you have an opportunity to interview two

12   children back on June 25th of 2001 by the name of Autumn

13   McLees and Lillian McLees?

14   A.    I did.

15   Q.    And at that time was Autumn approximately 8 years old

16   and Lillian 10 years old?

17   A.    That's correct.

18   Q.    And did they report incidents that occurred to them

19   while they lived in Louisiana?

20   A.    Yes, they did.

21   Q.    And how did you get called into this investigation?

22   A.    I received a referral from the department, Lee County

23   Department of Human Resources.

24   Q.    And let me specifically go to the interviews.  Were

25   they both conducted on June 25th, 2001?

36

1    A.    Yes, they were.

2    Q.    And were they conducted separately, each child was

3    interviewed separately?

4    A.    Yes, they were.

5    Q.    And was anybody else present in the room while you

6    interviewed the child, each child?

7    A.    No.    Just myself and the child.

8    Q.    Okay.    And in each of these cases did each of them

9    appear to have personal knowledge of the event?

10   A.    Yes, they did.

11   Q.    In other words, they were the victims, correct?

12   A.    That's correct.

13   Q.    And at the time I think we indicated that one was 8

14   and one was 10.    Did their maturity levels seem consistent

15   with their age?

16   A.    Yes, it did.

17   Q.    And did they, they weren't reporting things that were

18   hearsay, they were, it was based on their own knowledge of

19   things that had occurred; correct?

20   A.    That's correct.

21   Q.    And were you able to determine any apparent motive why

22   the child would report these things, such as any bias or

23   corruption or coercion, like family members or anyone else

24   or law enforcement or DHR that would have caused them to

25   report something that was false?

37

1    A.   No, I did not.

2    Q.   Did anyone else hear them make the statement, I know

3    you've indicated that you interviewed them alone, but were

4    there other people present who heard them make this report

5    to you?

6    A.   Yes, Detective Shane Healy from the Opelika Police

7    Department.

8            THE COURT:   Who?

9            THE WITNESS:   Shane Healy.  And Yarbi Cound from

10       the Lee County Department of Human Resources were

11       present in the observation room.

12           THE COURT:   Tell me that name again?

13           THE WITNESS:   Yarbi, Y-A-R-B-I, Cound, C-O-U-N-D.

14   Q.   Were any of these people -- well, let me ask you

15   before that, were any of the parents or family members

16   present also?

17   A.   No.

18   Q.   You mentioned Shane and Yarbi Cound, did they have any

19   effect on the interview, such as being able to enter the

20   room and ask any questions or pass anything on or talk to

21   you while you were doing this?

22   A.   They did not during the interview.

23   Q.   Did you determine whether the child was suffering from

24   any obvious illnesses or mental disorders or anything that

25   would have prevented them from being able to talk to you

38

1    and present their story to you?

2    A.    There did not appear to be any of those conditions.

3    Q.    They appeared to be coherent?

4    A.    Yes.

5    Q.    And were they able to describe abuse over an extended

6    period as opposed to a single incident?

7    A.    It was over an extended period of time.

8    Q.    In their statements did they appear to be responsive

9    to the questions you were asking?

10   A.    Yes, they were.

11   Q.    And appropriate --

12   A.    Age appropriate, very much, yes.

13   Q.    Did you suggest anything in any way through your

14   questioning technique?

15   A.    No, I did not.

16   Q.    And how did you question them?

17   A.    I basically began with open ended questions after I

18   had some rapport building time with the child, with each

19   child.  And began asking if they knew why they were at the

20   center to talk to me.  They each told why they were there.

21   And basically just asking them, you know, tell me what all

22   happened.    Tell me everything you can remember that

23   happened.

24   Q.    And then just follow up on anything that they said?

25   A.    Right.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

39

1    Q.    Was this recorded in any fashion?

2    A.    I was taking notes during the interview.

3    Q.    At sometime later did you convert those notes to a

4    report?

5    A.    Yes, I did.

6    Q.    Okay.  And you have those with you today?

7    A.    I do.

8           MR. GLANZER:  Judge, that's all we have at this

9    point.

10          THE COURT:  Cross.

11                 CROSS EXAMINATION

12    BY MR. FUNDERBURK:

13    Q.   I have a copy of the forensic interview for Autumn and

14    one for Lillian.  Both of those were done on 6-25-01.  The

15    written statement that you've made, do you have a copy of

16    that?

17    A.   Yes, I do.

18    Q.   Now, were any substantive matters, that is related to

19    these charges, the rape or the sodomy, were any statements

20    made concerning the rape and the sodomy that is not

21    included in your written statement?

22    A.   No.

23    Q.   Now before you interviewed the two girls, did you

24    review other statements made on March 21 and the doctor's

25    examination which had been conducted in Virginia?