40

1   A.   No, I did not.

2   Q.   Did you have any access to those records at all?

3   A.   No, I did not.

4   Q.   So in terms of comparing what you heard when you

5   talked to the girls against what they said earlier or what

6   the medical report may have shown, you had no way of

7   comparing what you were told against what they had told

8   other people?

9   A.   I did not.

10   Q.   Have you had a chance, I asked you about the doctor in

11   Virginia, have you had a chance to review the report of Dr.

12   Anz?

13   A.   No, I have not.

14   Q.   All right.  So when you did this report did you have

15   any knowledge as to whether or not there was physical

16   evidence based on a doctor's examination first, as to

17   Lillian, that there was any physical evidence of

18   penetration, either vaginally or rectally?

19   A.   I believe that both the children had been examined but

20   I did not have the results of the exam at that time, at the

21   time of the interview.  The only information I had was that

22   it was a sexual abuse report and who the suspect was.

23   Q.   All right.  So basically you didn't know the details

24   of the charges when you talked to the two girls?

25   A.   No, I did not.

41

Q.   Had you known what the physical evidence was, or let me say, what the doctor's examination revealed regarding the condition of these two girls, would that have made any difference in how you interviewed the girls?

A.   No, it would not.

Q.   And I realize this is redundant, but we have two cases here.

A.   I understand.

Q.   In the case of Autumn, were you familiar with her medical history?

A.   I don't believe at the time of the interview that I was familiar with that.  I had rather go into the interview with very little information.

Q.   This is the last question that I have and I'm sure I've covered this, in going through here, what you've written down is essentially consistent with your notes?

A.   That's correct.

Q.   In other words, you took notes and then you've written them up and you wouldn't have left out things like the number of times they may have been raped or the number of times they've been sexually abused, anally or vaginally?

A.   Usually in a, especially in a case like this when it involved all of that, I try to make sure that I do maybe ask that even twice to make sure that I've that correct, that I understand exactly what they're telling me.

42

1  Q.   Yes, ma'am, thank you.  That's all I have, Your Honor.

2           THE COURT:  Do you have these statements that you

3       intend to offer?

4           MR. GLANZER:  I've got my copies, Judge.

5           THE COURT:  Let me see the ones that you're going

6       to offer into evidence.

7           MR. GLANZER:  We were not intending to offer them

8       into evidence, but --

9           THE COURT:  Okay.  You're going to use them,

10      though, right?

11          MR. GLANZER:  Yes, sir.

12          THE COURT:  Well, let me see them at some point,

13      whether it's now or whenever.  Well, let me see them

14      now so that if I have any questions.

15               (Short pause.)

16          THE COURT:  All right.  Any other questions of

17      this witness?

18          MR. GLANZER:  No, sir.

19          THE COURT:  All right.  You can step down.  Next

20      witness?

21          MR. GLANZER:  I don't believe the doctor is here

22      yet.

23          THE COURT:  All right.  Do you have any other

24      witnesses?

25          MR. GLANZER:  Not other than Brenda's testimony.

43

1    THE COURT:  All right.  We'll take a little

2    recess for about ten minutes.  Let me know as soon as

3    she gets here.

4    (WHEREUPON, proceedings were in a brief

5    recess, after which the following occurred,

6    to-wit:)

7    THE COURT:  Raise your right hand.

8    DR. LINDA ANZ,

9    a witness, having first been duly sworn to speak the truth,

10    the whole truth, and nothing but the truth, was examined

11    and testified as follows, to-wit:

12    **DIRECT EXAMINATION**

13    BY MR. GLANZER:

14    Q.    Okay.  What is your name?

15    A.    Linda Anz.

16    Q.    And where are you employed?

17    A.    The Pediatric Clinic.

18    Q.    And what kind of duties do you perform for the

19    Pediatric Clinic?

20    A.    I'm a partner and a pediatrician there.

21    Q.    And what kind of education and training have you had

22    to perform duties as a pediatrician?

23    A.    I have had four years of college, four years of

24    medical school, three years of pediatric training and an

25    extra year of pediatric endocrinology.

44

1   Q.   And how long have you been a pediatrician?

2   A.   Over twenty-three years.

3   Q.   And during that time have you ever come in contact

4   with children that appeared to have sexual abuse type

5   injuries?

6   A.   I have.

7   Q.   And would you have any rough estimate of how many

8   times?

9   A.   Too many.

10  Q.   Have you ever had the opportunity to testify in a

11  court of law as an expert in pediatrics concerning sexual

12  injury?

13  A.   Yes, I have.

14  Q.   And about how many times?

15  A.   One.

16  Q.   Okay.

17       MR. GLANZER:   Judge, based on her education,

18       training and extensive experience we'd offer her as an

19       expert in pediatrics with some, with knowledge of

20       obviously sexual abuse injuries.

21       THE COURT:   All right, sir.

22  Q.   Let me call your attention back on June 25th, 2001,

23  and ask you if you came into contact with Autumn McLees and

24  her sister Lillian?

25  A.   Yes, I did.

45

1    Q.    And did you conduct a physical exam of either one or

2          both?

3    A.    I did.

4    Q.    And who did you conduct an exam on?

5    A.    On Autumn.

6    Q.    Okay.  And at the time you conducted that exam did

7    Autumn volunteer some information to you concerning her

8    injuries?

9    A.    She did.

10   Q.    That you -- okay.  And did it appear that she had

11   personal knowledge of what she was telling you about?

12   A.    Oh, definitely.

13   Q.    And did she appear to be, for her age, I believe she

14   would have been about eight years old, did she seem to have

15   the appropriate maturity for a child of eight?

16   A.    Yes, she did.

17   Q.    And as far as the statement made, was the statement

18   made directly to you?

19   A.    Yes, it was.

20   Q.    So you're sure that she made that statement?

21   A.    Oh, yes.

22   Q.    And did you record it at some point?

23   A.    Yes, I did, in my clinic notes.

24   Q.    And --

25              THE COURT:  Will you speak just a little louder

46

1    for me, please?

2         THE WITNESS:  Sure.  I'm sorry.

3    Q.    Did you make it a part of your report?

4    A.    Yes, I did.

5    Q.    And let me show you for the purposes of this hearing

6    what's, it's a letter which bears your signature and ask if

7    you can identify that?

8    A.    Yes, I wrote that letter.

9    Q.    And is that the report that contains the information

10   that Autumn volunteered to you?

11   A.    It is.

12   Q.    And did you record that closely after she had said the

13   words?

14   A.    Yes, I did.

15   Q.    And at some time later did you put it in this format?

16   A.    That's correct, yeah.

17   Q.    Okay.  Was anybody else present when she made that

18         statement?

19   A.    Her mother was.

20   Q.    Okay.  And did her mother influence what she said in

21   any way or what Autumn said to you?

22   A.    No.  No, sir.

23   Q.    Did you ask any suggestive questions or was this

24   something that she just volunteered to you?

25   A.    It's something she volunteered to me.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

47

1    Q.    Okay.  Did she indicate that she, at the current time

2    when she made that statement was suffering any pain or any

3    illness that, or distress that in some way would have

4    prevented her from being coherent in your opinion?

5    A.    Not at that time, no.

6    Q.    Did she appear to be coherent?

7    A.    Oh, definitely, yes.

8    Q.    Did the statements appear to be responsive to the

9    questions you asked?

10   A.    Yes.

11   Q.    And consistent?

12   A.    Yes, sir.

13   Q.    Okay.  And again, I guess, did you suggest anything in

14   any way or did anyone present suggest the content of what

15   she eventually told you?

16   A.    No, sir.

17   Q.    I'll just go ahead and show this to the Court for the

18   Court's information what we're talking about is the first

19   paragraph that I've highlighted there.   And we have no

20   further questions.

21              THE COURT:  Cross examination.

22                    CROSS EXAMINATION

23   BY MR. FUNDERBURK:

24   Q.    Dr. Anz, I notice on the last paragraph here that

25   apparently the child has also been examined by a forensic

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

48

1  specialist in Virginia, can you agree with this, with his

2  or her assessment?  At the time you did your examination

3  did you have a copy of the doctor's report from Virginia?

