VOLUME II

COURT OF CRIMINAL APPEALS NO. 01-1540

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF LEE COUNTY, ALABAMA

CIRCUIT COURT NO. CC 01 1001-1003

CIRCUIT JUDGE HON. ROBERT HARPER

Type of Conviction / Order Appealed From: SODOMY I (2 COUNTS) & RAPE I

Sentence Imposed: 16 YEARS

Defendant Indigent: ☒ YES ☐ NO

WILLIAM LEE KIRBY

LARRY COOPER                    (334) 502-0022
(Appellant's Attorney)                         (Telephone No.)
P.O. BOX 1868
(Address)
AUBURN, AL  36831
(City)                (State)                (Zip Code)

**NAME OF APPELLANT**

V.

STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)


EXHIBIT
A

<u>VOLUME TWO</u>
STATE OF ALABAMA
IN THE CIRCUIT COURT FOR THE COUNTY OF LEE
THIRTY-SEVENTH JUDICIAL CIRCUIT
CRIMINAL

STATE OF ALABAMA,

      PLAINTIFF,

   VS.                CASE NOS. CC-01-1001
                              CC-01-1002
WILLIAM LEE KIRBY,         CC-01-1003
                              CC-01-1004

        DEFENDANT

<u>REPORTER'S OFFICIAL TRANSCRIPT OF THE</u>
<u>TRIAL IN CHIEF BEFORE THE COURT AND JURY</u>

Before:

      HON. ROBERT M. HARPER, Circuit Judge, in the Courtroom Number Four of the Lee County Justice Center located at Opelika, Alabama, on the 3rd of December, 2001, and being concluded on the 4th day of December, 2001.

<u>A P P E A R A N C E S</u>

     HON. **VANCE NICHOLAS ABBETT**, District Attorney for the 37th Judicial Circuit of Alabama, and HON. **DAVID GLANZER**, Assistant District Attorney for the 37th Judicial Circuit of Alabama, appearing for the State of Alabama.

     HON. **KENNETH FUNDERBURK**, Attorney at Law, appearing for the Defendant.

191

1        P R O C E E D I N G S

2              (WHEREUPON, Volume Two continues with the

3              trial in chief as follows, to-wit:)

4                    DR. LINDA ANZ,

5    a witness, having first been duly sworn to speak the truth,

6    the whole truth and nothing but the truth, was examined and

7    testified as follows, to-wit:

8                    DIRECT EXAMINATION

9    BY MR. GLANZER:

10   Q.    Okay.  What is your name?

11   A.    Linda Anz.

12   Q.    And where are you employed?

13   A.    Pediatric Clinic.

14   Q.    And what kind of duties do you perform there?

15   A.    I'm a pediatrician and a partner at the Pediatric

16   Clinic.

17   Q.    And what kind of education and training do you have to

18   perform those kinds of duties?

19   A.    I have had four years of college, four years of

20   medical school, three years of general pediatric training

21   and a fellowship in pediatric endocrinology.

22   Q.    And how many years have you actually been practicing

23   pediatrics?

24   A.    About twenty-three.

25   Q.    And during that period of time how many physical exams

192

1    of, well maybe limit it to females, young females have you

2    done during that twenty-three years?

3    A.    Too many to count.    Thousands.

4    Q.    Thousands?

5    A.    Yes.

6    Q.    And of those exams have you encountered what could

7    possibly be in your professional opinion sexual abuse?

8    A.    Yes, sir.

9           MR. GLANZER:  We would offer Dr. Anz as an expert

10          in pediatrics and in particular with experience in

11          recognizing sexual abuse and doing those kinds of

12          exams.

13          MR. FUNDERBURK:  No objection.

14          THE COURT:  All right.

15   Q.    Before we get to any specifics here, in general if

16   you're conducting a physical exam is it always possible to

17   determine through a physical exam if someone has been

18   sexually abused?

19   A.    No, sir.  In fact literature shows that most children

20   who have been sexually abused have a normal physical exam.

21   Q.    And by normal physical exam, what would that be?  What

22   would you describe as normal?  What would you expect to see

23   in a normal physical exam?

24   A.    The normal exam, I assume we're talking about a pre-

25   pubertal child?

193

1    Q.    Correct.

2    A.    You would expect to see an intact hymen and no tears

3    or no lacerations, no scars.  And you can't see the opening

4    of the vaginal area very well.

5    Q.    Is it possible that some damage could occur from time

6    to time for various reasons and it heal and no longer be

7    noticeable?

8    A.    Damage as far as physical abuse or -- yes --

9    Q.    Yeah, I guess there's a difference.  Let me take --

10    there can be external damage, correct?

11    A.    Correct.

12    Q.    And there can be internal damage?

13    A.    Correct.

14    Q.    In your experience if there's internal damage does it

15    normally heal itself and go away or will you normally see

16    some kind of indications?

17    A.    It could be either way.  It could be absolutely

18    normal, sort of like the way that if you, you know, you

19    bite your tongue and it bleeds and then later on there's no

20    scar, but this area also especially in young girls can be

21    very elastic and can heal so that you can see a child who

22    is raped one month with an open laceration and see her

23    three months later and the exam can be completely normal.

24    Q.    So we have really three possibilities.  You can either

25    see nothing at all, you can have damage that heals or we

194

1    can have damage that doesn't heal and there is some

2    indication of it?

3    A.    That's correct.

4    Q.    In your professional opinion is it possible for a

5    mature male to penetrate a child let's say under the age of

6    eight?

7    A.    Yes, sir.

8    Q.    Is there, and obviously the size of the child and the

9    people make a difference, but is there a difference between

10   the, in lack of any good terms to talk about on this, is

11   there a difference between the expansion tolerant

12   capability of a vagina versus an anal area?  Does that vary

13   by person?  In other words, does one expand more than the

14   other?

15   A.    I don't know the answer to that.  I know that it's

16   very rare to find a physical finding on anal penetration.

17   Is that what --

18   Q.    Yes.

19   A.    -- you wanted?

20   Q.    And why would that be?

21   A.    And it probably is the distension of the anus.  But I

22   mean very rare, I don't think I've ever seen one, except

23   for like sexually transmitted disease, if you had condyloma

24   acuminata of an anus that I can say that it was definitely

25   penetrated.

195

1    Q.    So in all your experience it's very rare to see anal

2    injury?

3    A.    Correct.

4    Q.    Let me take you back to June 25th of this year, 2001,

5    and ask you if you had occasion to do an exam on an

6    individual by the name of Autumn McLees?

7    A.    Yes, I did.

8    Q.    And how did you come to perform that exam?

9    A.    She was referred to me by DHR and her mother brought

10   her in.

11   Q.    And at that time what did you do?  What did you do

12   first?

13   A.    At first I talked to the mother and then I talked to

14   the child.

15   Q.    Okay.  And what is the reason for talking to  someone

16   who would be brought to you first like that?

17   A.    Well, as a physician the first thing we always do is

18   get a history and talk to our patients, which I did.

19   Q.    Okay.  And what did, you indicated you had a chance to

20   talk to Autumn herself.  What did Autumn indicate to you?

21   A.    Is it okay if I refer to my notes?

22   Q.    Yes.  If you'd be more comfortable maybe you could

23   read her exact words.

24   A.    Well, she in essence when I asked her what happened

25   and  she  said,  and  she  was  indicating  her  mother's

1    boyfriend, he stuck his private part in my private part.

2    And she said the circumstances were that they were home

3    alone and they were watching TV and then he brought her

4    into the bedroom and took her and did it to her.

5    Q.   Do they indicate whether they were afraid to tell

6    anybody?

7    A.   Yes, they said that they were too afraid to tell

8    anybody at that time.

9    Q.   And did you conduct a physical exam following?

10   A.   I did, sir.

11   Q.   And what were your findings?

12   A.   Autumn's physical finding was very abnormal.

13   Q.   Okay.  And if you could describe that in detail, what

14   you were looking for and what you actually found?