4  A.   No, I did not.

5  Q.   Have you seen that since you did this report?

6  A.   I saw it for the first time today.

7  Q.   All right.  So you've had occasion now to go through

8  the 4/13/01 report from Dr. Starling, I believe it is.

9  A.   Actually, very briefly, sir, I just glanced at it.

10 Q.   I just want to make sure you've seen it because you

11 noted in your report that you needed to see that.

12 A.   Uh-huh.

13 Q.   And I understand that you saw both Lillian and Autumn?

14 A.   That is correct.

15 Q.   All right.  But I've only seen a report on Autumn.  Is

16 there some reason we don't have a report on Lillian?

17 A.   I don't understand that either.  I don't know why.

18 Q.   You had obtained the --

19      MR. GLANZER:  Were you asking for a report that

20   she would have done on Lillian?

21      MR. FUNDERBURK:  Yeah.

22      MR. GLANZER:  Did you understand the question?

23      THE WITNESS:  I did.  I cannot find a office note

24   for Lillian at all, just for Autumn.

25      MR. FUNDERBURK:  Yeah, I don't have one.

49

1      MR. GLANZER:  I don't think one was done, based

2      on --

3      THE WITNESS:  I'm sorry. I've seen so many that

4      sometimes it gets, they all get --

5  Q.   Well, the reason I'm asking, well there are a couple

6  of reasons.  One is, apparently you saw Autumn and Lillian,

7  but you've only conducted a physical examination on Autumn?

8  A.   That apparently is correct, sir.

9  Q.   And what I'm asking is, is there some reason you did

10  not do a physical examination or have any records regarding

11  Lillian?

12  A.   My recollection was, or I was told that her physical

13  exam was normal and for that reason she was not referred to

14  me for an examination.

15  Q.   Okay.  That's what I was going to ask if you had had

16  the occasion then to see her medical examination by Dr.

17  Starling, and I think I have a copy of that.

18  A.   No, sir, I have not seen that.

19  Q.   Would you mind if I showed it to you just --

20  A.   No.

21  Q.   Two pages.  If you would, just look over at the

22  finding and we'll begin from there.

23  A.   Okay.

24  Q.   All right.  That indicates that she had a normal

25  report both vaginally and rectally.  In other words, there

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

50

1   were no evidence of penetration either anally or vaginally?

2   A.    But as you said as the report records, the physical

3   exam was normal but this does not exclude penetration or

4   sexual abuse.

5   Q.    Well, actually what it says is, it does not exclude

6   the possibility of sexual contact, but it doesn't say a

7   thing about penetration, does it?  I realize there's more

8   than one form of sexual abuse.  But what it says is, that

9   the examination did not exclude some form of sexual

10  contact, but it doesn't mention anything about penetration,

11  other than penetration either vaginally or anally.   It's

12  normal.  She had a normal vagina and a normal rectal exam.

13  A.    That is correct.  But again that does not exclude

14  sexual abuse.  It's a well known fact.

15  Q.    And likewise, with Autumn, you didn't find any

16  physical evidence apparently of anal abnormality?

17  A.    No, I did not.

18  Q.    Now the abnormal exam, vaginal exam that you've noted,

19  you've got drawings and that type thing.

20  A.    Uh-huh.

21  Q.    Did you do any measurements with any estimates or was

22  this done visually or how?

23  A.    It was done visually.

24  Q.    Do they have instruments, diagnostic tools that can be

25  used other than physical seeing, looking?  Don't they have

51

1    things you use to measure?

2    A.    Are you referring to a colposcope or are you referring

3    to -- I don't know what you're referring to.

4    Q.    Well, I'm asking you.  Well, I'm just referring to any

5    instrument that's more accurate than a visual.

6    A.    I don't think there is anything more accurate than a

7    visual exam.

8    Q.    All right.  Is there an instrument that's used?    In

9    fact the doctor in Virginia used such an instrument.    Is

10   there an instrument that's used to measure the hymenal

11   exposure or the gap?

12   A.    You mean the colposcope, is that what you're referring

13   to?

14   Q.    Yes.

15   A.    Yes, I do not use a colposcope, we don't have one

16   available in our county.

17   Q.    All right.  And I believe that you may have -- let me

18   withdraw that.

19          What I have in my information given to me by the

20        State, so I'll have to ask you about it, are some

21        records from an emergency room treatment which took

22        place back --

23          MR. GLANZER:  I'm not sure where this is going

24        because actually we're trying to do a trustworthy

25        hearing that's on the hearsay portion of the report,

52

1    and not the medical data.  But if there's some purpose

2    here that --

3         THE COURT:  Overrule the objection if that's an

4    objection.

5         MR. GLANZER:  It's of no particular relevance to

6    this particular hearing.

7         THE COURT:  Well, I don't know whether it is or

8    not.  Overruled at this point.  I'll see.

9    Q.   Doctor, let me just show you what I have and let's see

10   if when you did your examination, pardon my notes, but it

11   looks like that's information from an emergency room

12   treatment back in 1998?

13   A.   No, this is just a, this is from a nurse triage system

14   in Birmingham where the parents call in.

15   Q.   Uh-huh.

16   A.   And give information.  This has nothing to do with the

17   emergency room.

18   Q.   Okay.  But underneath there --

19   A.   It's a triage.

20   Q.   Underneath there it does, emergency room record, this

21   is just part of --

22   A.   That's not the ER record, that is from a nurse triage.

23   Q.   Yes, ma'am, but just keep going.  That's the emergency

24   room record.

25   A.   Well, this is actually not the emergency room record,

53

1     this is my office, my partner's printed notes.

2     Q.    Okay.  This came out of your file?

3     A.    That's correct, sir.

4     Q.    All right.  And so would your partner have treated her

5     back at the emergency room visit back in --

6     A.    It wasn't an emergency room visit.  It was done in our

7     clinic.

8     Q.    Okay.  So she came to the clinic.

9     A.    She did.

10    Q.    For what was reported to be a straddle injury.

11    A.    An injury on the monkey bars, that's correct.

12    Q.    It was described as a straddle injury?

13    A.    Correct.

14    Q.    And so these are your office records, so I'm not

15    confusing myself?

16    A.    Yeah, those are our office records.

17    Q.    All right.  That's not my writing.  It says emergency

18    room records, but what we really have here are your office

19    notes, and I won't go into details, but obviously you had

20    access to that information?

21    A.    Yes.

22    Q.    When you examined Autumn?

23    A.    I had access to it but to be honest I did not look at

24    it until after I was through with the exam and for some

25    time afterwards.

54

1   Q.   But you have looked at it before today so that --

2   A.   I have looked at it --

3   Q.   -- later on I might ask you questions you'd know what

4   it is?

5   A.   Certainly, uh-huh.

6   Q.   And there's information in there, and if you need to

7   look at it now let me just leave it with you in case you

8   need to look at it.

9   A.   Oh, it's all right.

10  Q.   You have it there?

11  A.   Uh-huh.

12  Q.   All right.  I think what we're talking about here are

13  statements made essentially to you and in this case to your

14  office.  So back in 1998 were statements made at that time

15  as reflected by your office notes as to how she was

16  injured?

17  A.   That's correct.

18  Q.   And those statements are different than the statements

19  made on June 25 when you took a history?

20  A.   That's correct.

21  Q.   And when you take a history like that do you go back

22  and see what the inconsistencies are so you can reconcile

23  them with the physical evidence?

24  A.   We do.

25  Q.   Did you do that before you wrote this up on July 5?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

55

1    A.   No.

2    Q.   That's all I have at this time, Your Honor.

3         THE COURT:  Anything else of this witness?

4                    REDIRECT EXAMINATION

5    BY MR. GLANZER:

6    Q.   Pursuant to that, that, I assume when he's talking

7    about that straddle injury that your partner looked at

8    that.  Do you have any knowledge as to whether there was

9    actually a physical exam of internal injuries on Autumn at

10   that time?

11   A.   There was a superficial physical exam at that time.

12   But we usually don't go deep on a child.

13   Q.   And when you talk about straddle injuries, are the

14   type of injuries that you see with Autumn when you

15   conducted your, I guess, exam in June of 2001, would you

16   consider those consistent with a straddle injury?