15   A.   Well, the opening was very large and I know there's a

16   lot of variation in that, but in, especially in the left

17   side and lower, like there was complete absence of the

18   hymen which is very abnormal.  And on the other side the

19   hymen was very, very thin.  You could also, like I was

20   saying later, usually you can't see into the entrance of

21   little girls and you could see very well into hers.  So it

22   was definitely abnormal.  There was also a question of a

23   notch which is an irregular little area on the upper left

24   and upper right.

25   Q.   When you speak in terms of a notch, what is a notch

197

1    actually?

2    A.    It's sort of a jagged area that's sort of carved out

3    of the hymenal ring.

4    Q.    Does it have anything to do with previous injury?

5    A.    Yes, it does.  We are taught that that's one of the

6    signs of sexual abuse.

7    Q.    I might be wrong on this, but if say skin is solid

8    like that and there's a tear that separates, it would be

9    possible I guess to sew it together or something and it

10   would grow back and heal in a line, but a notch is

11   something that stays apart and heals?

12   A.    It's sort of a, it's just an irregularity of the hymen

13   configuration itself.

14   Q.    Okay.  So --

15   A.    And the hymen doesn't, you know, it can't stick

16   together because the two pieces don't come together.

17   Q.    So it can't come back?

18   A.    A lot of times.  Sometimes it's, it's elastic, and so

19   that's why sometimes you don't find physical findings, but

20   on other occasions it's been injured to a point that it

21   doesn't regrow, it doesn't come back and then it's absent

22   altogether or very, very thin, like hers was.

23   Q.    Based on your experience how would you classify the

24   extent of her injury?  You can say abnormal but --

25   A.    I would say hers was very abnormal to extremely

198

1   abnormal.  I mean, there's no question in my mind that this

2   was an abnormal exam.

3   Q.   I know you haven't seen these, but this was a report

4   that's in evidence now State's exhibit number six which is

5   Children's Hospital up in Virginia and they have an

6   assessment, and I guess read as much of it as you want, but

7   particularly look at the assessment and see if you agree

8   with their findings?

9   A.   Yeah, I agree completely with their findings and in

10  fact I'm sort of impressed that they saw the same thing

11  that I saw.

12  Q.   And what are they indicating as findings?

13  A.   Would you like me to just read it?

14  Q.   Okay.

15  A.   She has very abnormal genital examination.  She has a

16  complete lack of hymenal tissue at the base.  Additionally

17  there is an avascular area consistent with a scar that

18  extends from the distal vagina into the posterior

19  fourchette.  This injury is consistent with a penetrating

20  injury to the genitals.  It is consistent with her stated

21  history of penile vaginal penetration.

22  Q.   Okay.  Now, there's been some testimony that at some

23  point and I believe it was March, '98 or March, '99, that

24  Autumn had complained of falling on what they called a

25  balance beam, but testimony indicated that it was maybe a

199

1    short beam like that.  Would you find the injury that's

2    described that you saw as well as what's described in that

3    report consistent with falling on what's described as some

4    kind of beam?

5          MR. FUNDERBURK:  Objection, Your Honor, that's

6       not the proper predicate or form of question  for

7       getting a medical opinion on that subject.

8          THE COURT:  Sustained.

9    Q.   You indicated there's different ways of, where injury

10   could occur.  What kind of ways can a hymen be injured

11   generally speaking?

12   A.   It has to be a penetrating injury, something that

13   actually goes through the vagina.  It's not going to be

14   something which is blunt that doesn't go through the

15   vagina.

16   Q.   And in regard to Autumn her injury would be consistent

17   with a penetrating injury?

18   A.   That is correct.

19   Q.   And with regard to Lillian, did you perform a physical

20   exam on her?

21   A.   I did not.

22   Q.   Okay.  And were you aware that she had been examined

23   in Virginia?

24   A.   I was aware of that.

25   Q.   and were you aware that they had found nothing as far

200

1    as any scar injury, that kind of thing?

2    A.    I am aware of that.

3    Q.    And was that the reason why you didn't feel it was

4    necessary to look?

5    A.    Well, she was not referred to me, and so she was not

6    there for me to be examined, so --

7    Q.    Okay.  So she just wasn't brought there?

8    A.    Correct.

9    Q.    Okay.

10    A.    I think she was with her but I don't recall.

11    Q.    Nobody indicated anything to you?

12    A.    Yeah.    They didn't want me to examine her, so I

13    didn't.

14    Q.    You just weren't asked to look.  Okay.  That's all I

15    have right now.

16            THE COURT:  Cross examination.

17                    CROSS EXAMINATION

18    BY MR. FUNDERBURK:

19    Q.    Dr. Anz, do you normally agree with another doctor

20    without seeing their report?

21    A.    I don't know how to take that statement.  It depends.

22    Q.    Well, the statement is, do you normally agree with

23    another doctor without seeing their written report where

24    there is a written report?

25    A.    It depends who the doctor is and what the report is

201

1    about.

2    Q.    Well, do you know Dr. Starling?

3    A.    No, I don't.

4    Q.    So I'm going to ask you again, do you normally take or

5    agree with a report you have not seen from a physician you

6    don't know, and agree with it?

7    A.    It depends what my own physical exam was and what I

8    saw.

9    Q.    Well --

10   A.    And my own findings.

11   Q.    -- how do you know what that doctor saw if you didn't

12   see the report?

13   A.    I think it's better to be objective and to make your

14   own mind up.

15   Q.    Ma'am, the question though is whether you can agree

16   with another doctor's examination where he's made findings,

17   a doctor you don't know, whether you can agree with those

18   findings without seeing his report and knowing what his

19   findings were?

20   A.    I am still confused.  In order to agree with another

21   doctor I have to make my own physical exam of the person

22   and talk to them first and then find out what their

23   physical or their findings are.  And if we agree I agree,

24   if we are not, well then I don't agree.  I make up my own.

25   Q.    Well, so you'd have to see the doctor's report to know

202

1    what his findings were or talk to him on a phone?

2    A.    That's correct.

3    Q.    Now before you agreed with Dr. Starling and his report

4    did you talk to him on the telephone?

5    A.    I did not.

6    Q.    Did you see his report?

7    A.    I did not.

8    Q.    So you agreed with him without knowing what his report

9    was or what his findings were?

10    A.    Well, if somebody tells me that his findings are the

11    same as mine I guess I would agree with them.

12    Q.    But you didn't talk to him, based on what you've just

13    said in your report.

14            MR. GLANZER:    Judge, we'd object to that.

15            THE COURT:    You just said that, Mr. Funderburk.

16    Next question.

17    Q.    Okay.  In your report, you have your report there?

18    A.    I do.

19    Q.    Down at the bottom apparently the child has also been

20    examined by a forensic expert in Virginia and I agree with

21    his or her assessment.  You didn't even know if that person

22    was a male or female, did you?

23    A.    No, but I was told that this child had been examined

24    by a forensic specialist.  It's true --

25    Q.    Nor had you seen that person's assessment?

FORM CSR-LASER    REPORTERS PAPER & MFG. CO. 800-626-6313

203

1   A.    And I was told that they felt that the child had been

2   sexually abused and this child's physical exam was so

3   impressive that I concurred that this child had been

4   sexually abused.

5   Q.    But to answer my question, you did this without

6   knowing what was in the report and then you said it would

7   be helpful to have this record as well.  You didn't have

8   it, did you?

9   A.    I did not.

10  Q.    In fact, when is the -- when did you first see the

11  report from the doctor in Virginia?

12  A.    Today.

13  Q.    Now, in that doctor's report he mentions that some

14  photographs were taken.  Do you have his report there?

15  A.    I do.

16  Q.    Okay.  On his findings over here, if you'd just flip

17  over real fast, next page, let me -- I can't see that far.

18  Okay.  Number one says what?

19  A.    A colposcopic exam or photographs were taken.

20  Q.    Did you see those photographs?

21  A.    No, sir, I did not.  Or actually I just saw them a few

22  minutes ago.

23  Q.    The photographs?

24  A.    Uh-huh.  (Affirmative response.)  And that's the first

25  time I've ever seen them.