17   A.   No, sir, I would not.

18   Q.   And what is a straddle injury?

19   A.   A straddle injury is an injury made by either a

20   balance beam or on monkey bars and usually there's just

21   superficial bleeding and trauma and can be some bruising.

22   But usually no penetration.

23   Q.   Would you equate that to some degree with blunt force

24   trauma as opposed to a penetrating wound?

25   A.   I think that's reasonable.

56

1   Q.   Now as far as the exam that was conducted on Autumn

2   back in 1978 you weren't present at the time it was

3   conducted, correct?

4   A.   That's correct.

5   Q.   Okay.  And anytime that a patient comes to the

6   hospital they give you what's referred to as a history?

7   A.   That's correct.

8   Q.   And to a certain extent do doctors rely on what

9   they're told as far as how an injury may have occurred?

10  A.   That is definitely correct.

11  Q.   And in this particular case the description, who did

12  it come from?

13  A.   The --

14  Q.   Back in '78?

15  A.   Who gave the history.  The mother and the grandmother.

16  Q.   Do you know, and you may not know, but do you know

17  whether the mother was present when the injury occurred?

18  A.   I do not know.

19  Q.   It's possible she wasn't, correct?

20  A.   That's correct.

21  Q.   And again, back to, I guess the original questions

22  about the lack of any injury does not exclude sexual abuse,

23  correct?

24  A.   That is definitely correct.

25  Q.   Nothing further.

57

1    THE COURT:  What is it you're going to try to

2    offer to the jury?

3    MR. GLANZER:  As far as injury there is a hymen

4    injury and some notching in Autumn.  And Lillian

5    doesn't show any injury as far as her vaginal exam

6    which we are not going to get into, but they didn't

7    look at her here because there was no reported injury.

8    But Autumn was reported in Virginia as having injury

9    and Dr. Anz looked at her and will be reporting a

10   notch and hymen injury.

11   THE COURT:  Are you going to recall Dr. Anz

12   before the jury?

13   MR. GLANZER:  Yes, sir.

14   THE COURT:  Okay.  All right.  But insofar as the

15   statements that you're attempting to admit under this

16   statute, are you attempting to admit something that's

17   in this document that you showed me?

18   MR. GLANZER:  Right.  The first paragraph

19   highlighted in yellow is what we want Dr. Anz to talk

20   about as far as the hearsay.  But we'll also get into

21   the physical injury.

22   THE COURT:  Well, so the record is clear, let's

23   mark that so -- you're showing me a document which you

24   now will mark as State's exhibit what?

25   MR. GLANZER:  It can be one.

58

1        THE COURT: Beg your pardon?

2        MR. GLANZER: It can be one. We'll do that.

3        THE COURT: All right. State's exhibit number

4    one is the document that appears to be a letter from

5    the Pediatric Clinic. It contains yellow highlighted

6    material that you're going to offer under the

7    provisions of Section 15-25-30; is that correct?

8        MR. GLANZER: Yes, sir.

9           (WHEREUPON, the instrument hereinabove

10           referred to was marked for identification

11           and received into evidence as State's

12           exhibit number one.)

13        THE COURT: All right.

14        MR. GLANZER: And it is possible that we may

15    reconsider on the offering of Lillian and Autumn's

16    statements to Brenda Moss. So we would also like to

17    at least have it open to offer those after Brenda Moss

18    reads them to the jury. Those are the two forensic

19    interviews. So we would make those State's exhibit

20    two and three if so.

21           (WHEREUPON, the instruments hereinabove

22           referred to were marked for identification

23           as State's exhibits numbers three and

24           number four.)

25        THE COURT: Anything else of this witness at this

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

59

1      time?

2             MR. GLANZER:  Not at this time.

3             MR. FUNDERBURK:  No, sir, but I do have -- when

4      she leaves, some other matter.

5             THE COURT:  Well, let's let Dr. Anz go if we're

6      through with her.

7             MR. FUNDERBURK:  Well, I'm through with her.

8             THE COURT:  All right.  You can take that thing

9      off and you're excused.

10            All right.  Any other witnesses now on this

11     issue?

12            MR. GLANZER:  No, sir.

13            THE COURT:  Anything by the Defense?

14            MR. FUNDERBURK:  The only thing the Defense has

15     at this time is we have an examination of Lillian and

16     we have a medical exam that was done in Virginia that

17     --

18            THE COURT:  Now really the only purpose of this

19     hearing right now is to determine whether or not oral

20     statements made by the two alleged victims will be

21     admitted, which otherwise would be hearsay.  Anything

22     else that this hearing doesn't concern itself with?

23            MR. FUNDERBURK:  Well, there are a few statements

24     in there, I mean, that's in the report that --

25            THE COURT:  What report?

60

1    MR. FUNDERBURK: This is the report from the
2    doctor in Virginia.
3    THE COURT: Well, that hasn't been offered by the
4    State, so I would take it that they're not going to
5    try to offer that.
6    MR. GLANZER: They talked to DHR up there and to
7    the medical people and the rest of it, what we did is
8    we brought them down here and we did everything over
9    again. So we don't intend to use the Virginia stuff.
10   THE COURT: As long as I can cross examine on the
11   medical part, Your Honor, I mean while we're talking
12   about, there's medical findings in here. I don't know
13   all of what she may testify in regard to Lillian that
14   I may need to ask questions based on this medical
15   report where the doctor is not here but where this
16   gentleman is being charged with, you know, rape and
17   sodomy.
18   THE COURT: I understand that. I'm just saying
19   the State can't offer that as a hearsay document under
20   this statute.
21   MR. FUNDERBURK: Right.
22   THE COURT: How you may use it is up to you.
23   MR. FUNDERBURK: Yes, sir. I just want to make
24   sure. Thank you, Your Honor.
25   THE COURT: All right. Is your purpose then, Mr.

61

1       Glanzer, to offer State's one, two and three to the
2       jury as hearsay statements of the two girls, is that
3       correct?
4               MR. GLANZER:  Yes, sir.
5               THE COURT:  All right.  Anything by the Defense?
6               MR. FUNDERBURK:  Not on those issues.
7               THE COURT:  Okay.  All right.  They will be
8       admitted then.
9                   Anything else before we adjourn for lunch?
10      We'll be back at 1:15.
11                  (WHEREUPON, proceedings were in a luncheon
12                  recess, after which the following occurred
13                  out of the jury's presence and hearing, to-
14                  wit:)
15              THE COURT:  All right.  Anything else before we
16      bring the jury back?
17              MR. GLANZER:  No, sir.
18              THE COURT:  How much time do ya'll want for
19      opening statements?
20              MR. GLANZER:  Fifteen, twenty at most.
21              THE COURT:  Fifteen minutes?
22              MR. FUNDERBURK:  Same.
23              THE COURT:  Fifteen minutes a side?
24              MR. FUNDERBURK:  That will be fine.
25              THE COURT:  All right.  Fifteen per side.

62

1      Bring them on back.

2          (WHEREUPON, the jury returned to the

3          courtroom and the following proceedings

4          were had and done in its presence and

5          hearing, to-wit:)

6      THE COURT:  All right.  Ladies and gentlemen,

7  good afternoon.  Let me ask you something, how many of

8  you have never been on a jury before, let me see a

9  show of hands?  Let me tell you a few things before we

10  get started.  Of course, this is a criminal case.

11  What you're going to be called on to do at the end of

12  this trial is to determine whether or not this

13  Defendant is guilty or not guilty of these charges.

14  Should you convict him of one or more of them the

15  sentencing would be up to the Court, you wouldn't be

16  involved in that.

17      Now the way we proceed is this:  The lawyers

18  are going to make opening statements to you in just a

19  second.  What they tell you is not evidence in the

20  case, but it is an effort to give you an outline of

21  what they expect this evidence to be.

22      Once we've heard the opening statements then

23  we'll start hearing testimony of witnesses.  At the

24  conclusion of all of that then you'll hear the closing

25  arguments of the lawyers and then I'll tell you what

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

63

1    the law is that you apply to what you've heard.