204

1   Q.   Did you do such an exam yourself?

2   A.   No, we don't have an instrument available in our

3   community.

4   Q.   And that is a better way of examining somebody than

5   just visual, isn't it?

6   A.   No, sir, it's not.

7   Q.   Do you have any authorities you'd like to quote

8   stating that that type of exam is not superior to the eye

9   exam?

10   A.   I think it's just another tool to confirm your

11   diagnosis.  It's sort of like a laboratory exam or an X-

12   ray.  I have a partner who worked full time with the San

13   Diego Sexual Abuse people and she felt that --

14              MR. FUNDERBURK:  Your Honor, I'm going to object

15         to what her partner tells her.

16              THE WITNESS:  Okay.

17              THE COURT:  Sustained.

18   Q.   Now do you have your entire office record there?  I

19   may have asked you this earlier?

20   A.   I don't have the entire record, I have part of it.

21   Q.   If I show you what's been given to me could you

22   identify this as being the office record from your office?

23   A.   Yes, that's our office records.

24   Q.   And this nurse's note, is that also from your files?

25   A.   It's from my files, that's correct.

205

1   Q.   All right.  If I pull these out of here, let me

2   inquire if I've got a clean copy.

3   A.   I may have it.  Is this -- I might have it.

4   Q.   Oh, do you?

5   A.   Yeah.  This page, you're referring to?

6   Q.   Yes, what about the other pages?

7   A.   I have several.

8   Q.   I believe you've got everything I was looking at.

9   A.   Okay.

10       MR. FUNDERBURK:  Your Honor, could I check and

11   make sure that's part of exhibit -- we haven't made it

12   an exhibit?

13       THE COURT:  What are ya'll looking for?

14       MR. FUNDERBURK:  I'm looking for the records from

15   the emergency department from her office, other than

16   the report.

17       THE COURT:  Didn't you bring your records from

18   your office, Doctor?

19       MR. FUNDERBURK:  She does have it.

20       THE COURT:  Huh?

21       MR. FUNDERBURK:  She does have it right here.

22   I'm just inquiring as to whether this has already been

23   introduced.

24       THE COURT:  Have you got any objection to it?

25       MR. GLANZER:  Not at this point.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

206

1          THE COURT:  Do you want to introduce it?

2          MR. FUNDERBURK:  Yes, sir.

3          THE COURT:  Mark it.

4                (WHEREUPON,  the  instrument  hereinabove

5                referred to was marked for identification

6                as Defendant's exhibit number one.)

7          THE COURT:  Defendant's number one is admitted.

8                (WHEREUPON,  the  instrument  hereinabove

9                marked  for  identification  as  Defendant's

10               exhibit  number  one  was  admitted  and

11               received into evidence.)

12         THE COURT:  All right.  Go ahead.

13  **CROSS EXAMINATION RESUMED BY MR. FUNDERBURK:**

14  Q.    All right.  Looking at your office record?

15  A.    Uh-huh.  (Affirmative response.)

16  Q.    Was  Autumn  examined  by  your,  by  your  place  of

17  employment back in 1999?

18  A.    She was.

19  Q.    And going to the, it's not in order, but if you'll

20  look to the March 5, do you see that, a phone consult?

21  A.    yes.

22  Q.    And you see a reference there to this event occurring

23  on Wednesday at school?  Do you see that?

24         THE COURT:  Go up and point out what you want her

25         to look at, Mr. Funderburk.

207

1            MR. FUNDERBURK:  Yes, sir, Your Honor.

2    A.    Okay.  I've got it.

3    Q.    All right.  You don't mind me standing here?

4    A.    Okay.

5    Q.    All right.  March 5, it says Wednesday as school mom

6    noted blood on toilet seat and on her panties this morning.

7    And the jury will have it so they can read that.  March 5

8    was a Friday, Wednesday would have been a Thursday.  And I

9    represent to you that's the case, in 1999.  So this event

10   would have occurred in '99, and this is out of order,

11   because that's '98.  The next note is '99.  If you can

12   confirm that.  It shows March 5, 1999?

13   A.    Uh-huh.  That's correct.

14   Q.    And I represent to you that March 5, 1999 was a

15   Friday.

16   A.    Uh-huh.  (Affirmative response.)

17   Q.    And the Wednesday would have been the 3rd, two days

18   prior to that time.

19   A.    Uh-huh.  (Affirmative response.)

20   Q.    All right.  So your next note, if you'll put the page

21   back this way, it looks like there was a call, that's the

22   nurse's note, there was a call on the 7th, that would be

23   the nurse's note.  That would be this one here.

24   A.    Correct.

25   Q.    On the 7th.  And we've already read that.

208

A.    Ten o'clock.  Correct.

Q.    Noting that, this one the mom stated the child fell on Friday, that's just what it says?

A.    Correct.

Q.    And that she is still bleeding essentially.

A.    Right.

Q.    You can read yours, I'll show you mine if you don't mind me standing here this close.

      Then the next note is Monday, March 8.  And if you would, just tell the jury what that, if you can read all that, what that says?

A.    Recheck of the private areas.  Still bleeding.  Fever x two days.

Q.    Now that was found at the time to be the result of a straddle injury, was it not, by your office?

A.    Well, the history was that the child had fell at the school.

Q.    Yes, ma'am.

A.    And when you're a physician you pay attention to the history.  We're not going to be looking for problems.  And so we assume that the history was valid.  And also, I'd like to point out apparently there was a lot of bleeding in the area, so it could have been that she was unable to see anything else but the blood.  I don't know, I wasn't there and I didn't examine the child for sure.

209

1    Q.    But so we can move on, I mean the finding at that time

2    was a straddle injury?

3    A.    It was assumed it was a straddle injury because of the

4    history.

5    Q.    Well I know, ma'am, but the finding was a straddle

6    injury?

7    A.    That was the assumption, yes.  It was a vaginal

8    laceration is actually the diagnosis.

9    Q.    That left scars which are still there?  In other

10   words, there was a scar which you found when you examined

11   her, so there was a scar from this time?

12   A.    Well, we assumed that's from this time but it could

13   have been from other times.  I don't know.

14   Q.    Now ma'am, in your report I note that you use the word

15   as you have in your testimony, agreeing with Dr. Starling

16   I believe it is, that the findings are, actually that the

17   findings are not, in terms of the vaginal area, a normal

18   finding, let me get this out of my mouth, a normal finding

19   is, doesn't tell you anything really about whether or not

20   there's penetration, is that what you testified to earlier?

21   A.    It doesn't rule out penetration, correct.

22   Q.    Doesn't rule out penetration.  Now can you state with

23   any reasonable degree of medical certainty looking at the

24   two reports that you've seen, one on Lillian and one on

25   Autumn, can you state with a reasonable degree of medical

210

1    certainty that there is physical evidence supporting the

2    claim of Autumn and Lillian that they were penetrated

3    anally?

4    A.   There's no -- well, I guess I tend to believe the

5    children and just with their history --

6    Q.   Ma'am, I --

7           THE COURT: Dr. Anz, you need to listen to this

8           question carefully and answer it as he asks it. The

9           Prosecutor can clarify anything that needs to be

10         clarified.

11         THE WITNESS: Okay. I'm sorry.

12   Q.   Would you like for me to --

13   A.   Repeat the question, please.

14   Q.   Based on your examination of Autumn and the reviewing

15   of Dr. Starling's reports from both, on both Lillian and

16   Autumn, which you now have, can you state with a reasonable

17   degree of medical certainty that there is physical evidence

18   consistent with penetration?

19   A.   I don't have the report of Lillian and I have not, I

20   don't have it in hand, and have not had a chance to review

21   it. But there was no physical evidence of anal penetration

22   as we talked about later, I very rarely see.

23   Q.   And again, reviewing, since you did not examine

24   Lillian, but you have seen the report, can you state with

25   any reasonable degree, with a reasonable degree of medical

211

1    certainty that there was a physical finding in the report

2    by Dr. Starling regarding Lillian that there's physical

3    evidence supporting her testimony or her statement that she

4    had been vaginally penetrated many times?