2           You've got pads there that we've given you,

3    you're free to take notes during the trial if you want

4    to.   You need to put your names on the front page

5    because we'll take those up tonight and put them, lock

6    them up and give them back to you tomorrow.   Nobody is

7    going to read anything that you write on there but we

8    do take them up because people tend to lose them when

9    they take them out of the building.   So go ahead and

10   do that now if you want to.

11          Now I try to call recesses about every hour

12   and fifteen minutes or so.   If any of you need a

13   recess any more often than that just get my attention

14   by waving at me and I'll call a recess for you.

15          Now you're not going to be kept together

16   overnight.   You'll be free to go home, this sort of

17   thing.   But I do want you to stay together on recesses

18   here in the building.   And the reason for that is if

19   you go wandering off somewhere and happen to get

20   involved in a conversation with somebody who's a

21   witness in the case then that could cause us a

22   problem.   So just stay with the bailiff when you're on

23   your recesses.

24          One of you is an alternate.   We have to have

25   at least twelve so it gives us some margin for error

64

1      if somebody gets sick or has a family emergency then

2      we can still go on with the necessary twelve.

3              All    right.    We'll   hear   the   opening

4      statements   of   the   attorneys   at   this   time.    Mr.

5      Glanzer?

6                       **OPENING STATEMENTS**

7          MR. GLANZER:  The Judge read you four indictments

8      earlier and they're not evidence but they do tell you

9      what you're trying to find out facts about, because

10     your job is the fact finders.

11             We've got two victims.  We've got Lillian

12     McLees and Autumn.  Lillian's date of birth is May

13     11th of '91.  She's ten now.  Autumn's date of birth

14     is November 4th of '92, and she appears to be, I guess

15     just turned nine.

16             The   time   frame   we're   talking   about   is

17     between February of '98 and July of '99.  And Autumn

18     would have been over six and then into seven.  Lillian

19     would have been seven into eight.

20             We're talking about rape in the first degree

21     and  sodomy  in  the  first  degree  on  both  of  them  for

22     four charges.  Now the rape in the first degree is not

23     forcible rape.  We're talking about statutory rape, in

24     essence,  of  a  child  under  the  age  of  twelve  with  a

25     Defendant over the age of sixteen.  Because of those

65

1    age relationships it's rape in the first degree and

2    sodomy in the first degree.  These are all statutory

3    charges.  Statutory, not force or anything else.

4         Who is this guy?  What's his relationship to

5    these two kids?  Live-in boyfriend.  Not natural

6    father, live-in boyfriend.  And it's around July, '99

7    when the relationship ends and the victims go to

8    Virginia.  Now the mother in this case has relatives

9    in Virginia.  At one point they even moved to Virginia

10   and they came back.  But sometime after July, '99

11   Lillian, the older one, was talking to one of her

12   friends up in Virginia and says I got to tell you

13   this.  And boom, all of a sudden to the school

14   counselor, to the human resources people, and then

15   notification to Shane Healy of the Opelika Police

16   Department.  When Shane heard of this case he

17   contacted the Virginia authorities and then got a hold

18   of the victims and the family and says, come on down

19   here and tell us about it.

20        The first thing they did is had a medical

21   exam.  And we're not going to tell you that in rape

22   cases there's always medical evidence.  Some there

23   are, some there aren't.  There's evidence in Autumn's

24   case.  We're not saying that proves sex.  But it tends

25   to corroborate the rest of the story.

66

1          And you'll have a Dr. Anz, local doctor,

2     local pediatrician, been practicing for over twenty-

3     three years, who saw this in Autumn and says, we've

4     got a problem.    And they sent her to the Child

5     Advocacy Center, and Lillian, and they take

6     statements.

7          And we'll have Brenda Moss who's a forensic

8     interviewer, in essence, read you their statements.

9     And what do they say happened?  Well, they say it

10    happened, this guy lived there and there were times

11    when mother was not at home, at work, and there's

12    three girls in the house.   There was a younger girl

13    which was fathered by he and the mother in this case.

14    But Lillian and Autumn will tell you that at different

15    occasions he would take one of them in the back room

16    and things would happen.

17          Now what happened to them?  What are they

18    going to tell you happened to them?  We're going to

19    tell you two forms of sodomy, there's only one form of

20    rape.   But most of what you're going to hear is

21    sodomy.  He apparently had a preference for anal sex

22    and oral sex.   And the mother will tell you he had

23    that same preference with her.

24          But it's going to be two forms of sodomy

25    that you can pick from.   Now, Autumn will tell you

67

1   that when he did oral sodomy with her that he didn't

2   ejaculate.   She won't use those words but she'll

3   basically say nothing came out of him.   But Lillian

4   will tell you, yeah, something came out.   Well, what

5   did it look like?   Kind of a white stuff.

6           On the rape part of it Lillian will say

7   yeah, well, both of them will say it, he raped them in

8   what they refer to and both of them use the same term,

9   their pie, which is the front vaginal area.   Now one

10  of them used the term butt and Autumn picked up from

11  school or somewhere, she uses gluteus maximus plus

12  butt.   In any event, Autumn will tell you, and this

13  will also be significant, that one day it slipped and

14  went into a pie and it hurt and it bled.   Then the

15  mother will tell you, yeah, one day she saw blood on

16  the commode seat.   Autumn, what happened?   Are you

17  hurt, injured?   Well yeah, I fell on the balance beam

18  at school.   So they go to the doctor.   Yeah, Autumn

19  fell on the balance beam at school.   Okay.   And then

20  later when Autumn reveals that that's a story he made

21  up.   He told me to say that.   So there's your physical

22  injury on Autumn again.

23          But it will be a series of times and Brenda

24  Moss in her interview will say well, did these things

25  happen, whether it was the sodomy or whether it was

68

1    the other, one time, several times, two times,
2    whatever, and they'll say several, except for Autumn
3    will say only one time on the pie. That's the time I
4    bled. And that will be pretty much our case.

5         And in a child case things are treated a
6    little differently because of their memories and
7    sometimes trying to limit how many times they have to
8    tell the story, there is what's called a child hearsay
9    exception. And that's how you will hear the testimony
10   of Brenda Moss, because that's really hearsay, that's
11   not direct testimony from the child. And if for some
12   reason later they're not available or something like
13   that or they don't retain the memory because it
14   happened at a time when they're under developed and
15   things change, then these things can be gone back to.
16   So we will be using Brenda Moss's but we will also
17   have the children here themselves to tell you the best
18   they can of what they recall.

19        We also have Dr. Anz to tell you about the
20   medical side, but we'll also have her tell you about
21   the hearsay where Autumn says, yeah, he stuck his
22   private in my private, and a few other things, but not
23   a whole lot there.

24        But again, it's a declaration from a child
25   about what happened to them. And your corroboration

69

1    in Autumn is physical, in Lillian it won't be there

2    but listen to the testimony of the doctors. It's not

3    always there. It's not unusual.

4            But we're asking you for one conviction, two

5    convictions, three convictions, four. Take a pick.

6    All, one, two, three, four. We're saying he's guilty

7    of all four.

8            THE COURT: Mr. Funderburk?

9            MR. FUNDERBURK: May it please the Court, ladies

10   and gentlemen of the jury, Mr. Glanzer. My name is

11   Kenneth Funderburk and I've been practicing here in

12   this area now for about thirty-six years. David has

13   done a good job of telling you basically what the

14   charges are in this case. These two little girls do

15   charge Mr. Kirby with things that he has described

16   and, I might add, a lot more.