5    A.    There's no physical evidence.  But again, sometimes

6    there's not.

7    Q.    Dr. Anz, that's all I have.  Thank you.

8          THE COURT:  Any redirect?

9                    REDIRECT EXAMINATION

10    BY MR. GLANZER:

11    Q.    And I believe you said the actual diagnosis on Autumn

12    was vaginal laceration, correct?

13    A.    That is correct.  The first time?

14    Q.    Correct.

15    A.    Yes.  Back in March of '99.  That's correct, sir.

16    Q.    Would that be consistent with blunt force trauma or

17    would there have to be more involved?

18          MR. FUNDERBURK:  Your Honor, we object.  Again,

19       that's really not the proper for of the question.

20          THE COURT:  Sustained as to the form of that

21       question.

22    Q.    Can you state with a reasonable degree of medical

23    certainty that the vaginal laceration could have been made

24    by a blunt force trauma?

25    A.    It's hard for me to say because I did not examine the

213

1    A.    Was I told that by the child?  No.

2    Q.    Okay.   But you have learned that since from other

3    sources?

4    A.    I have learned that from other sources, yes, sir.

5    Q.    And it would be, I guess your opinion, based on what

6    you issued in your report, that you feel that based on your

7    exam that it would be a class three to four range sexual

8    abuse?

9    A.    That's correct.

10                MR. FUNDERBURK:  We would object.

11                THE COURT:  Sustain the objection to that.

12   Q.    Are there classes of sexual abuse categorized

13   medically?

14   A.    Yes, that's, that helps us tell you exactly how

15   certain we are of the abuse.

16   Q.    If you could, could you generally describe what you

17   would be looking for in each class or what class contains?

18   A.    A class one would be not a good history, maybe

19   something, you know, a little unusual on physical exam, not

20   very likely that the child was abused.

21   Q.    Class two?

22   A.    Class two might be again a physical finding but no

23   history or maybe history and -- well, that's about it.

24   Q.    Okay.  And then a class three?

25   A.    A class three is when you get a history and maybe no

214

1   physical finding, or a pretty impressive physical exam but

2   no history.

3   Q.   And class four?

4   A.   Class four is GC, a laceration where it's acute and a

5   history.

6   Q.   Okay.  Could a class four also include something like

7   an immediate report with sperm being found?

8   A.   Oh, definitely.

9   Q.   And that would also give you some more people?

10  A.   That would be class four.

11  Q.   Did you in this particular case classify in your

12  opinion the findings in this case concerning Autumn McLees?

13  A.   Yes, I thought it was a class three to a class four.

14  I thought her physical findings were extremely impressive

15  and she was now giving us a very detailed history.

16  Q.   Okay.  I have nothing further.

                    RECROSS EXAMINATION

18  BY MR. FUNDERBURK:

19  Q.   Dr. Anz, you took a medical history?

20  A.   Yes, sir.

21  Q.   And the people from your office took a history back in

22  1999; right?

23  A.   Correct.

24  Q.   Now a history, would it not be fair to say that one

25  reason you take a history is so you can compare the

216

1    excused.

2            And we will call it a day, ladies and

3    gentlemen.  I'm going to let you go and ask you to be

4    back in the morning at nine o'clock.  You do not need

5    to call in on the code-a-phone tonight, the message on

6    there will be for the other jurors, not you.  We'd ask

7    you to be back here at nine.  When you come back in

8    the morning, come back up here to the jury room behind

9    you.  We'll let you in that side door down there, if

10   you want to use that door.  I'd say we have a bailiff

11   out there by about a quarter to nine.  And come on up

12   here and we'll get started promptly at that time.

13           Please don't discuss this case with anybody

14   or let anybody discuss it with you.  That wouldn't be

15   fair to either side.  I know you want to be fair to

16   both sides.  So just forget about it until in the

17   morning and we'll begin at that time.

18           You may go out that door.

19           (WHEREUPON, the following proceedings were

20           had and done out of the jury's presence and

21           hearing, to-wit:)

22       THE COURT:  All right.  Now, what is it you want

23   to do, Mr. Glanzer?

24       MR. GLANZER:  Dr. Anz's report.

25       MR. FUNDERBURK:  I think I put the whole thing

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

217

1    in.

2         MR. GLANZER:  Yeah, he was saying he might have

3    put it in but I --

4         THE COURT:  This right here?  She had that with

5    her.  What is that?

6         MR. GLANZER:  Yeah, I thought he was talking

7    about the old stuff and not the new stuff.

8         THE COURT:  All right.  Nine o'clock in the

9    morning.

10             (WHEREUPON, proceedings were in recess from

11             December 3, 2001 at 4:50 o'clock p.m. until

12             December 4, 2001, at 9:00 o'clock a.m.)

13

14        **PROCEEDINGS SECOND DAY OF TRIAL**

15        THE COURT:  Everybody ready to go today?

16        MR. GLANZER:  Yes, sir.

17        MR. FUNDERBURK:  Yes, sir, Your Honor.

18             (WHEREUPON, the jury returned to the

19             courtroom and the following proceedings

20             were had and done in its presence and

21             hearing, to-wit:)

22        THE COURT:  Good morning, ladies and gentlemen.

23        THE JURY:  Good morning.

24        THE COURT:  I'm glad everybody got back all

25    right.

218

1        Call your next witness.

2              MR. GLANZER:  Shane Healy.

3                    **SHANE HEALY,**

4    a witness, having first been duly sworn to speak the truth,

5    the whole truth and nothing but the truth, was examined and

6    testified as follows, to-wit:

7                    <u>DIRECT EXAMINATION</u>

8    BY MR. GLANZER:

9    Q.    What is your name?

10   A.    Shane Daniel Healy.

11   Q.    And where are you employed?

12   A.    The Opelika Police Department.

13   Q.    And what kind of duties do you perform for them?

14   A.    I'm a detective.

15   Q.    And do you specialize in any particular types of

16   cases?

17   A.    Yes, sir.   Crimes involving children, especially

18   sexual crimes against children.

19   Q.    And how long have you been doing that?

20   A.    I've been in that capacity for almost three years.

21   Q.    Okay.  At some point did you become, I guess what's

22   called the case agent in the investigation of the Autumn

23   McLees and Lillian McLees case?

24   A.    Yes, sir, I did.

25   Q.    Tell the jury what a case agent does, first of all?

219

1  A.    Basically what my job is, is to coordinate everything

2  that goes on during the investigation.  In Lee County we do

3  what we call a multi-disciplinary team approach to these

4  types of investigations.  What that includes are people

5  from law enforcement, the Department of Human Resources,

6  Child Advocacy Center, people from the District Attorney's

7  office.  We all get together and investigate these cases

8  together as one entity instead of everybody doing their job

9  separately and differently at different times.  It helps us

10  to not revictimize the children, I guess is a good way to

11  put it.

12  Q.    And when you mentioned law enforcement, what groups

13  are involved in the multi-disciplinary team?

14  A.    The Opelika Police Department, the Auburn Police

15  Department and the Lee County Sheriff's Department.

16  Q.    And you mentioned DHR?

17  A.    Yes, sir, DHR.

18  Q.    And what kind of people are attending from DHR?

19  A.    What they call CAN investigators, child abuse and

20  neglect investigators.

21  Q.    Okay.  And you mentioned the Child Advocacy Center,

22  who represents them, what kind of people are associated

23  with them?

24  A.    Brenda    Moss,    basically    who    is    the    forensic

25  interviewer.

220

1    Q.    And the D.A.'s office?

2    A.    Yes, sir.  Yourself and some of the other Assistant

3    District Attorneys.

4    Q.    And when you say they investigate, do they

5    individually actually get involved in the specific

6    investigation that you're doing?

7    A.    Each group has a specific function.  We all have

8    different things that we need to accomplish during an

9    investigation and we help each other with whatever they

10   need.  We share information, the things that I may need

11   that DHR has, they will provide to me, vice-versa.

12   Q.    Okay.  What's your eventual goal when you're looking

13   at a case?