17           Mr. Kirby is here today and he is here

18   telling you he is innocent and he is not guilty of

19   these charges. He is not guilty of abusing in any way

20   his stepdaughters. And that's who these are. He

21   lived with Dawn for, off and on, over a period of four

22   or five years. And they have a child together, and

23   actually the facts will show that when this happened

24   they -- well, first they moved to Virginia in 1999,

25   she left, Dawn left him with the children and went to

70

1    Virginia with all three children in 1999. And
2    basically during that time the children were living
3    with Dawn's stepmother, I believe it is, the
4    children's grandparents. And during most of the time
5    we're talking about here they were, in fact, not
6    living with Dawn after they left here in Lee County.
7            Now they were gone about two years and after
8    about two years in the latter part of January of this
9    year, you'll find that Mr. Kirby went to see his
10   daughter in Virginia. That was in January of this
11   year. He went there, in fact, both of these girls met
12   with him and they had a good time. Mr. Kirby was
13   there with his present wife who was pregnant. So they
14   all had a good time together. Of course, I believe
15   you'll find that Dawn did not like the fact he was
16   remarried.
17           Now immediately, almost immediately after he
18   comes home these things that were to have occurred two
19   years before now start coming out. It's all related,
20   the same time. There's a petition filed for support
21   and these reports are made about abuse all within less
22   than sixty days after he goes to Virginia to visit his
23   child who has the nickname of Pookie.
24           Now what we have here is two children and a
25   lot of statements, more statements made than the one

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

71

1   you'll hear from the local person who took the
2   statements. Statements were made in Virginia in
3   March, approximately March 21 of this year. Now
4   hopefully we'll have occasion to see if those
5   statements compare with anything that was told to the
6   social worker here. Some do and some don't. Now,
7   these are children and one of the problems with
8   dealing with children, both certainly from the State
9   and very definitely from my point of view is they are
10  children and even though they're children what they
11  are saying is serious and we have to cross examine
12  them and of course, they don't always get things
13  right. But what you'll hear here is drastically not
14  right, between the statements that were made in
15  Virginia, between some testimony that was taken down
16  verbally which we've been provided. From statements
17  that were made to forensic, a sociologist in Virginia,
18  and the final statements that were made here that
19  you'll hear from the social worker who takes the
20  stand.

21          And one of the things you'll hear is both
22  girls essentially say that almost every day he would
23  penetrate them anally and vaginally. Almost every
24  day. Now, you'll find, and based on the opening of
25  Mr. Glanzer, that changes, by the time the statement

72

1    is made here in Lee County to the local worker the

2    vaginal penetration only occurred one time.    But

3    you'll see those big differences.

4            Now all this you've got to compare what we

5    all know or what we believe we know with medical

6    testimony that we hear.    First of all, there's no

7    physical evidence, no physical evidence of penetration

8    on Lillian at all, either anally or vaginally.    Yet

9    she says that she was penetrated on a daily basis.

10   There's no physical evidence of that.    And the doctor

11   can tell you what that means but one thing you'll see

12   is they cannot say there's physical evidence of

13   penetration anally or vaginally on Lillian.

14           Now secondly, there's medical testimony that

15   the exam of Autumn was normal, she had no evidence, no

16   physical evidence of anal penetration, although she's

17   claiming that this was done to her practically every

18   day.

19           You will find that there was an injury to

20   Autumn that has been described by the Pediatric Clinic

21   as both a straddle injury back when it occurred in

22   1998, March of 1998, and later after the events, after

23   him going to see his children, now it turns in that

24   she changes the story and says that he caused the

25   injury.    So you'll hear both of these stories and

FORM CSR - LASER    REPORTERS PAPER & MFG. CO.    800-626-6313

73

1      you'll have to reconcile which one makes sense.  But

2      I can tell you that the records you'll get to see will

3      show that the last statement made by Autumn was that

4      he did not intentionally penetrate her but he was

5      trying to do it from the rear and slipped.  Now, with

6      that fact and that oral testimony what the record

7      shows in 1998 is that on March 3 apparently of 1998,

8      apparently she received an injury and she bled for six

9      days, from March 3 to March the 8th, and the last

10     report in the record on March 8th, that's six days,

11     she was still bleeding.  And based on that you'll have

12     to decide in the end whether or not it's possible for

13     it to have occurred like it's reported in 1998 where

14     it's reported as a straddle injury, or in 2001 when

15     it's described orally by the child as an injury

16     occurring a different way.

17          So these are children and it's hard, it's

18     hard to cross examine these children and we'll do the

19     best we can to get the truth out as best we can so

20     that you as a jury can determine whether what you're

21     hearing is the truth or whether this long list of

22     things that you're hearing is fantasy and make believe

23     that comes to you under the influence of other people.

24

25          And I believe when you hear all this at the

74

1    end, I believe, ladies and gentlemen, you will agree

2    with Mr. Kirby that he is not guilty.  Thank you.

3         THE COURT:  Call your first witness.

4         MR. GLANZER:  Judge, can we approach?

5              (WHEREUPON, the following proceedings were

6              had and done at the bench, in the jury's

7              presence but out of its hearing, to-wit:)

8         MR. GLANZER:  We've got a problem in that he did

9    his opening and he referred to reports that neither

10   one of us can get into because there's no witnesses.

11   The State believes that the door has been opened for

12   us to submit all those reports, because he said that

13   there's going to be comparison.

14        MR. FUNDERBURK:  I may cross examine on some of

15   them I think if we have to.  I don't know what they're

16   going to put on.

17        THE COURT:  Well, we'll just wait until they're

18   offered and we'll see where we stand.

19              (WHEREUPON, the following proceedings were

20              had and done in the jury's presence and

21              hearing, to-wit:)

22        MR. GLANZER:  We'd call Autumn McLees first.

23        THE COURT:  Step up, lawyers.

24              (WHEREUPON, the following proceedings were

25              had at the bench, in the jury's presence

75

1    but out of its hearing, to-wit:)

2    THE COURT:  What's your position on that?

3    MR. FUNDERBURK:  Me?

4    THE COURT:  Yeah.

5    MR. FUNDERBURK:  Judge, I'd rather, I don't

6    believe unless something comes up where it's obvious

7    they need to be there, I'd --

8    THE COURT:  I think she can sit down off the

9    stand down there will be fine.  That chair right down

10   there.

11             (WHEREUPON, the jury retired from the

12             courtroom and the following proceedings

13             were had and done out of its presence and

14             hearing, to-wit:)

15   THE COURT:  If you'll hook the microphone, Cindy.

16             How are you doing today?

17   THE WITNESS:  Good.

18   THE COURT:  Tell me something, how old are you?

19   THE WITNESS:  Nine.

20   THE COURT:  Nine years old?

21             I think it might be better if we hook that

22   on the top of the bib overall there.

23             We're going to wire you up just like the

24   rock stars, how about that?  Is that okay?

25             Let me let you talk a little.  Say something

76

1    for me so I can see if the microphone works.

2        THE WITNESS:  One, two, three.

3        THE COURT:  Okay.  That works good.  What's your

4    name?

5        THE WITNESS:  Autumn.

6        THE COURT:  Autumn?  All right.  We're going to

7    do some things here in a minute, we're going to have

8    some folks ask you some questions and you don't have

9    to worry, nobody is going to hurt you.  Okay?  You

10   think you can answer these questions for me?

11       THE WITNESS:  (Nodding affirmatively.)

12       THE COURT:  Okay.  What I want you to do though

13   is, see this man right here?

14       THE WITNESS:  Uh-huh.  (Affirmative response.)

15       THE COURT:  He's going to write down what these

16           questions are and he's going to write down your

17           answers, so when they ask you a question you're

18           going to either need to say yes, sir, or no,

19           sir, or yes, ma'am, no, ma'am, rather than just

20           nod.  See what I mean?

21       THE WITNESS:  Yeah.

22       THE COURT:  Because he can't get it when you nod.

23   If you have any questions during this time if you just

24   ask me I'll try to get it straight for you, how about

25   that?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

77

1        THE WITNESS:  Okay.

2        THE COURT:  Is that okay?

3        THE WITNESS:  Uh-huh.  (Affirmative response.)

4        THE COURT:  Okay.  Well, we're going to let you

5    talk good and loud for us.  I know it's, you've

6    probably never been in a courtroom before, have you?

7        THE WITNESS:  (Shaking head negatively.)

8        THE COURT:  Okay.  That's a no?  Does that mean

9        no?

10        THE WITNESS:  No, sir.

11        THE COURT:  Okay.  It's kind of hard to remember

12    to say yes or no but you're going to have to do that

13    for us.  Do you think you can do that?

14        THE WITNESS:  Yeah.

15        THE COURT:  Okay.  Well, why don't we bring the

16    jury back in and let's get these questions done.  How

17    about that?