14   A.    Successful prosecution.

15   Q.    Okay.  At what point does the case leave the multi-

16   disciplinary team?

17   A.    Once a determination has been made at a team meeting

18   that we want to go ahead with the prosecution, then the law

19   enforcement will take over as far as completing warrants

20   and arresting the Defendant and then we turn it over to the

21   District Attorney's office.

22   Q.    And is that the process you followed in the Autumn and

23   Lillian McLees case?

24   A.    Yes, sir, it is.

25   Q.    In this case did you also receive records from

221

1   Virginia?

2   A.   Yes, sir, I did.

3   Q.   And what kind of records did you receive from

4   Virginia?

5   A.   Received a interview of Autumn McLees that is actually

6   a typed, the interview was recorded, tape recorded, and

7   then transcribed.  I received a report of an interview with

8   Lillian, and then I received medical exams of both Autumn

9   and Lillian that were completed at the Children's Hospital

10   up there.

11   Q.   When you say interviews on both children, who was

12   doing the interviewing in Virginia, what groups were doing

13   that?

14   A.   Dorrie Milford who is a forensic interviewer for the

15   Child Protective Services in Chesapeake, Virginia.

16   Q.   Professionals?

17   A.   Yes, sir.

18   Q.   Upon receiving that information what did you do?

19   A.   I received that information, collected as much

20   information as possible, I contacted the girl's mother,

21   explained to her what was involved in completing an

22   investigation like this here in Alabama, and the big part

23   of that was that they would need to travel to Alabama

24   several times so that we could perform forensic interviews,

25   medical exams if needed, they would need to come down for

222

1    any court hearings, to sign warrants, anything like that.

2    Q.    And did they, I believe do that?

3    A.    Yes, sir, they did.

4    Q.    Obviously.  When you say interviews and the medical,

5    in essence did you decide to re-investigate the whole case?

6    A.    We decided to use the people that we have here to not

7    necessarily redo what was done in Virginia, but to show

8    that what was done in Virginia is true and correct.

9    Q.    Okay.  And at some point did they come down for

10    interviews?

11    A.    Yes, sir, they did.

12    Q.    And when was that?

13    A.    June 25th of this year.

14    Q.    And also when was the medical exams conducted?

15    A.    The medical exams here in Alabama?

16    Q.    Yes.

17    A.    On June 25th.

18    Q.    After having those interviews and the medical exams

19    did you have an opportunity to compare the interviews here

20    and the medical versus what was in Virginia?

21    A.    Yes, sir, I did.

22    Q.    And did you find those consistent to you?

23    A.    Yes, sir.

24              MR. FUNDERBURK:  Objection, we --

25              THE COURT:  Sustain the objection.  Disregard

223

1    that last answer, ladies and gentlemen.  Now, don't

2    answer out when there's an objection until I have a

3    chance to rule on it.

4         THE WITNESS:  Yes, sir.

5    Q.   I have nothing further.

6         THE COURT:  Cross examination.

7         MR. FUNDERBURK:  No questions.

8         THE COURT:  You can step down.  Next witness.

9         MR. GLANZER:  Brenda Moss.

10                   BRENDA MOSS,

11   a witness, having first been duly sworn to speak the truth,

12   the whole truth and nothing but the truth, was examined and

13   testified as follows, to-wit:

14                 DIRECT EXAMINATION

15   BY MR. GLANZER:

16   Q.   What is your name?

17   A.   Brenda Moss.

18   Q.   And where are you employed?

19   A.   The Child Advocacy Center of East Alabama.

20   Q.   And how long have you been with them?

21   A.   Three years.

22   Q.   And prior to that where were you employed?

23   A.   I was employed at the Opelika Police Department.

24   Q.   And how long have you worked for them?

25   A.   Twenty-six years.

224

1    Q.   And during those twenty-six years with the Opelika

2    Police Department did you specialize in any particular kind

3    of cases?

4    A.   It was mainly in the juvenile division and also I was

5    involved in a lot of the sexual abuse and rape

6    investigations.

7    Q.   Okay.   And then the Child Advocacy Center as a

8    forensic interviewer.  What kind of education and training

9    have you had to perform those kinds of duties?

10   A.   I have a B.S. degree from Auburn University in child

11   development and I also attended a fifty hour school on

12   forensic interviewing.

13   Q.   Okay.   And since becoming an interviewer,

14   approximately how many children have you interviewed?

15   A.   Approximately 250.

16   Q.   And have you previously testified in court, either OPD

17   as a case agent for part of an investigation, and as a

18   forensic interviewer?

19   A.   Yes, I have.

20   Q.   And approximately how many times?

21   A.   Probably 75 to 100 times.

22   Q.   Okay.   We'd offer her as an expert in forensic

23   interviewing at this time.

24           MR. FUNDERBURK:  No objection.

25           THE COURT:  Okay.  So recognized.

225

1    Q.    When you do a forensic interview and -- well, let me

2    ask you first, what is the range of the ages of the

3    children that you interview?

4    A.    Anywhere from two and a half to three up until their

5    seventeenth birthday.

6    Q.    Okay.    And how do you go about conducting an

7    interview?

8    A.    Basically we get our referrals from the Department of

9    Human Resources or the law enforcement agency involved in

10   the case.  They would call me when they get a report.  We

11   coordinate a time for me to interview the child, the child

12   is brought to the center by their custodians or, you know

13   parent or custodians.  And I have very little information

14   about the case when I go into the interview.  That's just

15   the way it's recommended that we do interviews.  And I just

16   begin talking to the child about just kind of rapport

17   building, finding out about school and who all they live

18   with, their favorite things at school, their family.  And

19   then I ask them, you know, if they know why they've been

20   brought to the center to talk to me.  Most of them do know

21   why they're there.  Then I go, depending on their age I

22   explain truth and lies and real and pretend to the younger

23   children, and then I actually have some rules that I go

24   over with the older children to make sure that they

25   understand their obligation to tell me the truth and also

226

1    to make sure that they understand that they have all the

2    information.    Most  kids  things  that  adults  have  the

3    information, not them.  But in cases like this I make sure

4    they understand that they have all the information.  I let

5    them  know  that  if  they  don't  know  something  or  don't

6    remember not to guess at an answer.  A lot of times kids

7    just think they have to give adults an answer when they're

8    asked something.  I let them know that if I get something

9    wrong, a lot of times I'll repeat back to them things that

10   they have told me and I make sure that they know that they

11   can correct me if I get something wrong.  And I tell them

12   if a question is too hard that we can come back to it

13   later.    And then I go into, you know, the questioning

14   techniques that I was trained in from the, open ending

15   questions  like  tell  me  what  all  happened,  tell  me

16   everything you can remember that happened, to the more

17   abuse focus questions.  And we just have a wide range of

18   questioning techniques from multiple choice, I do not ask

19   any leading questions to the children and then just try to

20   find out as many facts as I can about what has happened to

21   them.

22   Q.    Do you conduct this in a special area?

23   A.    I do.

24   Q.    And describe that if you would?

25   A.    It's just a, we have an interview room at our center

227

1    and it's just child friendly, has paintings on the wall, we

2    have two rocking chairs in there and then a small round

3    table with two chairs for the younger children, have

4    crayons in there and paper for them to draw on.  And then

5    we have an observation room that's located right next to

6    the interview room.

7    Q.   And when you say observation room, how is it possible

8    that somebody can observe what you're doing in the

9    interview room?

10   A.   We have the one-way mirrors, windows.

11   Q.   When someone is in that other room are they permitted

12   to in any way interrupt what you're doing?

13   A.   No.  Not at all.

14   Q.   Did you conduct the interview of both Autumn McLees

15   and Lillian McLees?

16   A.   Yes, I did.

17   Q.   And when did you do that?

18   A.   It was on June the 25th of this year.

19   Q.   Okay.  And approximately how old were each of them at

20   that time?

21   A.   Autumn was eight years old and Lillian was ten years

22   old.

23   Q.   Okay.  Was there anybody else present when you

24   conducted those interviews?