18        THE WITNESS:  Yeah.

19        THE COURT:  It shouldn't take too long, is it?

20    We're going to let Ms. Teague sit in that chair right

21    down there by you.  Okay?  Is that all right?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  Okay.  Bring the jury back.

24             (WHEREUPON,  the  jury  returned  to  the

25             courtroom  and  the  following  proceedings

78

1        were had and done in its presence and

2        hearing, to-wit:)

3        THE COURT:  Okay.  Autumn, tell us your name,

4    please?

5        THE WITNESS:  Autumn Rose McLees.

6        THE COURT:  And how old are you?

7        THE WITNESS:  Nine.

8        THE COURT:  Nine years old?

9        THE WITNESS:  Yes, sir.

10       THE COURT:  What grade are you in in school?

11       THE WITNESS:  Third.

12       THE COURT:  Third grade?

13       THE WITNESS:  Yes, sir.

14       THE COURT:  Do you know what it means to tell the

15   truth?

16       THE WITNESS:  Yes, sir.

17       THE COURT:  And you know it's bad to tell a lie,

18   you know that?  Right?

19       THE WITNESS:  Yes, sir.

20       THE COURT:  You're going to answer out loud for

21   me now, like we talked about a minute ago?

22       THE WITNESS:  Yes, sir.

23       THE COURT:  Okay.  Now I'm going to swear you in

24   like you see them do it on TV.  Okay?  Let me get you

25   to raise your right hand for me.  There you go.

79

**AUTUMN MELISSA McLEES,**

a witness, having first been duly sworn to speak the truth, the whole truth and nothing but the truth, was examined and testified as follows, to-wit:

THE COURT:  Okay.  Now these men are going to ask you a few questions so you just try to answer good and loud so everybody can hear you.  Is that all right?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Mr. Glanzer, you want to ask some questions?

MR. GLANZER:  Yes, sir.

**DIRECT EXAMINATION**

BY MR. GLANZER:

Q.   Okay.  What is your name?

A.   Autumn Rose McLees.

Q.   Okay.  And you're nine years old, right?

A.   Yes, sir.

THE COURT:  Let's see, you're standing between the jurors and the witness, MR. Glanzer.  You need to come around over here.  And we'll move that lectern over here if you want to use it.

MR. GLANZER:  I would just -- well, I wanted to approach the witness.

THE COURT:  Well, you don't need to be between her and the jurors.

80

```
 1              MR. GLANZER:  Okay.
 2    Q.    Okay.  At some point did you live in Opelika?
 3    A.    Yes, sir.
 4    Q.    And do you remember where you lived?
 5    A.    Alabama.
 6    Q.    Okay.  And it was Opelika, Alabama?
 7    A.    Yes, sir.
 8    Q.    And at some point did you have a person that lived
 9    with you by the name of Lee?
10    A.    Yes, sir.
11    Q.    And do you see him in here today?
12    A.    Yes, sir.
13    Q.    Could you point to him?
14    A.    (Witness pointing.)
15    Q.    Is he in the white shirt and the tie?
16    A.    Yes, sir.
17              MR.  GLANZER:   Let  the  record  reflect  she's
18        pointed to Lee Kirby.
19    Q.    Did Lee Kirby do some bad things to you?
20    A.    Yes, sir.
21    Q.    Did he sometimes punish you?
22    A.    Yes, sir.
23    Q.    And let specifically ask you about something, was
24    there something he used to do with some handcuffs?
25    A.    Yes, sir.
```

FORM CSR - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

81

1    Q.    What would he do with handcuffs?

2    A.    He dunked me under water.

3    Q.    When you say dunk me in the water, how would he, would

4    he put handcuffs on your hands or your legs or where would

5    he put them?

6    A.    My hands.

7    Q.    Okay.  And would they be in front or would they be

8    behind you?

9    A.    Behind.

10    Q.    And when would he do this?  Where would you be?

11    A.    I'd be in the bath tub.

12    Q.    In the bath tub?

13    A.    Yes, sir.

14    Q.    Okay.  And would you be on your back or on your

15    stomach?

16    A.    On my stomach.

17    Q.    Stomach?  And did he, was he mad at you when he did

18    this?

19    A.    No.

20    Q.    Did he say you were in trouble?

21    A.    No.

22    Q.    Did he say why he was doing it at all?

23    A.    No.

24    Q.    Did he do anything else to punish you?

25    A.    Yes.

82

1   Q.   Like what?

2   A.   He choked us until we passed out.

3   Q.   Okay.  Did he choke both of ya'll or just you?

4   A.   Both of us.

5   Q.   Both of you?  And did he choke you once where you

6   passed out?

7   A.   Yes, sir.

8   Q.   How did he do that?

9   A.   He just taken me by the wall.

10  Q.   He would take you by the wall and then what would he

11  do?

12  A.   He'd put me over my bed and just choke me until I

13  passed out.

14  Q.   Okay.  Would he put one hand on your neck?

15  A.   Yes, sir.

16  Q.   Would he put both hands?

17  A.   One.

18  Q.   Just one?  When you say the wall, where did the wall,

19  what did that have to do with the wall?  Would he hold you

20  against the wall?

21  A.   Yes, sir.

22  Q.   Like this, around your neck and then hold you up like

23  that?

24  A.   Yes, sir.

25  Q.   Would you feet be off the ground?

83

1    A.    Yes, sir.

2    Q.    Would he tell you, would you do something wrong for

3    him to do that?

4    A.    No, sir.

5    Q.    He would just do that?

6    A.    Yes, sir.

7    Q.    Did he do any other kind of punishing things to you?

8    A.    Yes, sir.

9    Q.    Like what?

10    A.    He'd stick his private part in my private part.

11    Q.    Okay.  When you say his private part, what are you

12    talking about?

13    A.    His winkie.

14    Q.    His winkie?  Okay.  Where is his private part?  Can

15    you tell where it's located, point to it?

16    A.    By the legs.

17    Q.    By the legs?  And right here, is that what you're

18    talking about?

19    A.    Yes, sir.

20    Q.    Okay.  And you call that a winkie?

21    A.    Yes, sir.

22    Q.    Okay.  When you say your private part, do you have

23    more than one private part?

24    A.    Yes, sir.

25    Q.    Can you, what private parts do you have?  You have a

84

1    private part?

2    A.   Yes, sir, I have a back private part and then I have

3    a front private part.

4    Q.   Okay.  What do you call the back private part?

5    A.   Your gluteus maximus.

6    Q.   Do you have another word for that?

7    A.   Your butt.

8    Q.   Your butt.  Okay.  And do you have a word for the

9    front private part?

10   A.   Your pie.

11   Q.   Your pie?  And what's the private part up here?

12   A.   Your chest.

13   Q.   Chest?  When you say he put his private part in your

14   private part what private part did he put it in of yours?

15   A.   In my butt.

16   Q.   In your butt?  Did he do that one time or more than

17   one time?

18   A.   More than one time.

19   Q.   Did he do it more than two times?

20   A.   More than two times.

21   Q.   Did he do it a lot of times?

22   A.   Yes, sir.

23   Q.   Okay.  Would anybody else be in the room when he would

24   do that to you?

25   A.   No, sir.

85

1    Q.    Just him and you?

2    A.    Yes, sir.

3    Q.    Would he take his clothes off first?

4    A.    Yes, sir.

5    Q.    Would you take your clothes off?

6    A.    Yes, sir.

7    Q.    Okay.  Would the door be open or closed?

8    A.    Closed.

9    Q.    And what room would this be in?

10   A.    His and my mom's.

11   Q.    His and your mom's bedroom?

12   A.    Yes, sir.

13   Q.    Would he do this on the bed?

14   A.    Yes, sir.

15   Q.    Did he ever put his winkie in your mouth?

16   A.    Yes, sir.

17   Q.    Did he do that one time?

18   A.    He did it more.

19   Q.    He did it more times?

20   A.    Yes, sir.

21   Q.    A lot of times?

22   A.    Yes, sir.

23   Q.    Okay.  Did he ever put his winkie in your pie?

24   A.    One time.

25   Q.    One time.  Tell us about that one time?

86

1    A.    His private part was wet and he was about to stick it

2    in my butt but when he put it in my butt it slipped and it

3    went in my private part, my front private part.