25   A.   Just the child, no, in the interview and then

228

1    Detective Healy of the Opelika Police Department and Yarbi

2    Cound who is a social worker with Lee County DHR, they were

3    present in the observation room.

4    Q.    Okay.    And when you conducted each one of these

5    interviews you, did you try to determine whether the

6    knowledge that the child had was something from their own

7    personal knowledge?

8    A.    Yes, I did.

9    Q.    And did it appear to be?

10   A.    It appeared to be.

11   Q.    And when you're interviewing do you try to determine

12   whether they appear to be, have the, I guess appropriate

13   maturity for their age?

14   A.    Yes, I do like a child development, making sure --

15   especially with the younger children, making sure they

16   know, like they know the basic colors, if they understand

17   the concept of prepositions, inside, outside, under, on top

18   of, that sort of thing.

19   Q.    When you're dealing with children of this age do you

20   see difference in their understanding of things like time

21   and space compared to adults?

22   A.    Oh, very much so, especially with Autumn.

23   Q.    What kind of differences do you see?

24   A.    In a child like at six years old they may be able to

25   count to fifty or a hundred but they really don't

229

1    understand the concept, if you ask them how many times did

2    something happen. How many times did you go to school this

3    week. They just don't understand that concept, even though

4    they may can count to fifty or fifteen or twenty they have

5    a hard time understanding the concept of the number of

6    times something happened.

7    Q.   It's just different for children?

8    A.   Their developmental level. It's very normal.

9    Q.   When you interviewed them as well as others, do you

10   try to look for any, maybe biases or coercion that might

11   have caused them to relate these kinds of things?

12   A.   I think basically as you become more experienced in

13   doing this you can almost tell a difference when a child

14   has been coached, just the way they make the disclosure and

15   the way they talk to you. Neither of these children

16   appeared to be coached or had any motive for making this

17   up.

18   Q.   And how did they get to the center, who brought them

19   there?

20   A.   They were brought there by their mother and their

21   maternal grandmother.

22   Q.   And at anytime did they try to influence anything you

23   were doing or any of the content of the children's

24   statements to you?

25   A.   No. I take the children back into the, you know, to

230

1    the interview room, you know, shortly after they get there

2    and then there's always one of our employees, you know, in

3    the room where they're waiting, just playing with the

4    children.

5    Q.    Okay.  And you had already indicated you try to avoid

6    any leading questions, in other words, yes or no type of

7    answers.  And did you do that in this case?

8    A.    I did.

9    Q.    Avoid those kind of things?  When you asked the

10   opening questions did their responses appear to be age

11   appropriate?

12   A.    Yes, very much so.

13   Q.    And also content appropriate?

14   A.    Yes.

15   Q.    Did either one of the children indicate that they were

16   suffering from any, maybe medical disorder or any

17   discomfort or pain that maybe somehow would have affected

18   their ability to tell you anything?

19   A.    No, they did not.  They did not appear to be that way.

20   Q.    They appeared to be coherent?

21   A.    Right.

22   Q.    Let me refer you to Autumn McLees, and didn't -- let

23   me ask you first, when you talked to these individuals did

24   you record the statement in any way?

25   A.    I did not.  I made notes during the interview.

231

1   Q.   Okay.  You made hand notes?

2   A.   Hand notes.

3   Q.   At sometime did you transcribe those into a written

4   report?

5   A.   Yes, I did.

6   Q.   And was that report made, I guess a permanent part of

7   your records?

8   A.   Yes.

9   Q.   Let me show you first what's marked State's exhibit

10  number two and ask if you can identify this?

11  A.   Yes, this is the report on the interview with Autumn.

12                  (WHEREUPON, said document was marked for

13                  identification as State's exhibit number

14                  two.)

15  **DIRECT EXAMINATION RESUMED BY MR. GLANZER:**

16  Q.   Okay.  And that was the report you prepared?

17  A.   Yes, it is.

18  Q.   And have you had an opportunity to review that since

19  you made that report?

20  A.   Yes, I have.

21  Q.   And does it fairly and accurately reflect the

22  interview as you recall it?

23  A.   Yes, it does.

24                  MR. GLANZER:  We'd offer State's number two at

25                  this time, Judge.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

232

1      MR. FUNDERBURK:  Objection.

2      THE COURT:  Did you say no objection?

3      MR. FUNDERBURK:  Objection.  We object to it.

4  She can testify from it but we'd object to the

5  document itself.

6      THE COURT:  Sustained.  Well, you mean you're

7  objecting to the document going to the jury?

8      MR. FUNDERBURK:  Yes, sir.  Okay.  It will be

9  admitted for the purposes of her testimony but will

10  not be permitted to go to the jury.

11     MR. FUNDERBURK:  Yes, sir.

12         (WHEREUPON, said document was received into

13          evidence as State's exhibit number two, but

14          was not permitted to be sent to the jury

15          during deliberations.)

16  **DIRECT EXAMINATION RESUMED BY MR. GLANZER:**

17  Q.  If you would, we'd ask that you read that report at

18  this time?

19  A.  Okay.  Do you want me to start with the second

20  paragraph?

21  Q.  That would be fine.

22  A.  Okay.  "Autumn is eight years old and she just

23  completed the second grade.  Autumn said she went to school

24  at Butts Road Primary School in Chesapeake, Virginia.

25  Autumn said she had two teachers, Ms. Johnson and Ms.

233

Rainfelt. I asked Autumn her favorite subject in school and she said that she liked art the best. I asked Autumn if there was anything else, anything she didn't like about school and Autumn said she liked everything about school.

I asked Autumn who all she lives with. Autumn said she lives with her grandma, her papa, her mom, two sisters, Lillian and Elizabeth, and two cousins, Robbie and Carlton.

I asked Autumn if she knew why she had been brought to the center to talk to me. I told Autumn that that was" -- I'm sorry. "Autumn said it was about some bad things Lee did to her when they lived in Opelika. I told Autumn that was what we would be talking about. I then told Autumn that we would only talk about things that had really happened and not pretend things. I used several examples in explaining truth and lies and Autumn responded appropriately and said she would tell the truth.

I asked Autumn who Lee was. Autumn said Lee lived with them when they lived in Opelika and he was her mom's boyfriend. I told Autumn to tell me everything she could remember about what happened. Autumn said that Lee did some bad things to her and her sister Lillian. Autumn said that Lee choked her until she passed out. I told Autumn to tell me more about that. Autumn said she couldn't remember why Lee did that or anything else about

234

1    it.

2         Autumn said a friend of her mother's had given

3    her a pair of handcuffs for a birthday or Christmas

4    present. Autumn said Lee put the handcuffs on her hands

5    behind her back and then he would duck her in the water in

6    the bath tub. Autumn said Lee would hold her heard under

7    the water in the bath tub. Autumn said Lee did that to

8    Lillian but most of the time he just did it to her. Autumn

9    said Lee would hold her head under the water in the toilet

10   and then flush the toilet. Autumn said Lillian told her

11   that Lee did that to her too. Autumn said she believed Lee

12   did that to Lillian because she would hear Lillian

13   screaming in the bathroom.

14        I asked Autumn if there was anything else Lee did

15   to her. Autumn said Lee stuck his private part in her

16   private part. I asked Autumn to point to her private part

17   that she was talking about. Autumn pointed to her butt.

18   I asked Autumn if she had a name for that part of her body.

19   Autumn said she thought it was called a gluteus maximus.

20   I asked Autumn if she had another name for it and she said

21   it was her back private part. I asked Autumn if she had a

22   name for Lee's private part and Autumn said she called it

23   a winkie. I asked Autumn if Lee put his winkie against her

24   private part or inside and she said he put it inside and it

25   hurt her. I asked Autumn if her clothes were on or off

235

when this happened. Autumn said Lee would tell her to take her clothes off and she did. Autumn said she took all her clothes off, even her panties. I asked Autumn if anything happened to Lee's clothes. Autumn said Lee would take all his clothes off. Autumn said Lee wore boxer underwear most of the time. I asked Autumn if Lee did anything else with his winkie. Autumn said Lee put his winkie inside her mouth. I asked Autumn if Lee's winkie felt hard, soft or some other way. Autumn said it felt hard. I asked Autumn if she felt anything come out of Lee's winkie when it was inside her mouth and she said no. I asked Autumn where this happened. Autumn said it happened when they were all living in Opelika in a trailer. Autumn said the trailer was past Golden Corral. I asked Autumn who all would be at home when this happened. Autumn said it always happened when her mom was at work and she, Lillian and Elizabeth would be at home with Lee. Autumn said Lee kept them while her mom worked. I asked Autumn if anything else happened. Autumn said one time Lee had his winkie inside her back private part and it slipped and went inside her pie. I asked Autumn what her pie was. Autumn said it was her front private part and she pointed to her vaginal area.