4    Q.    Okay.  And how did that feel?

5    A.    It hurt.

6    Q.    It hurt.  Did anything happen?

7    A.    Blood had came out.

8    Q.    Blood came out?  Did your mom find out about the

9    blood?

10   A.    No, sir.

11   Q.    Okay.  Did she take you to the doctor for the blood?

12   A.    No, sir.

13   Q.    Did you tell anybody how you got the blood?

14   A.    No, sir.

15   Q.    Okay.  Do you remember anything about a balance beam?

16   A.    I told my mom that I fell on a balance beam.

17   Q.    So your mom did find out?

18   A.    Yeah.

19   Q.    That you were bleeding?  And you -- where did you get

20   the story about falling on a balance beam, who told you?

21   A.    Lee told me to tell my mom that.

22   Q.    Lee told you to tell your mom that?

23   A.    Yes, sir.

24   Q.    And that was after his winkie slipped?

25   A.    Yes, sir.

87

1    Q.    How did his winkie feel, was, what was it like?

2    A.    Hard.

3    Q.    Hard?

4          That's all I have right now.

5          THE COURT:  Cross.

6                    CROSS EXAMINATION

7    BY MR. FUNDERBURK:

8    Q.    Good afternoon Autumn, my name is Kenneth Funderburk

9    and I need to ask you a couple of questions.  If you don't

10   understand it let me know and I'll try to ask you again.

11   Okay?

12   A.    Yes, sir.

13   Q.    Now, are you living in Virginia now?

14   A.    Yes, sir.

15   Q.    And do you live with your mother or is it your

16   grandmother?

17   A.    We, I live with both.

18   Q.    With both?  Is your mother married now?

19   A.    Yes, sir.

20   Q.    Does she live with, is it your grandmother, ya'll live

21   with?

22   A.    Yeah.  Yes, sir.

23   Q.    And how long have you lived with your grandmother?

24   A.    I don't remember.

25   Q.    Have you lived there ever since you left Alabama?

88

1    A.    Yes, sir.

2    Q.    And do you remember if you went to Virginia before

3    your sister?

4    A.    No, sir.

5    Q.    Do you remember going up there one summertime and she

6    stayed here?

7    A.    Yes.  Yes, sir.

8    Q.    Okay.  Was that when ya'll moved back up there or was

9    that before you moved back up there?

10   A.    That was before we even moved back up there.

11   Q.    All right.  So the summer before you moved back up

12   there?

13   A.    Yes, sir.

14   Q.    You went up to stay with your, well who did you go up

15   and stay with?

16   A.    My grandmother.

17   Q.    And how long were you there before you came back?

18   A.    We stayed there the rest of the year.

19   Q.    Okay.  Now, help me out with these years.  Do you

20   remember when, was it Pookie?

21   A.    Yes, sir.

22   Q.    Pookie was born?  Do you remember when Pookie was

23   born?

24   A.    Yes, sir.

25   Q.    And why don't you tell us who Pookie is?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

89

1    A.    Pookie is my littlest sister.

2    Q.    And who is her daddy?

3    A.    Lee.

4    Q.    All right.  That's William over here?

5    A.    Yes, sir.

6    Q.    Now these bad things you say happened, was that after

7    Pookie was born?

8    A.    Yes, sir.

9    Q.    And before you went back to Virginia?

10    A.    Yes, sir.

11    Q.    So but in between there ya'll moved to Virginia and

12    stayed a while and then came back?  Can you recall?

13    A.    We, we'd visit there and then one summer we actually

14    stayed there.  We stayed there forever.

15    Q.    Do you recall how old you were when, do you call him

16    William or do you call him Lee?

17    A.    I call him Lee.

18    Q.    All right.  Thanks.  Do you recall how old you might

19    have been when Lee came to live with you, or when ya'll

20    went to live with Lee?

21    A.    No, sir.

22    Q.    You were pretty young?

23    A.    Yes, sir.

24    Q.    And you lived with him for, you think maybe three or

25    four years?

90

1    A.    Yes, sir.

2    Q.    Of course, you haven't seen him now for about two

3    years now, have you?  Ya'll have been gone for about two

4    years, haven't you?

5    A.    Yes, sir.

6    Q.    And I believe you and your mother and your sister and

7    Pookie moved back to Virginia to live with your mother's

8    mother or your mother's stepmother?

9    A.    Yes, sir.

10    Q.    Is it the stepmother?

11    A.    She's my grandma.  She is my mom's stepmother.

12    Q.    Okay.  And your grandfather lives there too?

13    A.    Yes, sir.

14    Q.    And do you recall when Lee came to see you this year?

15    A.    Yes, sir.

16    Q.    Tell me about that?

17    A.    He had came to visit Pookie and he had bought Pookie

18    some stuff because he wanted to see Pookie.  So he brought

19    her a lot a stuff and took her to a movie and then he went

20    back to Alabama.

21    Q.    All right.  Can you remember what ya'll did when Lee

22    came up to see you?

23    A.    We went to the mall and then after a while we had to,

24    me and Lillie had to get back home to do our homework.

25    Q.    All right.

91

1    A.    So it was only him, my mom, Pookie and my grandmother.

2    Q.    Who was at the mall?

3    A.    Yes, sir.

4    Q.    Was Lillie there?  You say Lillie, you and Lillie?

5    A.    Me and Lillie had to go home.

6    Q.    Okay.  Before you went home though did you go to the

7    show?

8    A.    No, sir.

9    Q.    How long were you there with Lee?

10   A.    I'm not quite sure.

11   Q.    Was it a little while?

12   A.    Yes, sir.

13   Q.    And did ya'll have a good time?

14   A.    Yes, sir.

15   Q.    Was he nice to you?

16   A.    Yes, sir.

17   Q.    Were you nice to him?

18   A.    Yes, sir.

19   Q.    But you feel like he might have hurt your mother,

20   don't you?

21   A.    Yes, sir.

22   Q.    And how do you think he hurt your mother?  Do you know

23   how?  How do you think he hurt our mother?

24   A.    The same way that he hurt us.

25   Q.    All right.  And do you think he hurt your mother

92

1    because he wasn't living with her?  Did your mother, didn't

2    you think your mother loved Lee?

3    A.    Yes, sir.

4    Q.    And that's what you told several times, right?

5    A.    Yes, sir.

6    Q.    And then you thought that maybe he loved Pookie more

7    than you and more than Lillian?

8    A.    Yes, sir.

9    Q.    And that didn't make you feel good, did it?

10   A.    No, sir.

11   Q.    And as between your mother and Lee when he was living

12   with you, who had to discipline you when you did something

13   wrong?

14   A.    What does discipline mean?

15   Q.    Well, when you did something wrong, you do -- have you

16   ever done anything wrong?

17   A.    Yes, sir.

18   Q.    All right.   And when you did something wrong who

19   punished you?

20   A.    Lee.

21   Q.    Did your mother ever punish you for doing things

22   wrong?