Autumn said Lee put her in the bath tub. Autumn said Lee knew he had hurt her because she had blood coming out of her pie. Autumn said when Lee saw the blood he put

236

her in the bath tub.  I asked Autumn if she told anyone about that.  Autumn said she told her mom that she had fallen off the balance beam at school.  Autumn said that was what Lee told her to tell her mom.

I asked Autumn if she went to the doctor because of this.  Autumn said she didn't think she did but she couldn't remember for sure.

Autumn said she didn't think Lee meant to hurt her pie but his winkie slipped when he had it inside her back private part.

I asked Autumn what grade she was in when all this happened.  Autumn said she was in kindergarten.  I asked Autumn if she remembered the name of her school and she said no.

I asked Autumn if there was anything else she could remember.  Autumn said one time Lee slammed her head against the wall in the trailer.  Autumn said she didn't know why Lee did that but it left a hole in the wall. Autumn said that happened in her bedroom.

Autumn said she shared a bedroom with Lillian and Elizabeth.

I asked Autumn if Lee put his winkie inside her private part, in her back private part one time, two times or a bunch of times and she said a bunch of times.

I asked Autumn if Lee put his winkie inside her

237

1    mouth one time, two times or a bunch of times and she said

2    it was a bunch of times.

3          I asked Autumn if Lee put his winkie inside her

4    pie one time, two times or a bunch of times and she said

5    that only happened one time.

6          Autumn said Lee's full name was William Lee

7    Kirby.  Autumn said her mother had told her that today.  I

8    asked Autumn if there was anything else she could remember.

9    Autumn said that Lee would kick and punch her and Lillian

10   and leave marks and bruises on their legs and belly.  I

11   asked Autumn if that happened one time, two times or a

12   bunch of times and she said a bunch of times.

13         I asked Autumn if there was anything else she

14   could remember and she said no.

15         Autumn said she wanted me to know that everything

16   that she told me was the truth.  I thanked Autumn for

17   talking to me and ended the interview."  And the interview

18   lasted approximately forty minutes.

19   Q.   Let me show you what's marked State's exhibit number

20   three and ask if you can identify this?

21   A.   Yes, this is the report I completed on the interview

22   with Lillian McLees.

23   Q.   And have you had an opportunity to review that since

24   you prepared it?

25   A.   Yes, I have.

238

Q.   And does it fairly and accurately reflect the
interview as you recall it?

A.   Yes, it does.

          MR. GLANZER:  Judge, we'd offer State's three for
     the purposes of entering it for reading.

          THE COURT:  Admitted.

               (WHEREUPON, the instrument hereinabove
               marked for identification as State's
               exhibit number three was admitted and
               received into evidence, but not to be
               received by the jury for deliberations.)

DIRECT EXAMINATION RESUMED BY MR. GLANZER:

Q.   And if you would, please read Lillian's.

A.   Okay.  "Lillian is ten years old and has just
completed the fourth grade at Butts Road Intermediate
School.  Her teacher is Mr. Burkey.  I asked Lillian about
her favorite subject.  Lillian said she liked math the best
and didn't like English and reading.

          I asked Lillian who all she lives with.  Lillian
said she lives with her grandparents (and Robert Hepner),
her sisters, Autumn and Elizabeth, and her cousins, Robbie
and Carlton.

          Lillian said her mom and stepdad live in
Chesapeake but they visit each other a lot.  I asked
Lillian if she knew why she had been brought to the center

239

1    to talk to me.  Lillian said it was about the bad things
2    Lee Kirby did to her.
3            I told Lillian that was what we would be talking
4    about.  I then explained the rules to Lillian as follows:
5    You know more than I about what happened.  Always tell the
6    truth.  No guessing.  If you don't know or don't remember
7    say so.  If I repeat a question it doesn't mean your first
8    answer was wrong and you can correct me if I get something
9    wrong.  Lillian said she understood and would follow the
10   rules.
11           I told Lillian to tell me everything she could
12   remember about what happened.  Lillian said that Lee hurt
13   her and touched her in ways she didn't like.  Lillian said
14   it didn't feel right when he touched her.  I asked Lillian
15   where Lee touched her.  Lillian said he touched her private
16   parts, her pie and her butt.  Lillian said her pie was her
17   front private part and her butt was her back private part.
18   I asked Lillian where this happened.  Lillian said it
19   happened at their trailer when they were all living in
20   Opelika.  Lillian said it happened in the living room and
21   in her mom's bedroom.  I asked Lillian if her clothes were
22   on or off.  Lillian said Lee told her to take her clothes
23   off.  Lillian said she took all her clothes off.  I asked
24   Lillian did anything happen to Lee's clothes.  Lillian said
25   Lee took all his clothes off and then touched her privates

240

1    with his hands and his private part.  I asked Lillian if

2    she had a name for Lee's private part and she said it was

3    his penis.

4           Lillian said Lee put his penis inside her butt

5    and inside her pie.  I asked Lillian if Lee did anything

6    else with his penis.  Lillian said Lee put his penis inside

7    her mouth.  I asked Lillian what his penis felt like.

8    Lillian said it was hard and felt awful.

9           I asked Lillian if she felt anything come out of

10   Lee's penis when it was inside her mouth.  Lillian said

11   something came out and it was white but she didn't know

12   what it was.

13          I asked Lillian who all was at home when this

14   happened.  Lillian said her sisters Autumn and Elizabeth

15   were there and her mother would be at work.

16          I asked Lillian if Lee put his penis inside her

17   butt one time, two times or a bunch of times and she said

18   it happened a bunch of times.

19          I asked Lillian if Lee put his penis inside her

20   pie one time, two times or a bunch of times and she said it

21   happened a bunch of times.

22          I asked Lillian if Lee put his penis inside her

23   mouth one time, two times or a bunch of times and she said

24   a bunch of times.

25          Lillian said after he touched her that way he

241

1    would put her in the bath tub and bathe her.

2           I asked Lillian if Lee did anything to her when

3    she was in the bath tub.  Lillian said sometimes Lee would

4    hold her head under the water and it would scare her.

5    Lillian said Lee would spank her and Autumn and leave

6    bruises on them for days.

7           I asked Lillian if Lee ever said anything to her

8    when he was touching her in these ways and she said no, not

9    that she could remember.

10          I asked Lillian if she ever told anybody about

11   this.  Lillian said she remembered talking to Autumn about

12   it.  Lillian said she never told anyone until a while ago.

13   Lillian said she told her best friend, Jackie Newman and

14   then her counselor in Virginia.

15          I asked Lillian what grade she was in when Lee

16   did these things to her.  Lillian said she was in the

17   second grade.

18          Lillian said she went to a school in Opelika but

19   she couldn't remember the name of the school.

20          I asked Lillian if there was anything else she

21   could remember and she said no.  I thanked Lillian for

22   talking to me and ended the interview." And this interview

23   lasted approximately forty-five minutes.

24   Q.   The State has nothing further.

25          THE COURT:  Cross.

242

<u>CROSS EXAMINATION</u>

BY MR. FUNDERBURK:

Q.    Ms. Moss, how long did the interview with Lillian last?

A.    About forty-five minutes.

Q.    Okay.  So you apparently saw these girls, one of them for forty minutes and the other one for forty-five minutes?

A.    That's correct.

Q.    Was that the only contact you had with these girls?

A.    Yes, it is.

Q.    All right.  You haven't, you didn't see them before this time and you've not talked to them after that time?

A.    I've seen them in the courthouse this week, but I have not --

Q.    But as far as talking to them or interviewing them, you haven't?

A.    No, I have not.

Q.    Now apparently, based on the testimony of Officer Healy, available to you if you had asked for it would have been the other statements given by these girls in Virginia. Did you review those?