23   A.    Sometimes.  She would put us like in a corner.

24   Q.    Mostly it was Lee?

25   A.    Yes, sir.

93

```
 1      Q.    And did that sometimes make you mad --

 2      A.    Yes, sir.

 3      Q.    -- because he punished you more than he did Pookie?

 4      A.    Yes, sir.

 5      Q.    And do you remember, I believe you've told, I believe

 6      you've talked to several people now about what happened to

 7      you after you decided this was no longer a secret?

 8      A.    Yes, sir.

 9      Q.    Do you remember when you decided this was no longer a

10      secret?

11      A.    Yes, sir.

12      Q.    Was that after Lee came up to see ya'll in Virginia?

13      A.    That was after.

14      Q.    That was this year?

15      A.    Yes, sir.

16      Q.    And so since then you've talked to a lot of people

17      about this, haven't you?

18      A.    Yes, sir.

19      Q.    Now do you recall what time of the day it was when you

20      think Lee did these things to you?

21      A.    Daytime and nighttime.

22      Q.    Say that again.   Daytime and the nighttime, or just

23      daytime?

24      A.    Both.

25      Q.    All right.  Do you remember telling various people, do
```

94

1   you remember telling people that talked to you that it was
2   only the daytime?
3   A.   Which -- he'd come in our room at nighttime, but he
4   normally only would do it to us during the daytime.  But
5   he'd come in our room at night.
6   Q.   All right.  Do you remember telling some of these
7   workers like the lady that talked to you here in Alabama
8   that he only did these bad things to you in the daytime?
9   A.   Yes, sir.
10  Q.   Is that true?
11  A.   Yes, sir.
12  Q.   And then he only did things to Lillian in the
13  nighttime, is that right?
14  A.   Yes, sir.
15  Q.   And I believe you have told everybody that he would do
16  these things in the daytime and the nighttime when your
17  mother was working; do you remember that?
18  A.   Yes, sir.
19  Q.   Did your mother work all the time when you were here
20  in Alabama?
21  A.   Yes, sir.
22  Q.   She had a steady job and worked all the time?
23  A.   Yes, sir.
24  Q.   Did she work at nighttime or in the daytime?
25  A.   She had many jobs down here so it would be kind of

95

1    like in the morning.

2    Q.    Uh-huh.

3    A.    And then in the daytime.  And she'd go like out to the

4    store at nighttime.

5    Q.    Do you think she worked all the time when she was here

6    in Alabama?

7    A.    Yes, sir.

8    Q.    And it was when she was working Lee was keeping you,

9    right?

10    A.    Yes, sir.

11    Q.    Were you in kindergarten at that time?

12    A.    Yes, sir.

13    Q.    Was Lillian in kindergarten?

14    A.    No, sir.

15    Q.    So when Lee was keeping you was that in the daytime or

16    the nighttime?

17    A.    Daytime and night.

18    Q.    Now when did Lee work?

19    A.    Lee worked, he kind of got a job at like the end -- he

20    kept us at home when my mother had to work.  I don't

21    remember when he got his job, but he stayed home with us.

22    He'd work on his car and stuff.

23    Q.    And so most of the time for the whole year or so this

24    was happening Lee was home keeping you while your mother

25    worked?

96

1     A.    Yes, sir.

2     Q.    So Lee was mostly at home?

3     A.    Yes, sir.

4     Q.    Did ya'll ever play out in the yard together with Lee?

5     A.    No, sir.

6     Q.    Never went outside with him?

7     A.    We'd go outside when like my mother was here but never

8     just with him.

9     Q.    So when he was keeping you then ya'll never went

10    outside?

11    A.    No, sir.

12    Q.    And you think your mother worked a lot more than Lee

13    did?

14    A.    Yes, sir.

15    Q.    Because he stayed home with you and kept you more than

16    she did?

17    A.    Yes, sir.

18    Q.    And sometimes I can't read my writing, so let me make

19    sure I've got this right.  All right.  You said one time

20    that your mom didn't find out about this injury you had

21    when you were bleeding?  Do you remember telling Mr.

22    Glanzer that?

23    A.    Yes, sir.

24    Q.    And you were not taken to the hospital or to a doctor

25    either, were you?  That was when, let me make sure I'm

97

1    talking about the right thing.  Do you recall when you told

2    the jury that he was trying to do it to you in the rear and

3    it slipped and accidentally got you in your pie?

4    A.    Yes, sir.

5    Q.    And that's when you bled?

6    A.    Yes, sir.

7    Q.    And it was that time that your mother didn't know

8    about it?

9    A.    Yes, sir.

10    Q.    She didn't know you were bleeding and you didn't go to

11    the doctor?

12    A.    At that point she wasn't home and that day I didn't

13    go.  The next day she asked me what was the matter, I said

14    nothing, and that day I went to school and she noticed that

15    I had blood in my panties and then she had started, she

16    took me to the hospital once to see what was the matter

17    with me.  They didn't say anything to her.

18    Q.    Did you go to the hospital or just the doctor?

19    A.    The doctor.

20    Q.    Now do you recall, was it a school day when you hurt

21    yourself?

22    A.    Yes, sir.

23    Q.    And do you recall what time of day this happened?

24    A.    In the afternoon.

25    Q.    During school hours?

98

1    A.    We were already out of school.

2    Q.    You and Lillian?

3    A.    Yes, sir.

4    Q.    Were out of school?  And ya'll were at home together?

5    A.    Yes, sir.

6    Q.    When this happened?

7    A.    Yes, sir.

8    Q.    And this happened during the daytime?

9    A.    Yes, sir.

10   Q.    Where was Lillian when this happened?

11   A.    Lillie was in the bedroom with Pookie cleaning up and

12   playing.

13   Q.    Now how old was Pookie at that time?

14   A.    I don't remember.

15   Q.    Do you think Pookie started cleaning the house when

16   she was just a young girl?

17   A.    She never cleaned the house.

18   Q.    And so what was Pookie doing?

19   A.    Pookie was playing.

20   Q.    And where was your mother?

21   A.    My mother was at work.

22   Q.    And who picked you up from school?

23   A.    We rode the bus home.

24   Q.    Lee picked you up?

25   A.    No, we rode the bus home.

99

1    Q.    All right.  Now, do you claim this happened in daytime

2    or nighttime?

3    A.    Daytime.

4    Q.    Do you know what time of day this would have happened?

5    A.    No, sir.

6    Q.    Before supper time?

7    A.    Before supper time.

8    Q.    Now do you think you went to the doctor one time or

9    several times?

10   A.    Several times.  Several times.

11   Q.    All right.  And when you went to the doctor all these

12   times what would he tell you, he or she, what would the

13   doctor tell you?

14   A.    They told me that there was probably just like an

15   accident.  I probably fell on the balance beam the wrong

16   way and hurt myself.

17   Q.    That's what the doctor told you?

18   A.    Yes, sir.

19   Q.    Now that's the only time that, this time that you say

20   something happened by accident, that's the only time where

21   he touched your pie?

22   A.    Yes, sir.

23   Q.    But then you told the worker here and several people

24   that he did it to your butt and penetrated your butt almost

25   every day?

101

1    A.   Yes, sir.

2    Q.   And leave bruises on you, right?

3    A.   Yes, sir.

4    Q.   And your mother would never see that?

5    A.   My mother would see the bruises.

6    Q.   What did you tell her happened?

7    A.   I said like I fell or something.  I'd tell her like

8    I'd fall.

9    Q.   You told her you had fallen?

10    A.   Yeah.

11    Q.   So almost every day now you would be home with Lee and

12    your mother would be working and all these things would

13    happen, right?

14    A.   Yes, sir.

15    Q.   And I believe you know because you and Lillian have

16    talked about this, but did the things that you have talked

17    about to Lillian, did they all happen in the daytime or did

18    they all happen at nighttime?

19    A.   What do you mean?

20    Q.   Well, you and Lillian have talked about this, haven't

21    you?

22    A.   Yes, sir.

23    Q.   The things that happened to her, did she tell you

24    those things happened at the nighttime or the daytime?

25    A.   Yes, sir.  She told me that they happened at the

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

102

1   nighttime.

2   Q.   So Lee would have to be home in the daytime and the

3   nighttime, every day to do all this stuff, wouldn't he?

4   A.   Yes, sir.

5   Q.   In the daytime and the nighttime; right?

6   A.   Yes, sir.

7   Q.   And in the daytime or the nighttime your mother would

8   not be there, she would be at work?

9   A.   Yes, sir.

10  Q.   Autumn, do you recall back in March of this year, at

11  school this year, I know you don't know the months like I

12  don't, do you recall talking to somebody named Dorrie

13  Milford at the school where you go?

14  A.   Yes, sir.

15  Q.   And do you remember she asked you a lot of questions

16  and you gave a lot of answers?

17  A.   Yes, sir.

18  Q.   And do you remember her asking you have you ever seen

19  a man's private parts and you said I don't think so, do you

20  remember telling her that?

21  A.   Yes, sir.

22  Q.   And you were asked then, somebody asked you then, said

23  did you ever -- did he ever ask you to touch him in any way

24  or to touch his pie and you said no; do you remember that?

25  A.   Yes, sir.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313