A.    I did not.

Q.    And also available were the medical examinations by Dr. Starling and Dr. Anz.  Did you review those?

A.    I did not.    I was not trained to have a lot of

243

1    information prior to the interview, just to keep me from

2    having any bias when I go into the interviews.

3    Q.    Yes, ma'am, but the bias you have is that you were not

4    seeking facts that could be verified independently of what

5    the girls were saying, that's one thing you were not

6    looking for, isn't it?

7    A.    I was looking for, first of all to determine whether

8    or not abuse occurred and if it did occur to obtain as many

9    details from the children as I could, as they could give

10   me.

11   Q.    Well, the details you were not obtaining though were

12   things like did this happen in the daytime or nighttime so

13   you could check the schedules of the parents to see if they

14   were in fact there together or not there during the time

15   when this allegedly occurred? You didn't get specific, did

16   you?

17   A.    I did not on that item.

18   Q.    Well, it was the only time you talked to them.

19   A.    It is.  I usually try to get when it's an ongoing

20   abuse situation, get as many details about the actual

21   abuse.  They did say that it happened when their mother was

22   not at home, while she was at work.

23   Q.    But for example did you, apparently you didn't because

24   it's not in here, you didn't ask them whether this occurred

25   in the daytime or the nighttime?

244

A.    I did not.

Q.    Now you didn't ask them for example if it occurred in the daytime what hours, for example, Mr. Kirby was working?

A.    I don't believe children this age could have told me the hours, but I did not ask that question.

Q.    They should know though whether this happened at night when they were awakened or in the morning when they were awakened, they should know that, shouldn't they?

A.    If it had been one or two times possibly.  Probably.

Q.    If it always occurred at the same time, either the morning time or the nighttime, wouldn't they at least have enough understanding to know that?

A.    I don't, I'm not for sure with it being an ongoing situation.

Q.    Now, did you try to verify any of -- well, first of all, they didn't give any facts, but did you try to verify any of the facts that you did get in these reports?

A.    I complete the reports and then I furnish this to the law enforcement agency and the social worker and basically that's my job to do that and that's all I do in these investigations.

Q.    But you've given an opinion that you thought the girls apparently were telling the truth, therefore I guess from that we could assume there were no inconsistent statements made to other interviewers?

245

1    A.   I felt like they were telling me the truth.  Today I

2    don't know about any inconsistencies.

3    Q.   For example, It's already been referred to, there was

4    a recorded statement, which I believe was mentioned by

5    Officer Healy.  And I believe they asked Autumn this, she

6    failed to mention, did not mention this business of oral

7    sex that she's mentioning to you.    Wouldn't that be

8    important to know that maybe something serious had been

9    left out when she gave a recorded statement previously.

10   Q.   I don't know who she gave the recorded statement to.

11   I think it depends on, you know, how she was questioned --

12   Q.   It was given to her by a forensic interviewer, like

13   yourself.

14   A.   Sometimes   children   don't   tell   everything   that

15   happened.

16   Q.   And sometimes they tell things that don't happen too,

17   don't they?

18   A.   Sometimes they do but I think in situations like this

19   they would not have any, you know, I cannot think of a

20   reason they would have to make this up.

21   Q.   Well, one reason, wouldn't it be sort of important to

22   know that if the girls, for example, one stated it always

23   happened at nighttime and one said it always happened in

24   the morning time, wouldn't it be important to know why

25   there was that difference, that they changed their story?

246

A.    I think you would need to know first of all what they

consider nighttime and daytime.  I mean nighttime to a, I

mean daytime to a eight year old could, even if it was

seven or eight o'clock in the morning if she was still in

the bed she might consider that being still nighttime.

Q.    Well, did you find out, for example, that the time

frame when this occurred, one girl was, both girls caught

the same school but at 7:15 every morning?  Wouldn't that

be important if one said it was during the day that you

would want to ask them something like that so you could

verify the time?

A.    I did not ask them anything like that, because daytime

could be in the afternoon also.

Q.    Yes, ma'am, wouldn't you think it would be important

to know that the father who is the accused here got off

from work at seven o'clock every morning and the girls were

waiting on the but by the time he got home every morning,

wouldn't that be important?

        MR. GLANZER:  We'd object to the testimony, he's

    asserting that as if that's some fact before the

    Court.

        THE COURT:  Overrule the objection.  It's cross

    examination.

Q.    It would be important to know that little fact,

wouldn't it?

247

1    A.    It wasn't in this interview.

2    Q.    I know, but ma'am, you did the interview and you're

3    forming opinions without getting facts or without comparing

4    it to other statements that are made, or without comparing

5    it to whether any of this is supported by physical

6    evidence.

7    A.    That's not my job to do that.

8    Q.    Your job is just to talk to the girls and, for forty

9    or forty-five minutes and form opinions without knowing any

10   of the history, or any of the physical exams?

11   A.    I formed my opinion based on the disclosure they gave

12   me during the interview.

13   Q.    And I believe, and you correct me if I'm wrong, that

14   forensic interviewers are certainly taught to try to get

15   information on facts that can be verified so you could

16   separate the truth from fantasy.  That's, you're trained to

17   do that, aren't you?

18   A.    I was trained to do that and I felt like I was doing

19   it when talked to them about the, you know, real and

20   pretend and the importance of telling the truth.

21   Q.    I mean, for example you want to be able to distinguish

22   whether in fact they saw Santa Claus flying over the house

23   or whether they just thought they saw Santa Claus flying

24   over the house.  You've got to get facts that you can check

25   to know if what they're saying is the truth, don't you?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

248

1  A.    I obtained as many facts as I could with this being an

2  ongoing situation.

3  Q.    Ma'am, all you had to do is ask the girls questions

4  that were asked on this stand, like what have you told

5  other people happened.

6  A.    I would not ask that question during my forensic

7  interview.

8  Q.    For example, if you want to know, for example, that

9  two years ago one of the girls, Autumn, told a doctor and

10 her mother --

11             MR. GLANZER:  We object to the assertion that

12        this is some fact before the Court.

13             MR. FUNDERBURK:  It is a fact before the Court.

14             THE COURT:  Let's finish the question before you

15        -- see what it is first.

16 Q.    That she had a, fell on a balance beam and had a

17 injury to her private parts and later changed that story,

18 wouldn't that be something that you would want to know,

19 that one of these girls changed, was willing to change her

20 story about what's happened and how it happened?

21 A.    When I interviewed Autumn she told me that this is

22 what she told her mother that she had fallen off the

23 balance beam.  Now I asked her about the doctor and she

24 said she did not remember going to the doctor.

25 Q.    Well,  would you have any idea to figure out why she

249

1    would remember it yesterday and not remember when you, a

2    forensic interviewer examined her on the 25th of June?

3    A.    No, children's memories, you know, are different at

4    different times, I guess.  You're also talking about a, you

5    know, a good many times that this occurred according to the

6    child and it's, you know, which one are you going to talk

7    about during an interview.

8    Q.    Well, this is a redundant question, so excuse me for

9    asking it, but one of the things you've got to know or

10   should know is when this, the time of day, if it

11   consistently occurred in the morning you'd need to know

12   that, wouldn't you?  And if it always occurred at night you

13   would need to know that?

14   A.    I did not ask either child the time of day.

15   Q.    But you would need to know that to be accurate in your

16   report, wouldn't you, so that somebody sitting here trying

17   to make a serious decision would know how to make a

18   decision?

19   A.    I did not ask the children the time of day.

20   Q.    That's all I have.

21            THE COURT:  Anything on redirect?

22            MR. GLANZER:  Yes, sir.

23                    REDIRECT EXAMINATION

24   BY MR. GLANZER:

25   Q.    Now, Lillian indicated that these things happened at