250

1    nighttime, correct?

2    A.    I believe she did.

3    Q.    And she also indicated that it happened both in the

4    living room and the bedroom?

5    A.    That's correct.

6    Q.    Did she differentiate between saying who was at home

7    when it happened in the living room versus when it was in

8    the bedroom?

9    A.    No, she just told me that it, every time it happened

10    that her mother was at work.

11    Q.    So there was no indication of who might have been in

12    the bedroom at the time they used the living room?

13    A.    No, sir.

14    Q.    If a child is being interviewed and something is not

15    asked and what I'm referring to is she didn't reveal the

16    oral sex, would that be common, that if an interviewer is

17    interviewing a young child and doesn't say specifically,

18    did he put it in your mouth, would they tend to not respond

19    to that issue?

20    A.    I think a lot of times, you know, what I usually do is

21    say did he do anything else with it.  And if they did not

22    ask that question they may not, you know, respond.  They

23    may not just tell you without some type of questioning.

24    Q.    Is  a child normally dependent on your questions to

25    get into an area of conversation?

251

A.    I think a lot of times they are, especially the younger children, you have to be more focused, abuse focused questions, such as did he put it anywhere else. You've told me about the pie, did he put it anywhere else.

Q.    Okay.   And in relation to the balance beam, didn't Autumn reveal to you that that story came from the Defendant?

A.    That's what she told me that he told her to tell her mother, because of, she was bleeding.

Q.    Nothing further.

### RECROSS EXAMINATION

BY MR. FUNDERBURK:

Q.    Well, that would indicate to you a child who is very suggestive to take suggestions from people in authority, wouldn't that sort of suggest that to you?

A.    I think they were, definitely felt like he was a person in authority.

Q.    Well, what about the mama and the grandmama they were living with?

A.    Well, they're adults and not children.

Q.    Right.   Ma'am, I realize that.   As Mr. Kirby is an adult and not a child, his mama and his grandmama they were living with two years before this came up they had some input into their life, wouldn't you say?

A.    Oh, yes.

252

1   Q.    And everytime they came down here, they were brought

2   certainly the one time you saw them, because I've just

3   asked you about that one.  When they came down the mother

4   and the grandmother, I believe you told me, or was it just

5   the mother?

6   A.    It was the mother and the maternal grandmother.

7   Q.    All right.  So the mother and the grandmother would

8   be, would bring them down from Virginia?

9   A.    Uh-huh.

10  Q.    And would take them back.  Did I understand you to say

11  that Lillian told you this happened at night?  Did you say

12  that or did I misunderstand you?

13  A.    I'm just going to refer to my notes here to the

14  report.

15  Q.    Is that what you just testified to?  I may have heard

16  you wrong.

17  A.    I did, but you know, I was going to review my notes

18  here.  I don't know if she, if I ever asked her about the

19  nighttime.  I was trying to find it in here.

20  Q.    Well, didn't you just testify when Mr. David asked you

21  that you told you at night and --

22  A.    I'm sorry, I may have --

23  Q.    -- then -- didn't you say that?

24  A.    I did, but I may have made a mistake.  I was going to,

25  you know, read over this again.  I don't believe I ever

253

1    asked her about the nighttime.

2    Q.    All right.  So that was --

3    A.    I'm sorry.

4    Q.    -- you spoke incorrectly?

5    A.    I spoke incorrectly on that question.

6    Q.    That's all I have.

7          THE COURT:  Anything else of this witness?

8          MR. GLANZER:  No, sir.

9          THE COURT:  All right.  You can step down.

10    You're excused.

11          MR. GLANZER:  Judge, just one additional

12    question.

13              **FURTHER REDIRECT EXAMINATION**

14    BY MR. GLANZER:

15    Q.    Persons in authority or abusers, do they normally have

16    control over their victims, more so than normal?

17          MR. FUNDERBURK:  I object to that.

18          THE COURT:  Sustain the objection to that

19    question.

20          MR. GLANZER:  Nothing further.

21          MR. FUNDERBURK:  I have no further questions.

22          THE COURT:  All right.  You're excused.  Next

23    witness?

24          MR. GLANZER:  State would rest its case in chief.

25          THE COURT:  All right.  Ladies and gentlemen,

254

1  I'll give you your first break. I'll need to go over

2  some things with the lawyers. I'll let you step back

3  to the jury room. You can get a cup of coffee and

4  we'll be back in just a few minutes.

5            (WHEREUPON, the jury retired from the

6            courtroom and the following proceedings

7            were had and done out of its presence and

8            hearing, to-wit:)

9  THE COURT: Okay. The jury is out of the

10  courtroom.

11  MR. FUNDERBURK: Are you ready for my motion,

12  Your Honor?

13  THE COURT: Yeah.

14  MR. FUNDERBURK: At this time Your Honor, the

15  Defendant moves for an acquittal on the basis the

16  State failed to carry its burden of proof as to

17  Lillian and as to, separately as to Autumn.

18            Secondly, the State -- the doctor who

19  testified in this case and the physical evidence in

20  this case, could not state with any reasonable degree

21  of medical certainty that the physical examinations

22  which were conducted in the case of Lillian supported

23  or agree with the conclusion there was penetration in

24  the anal or vaginal area. In the case of Autumn there

25  was no testimony from the physician based on a

256

1    and we'll come back and get started on the Defense

2    case.

3        MR. FUNDERBURK:  Thank you, Your Honor.

4            (WHEREUPON, proceedings were in a brief

5            recess, after which the following occurred,

6            to-wit:)

7        THE COURT:  Everybody ready?

8        MR. FUNDERBURK:  Yes, sir, we're ready.

9            (WHEREUPON, the jury returned to the

10           courtroom and the following proceedings

11           were had and done in its presence and

12           hearing, to-wit:)

13       THE COURT:  Call your first witness.

14                **DEFENDANT'S WITNESSES**

15       MR. FUNDERBURK:  Your Honor, we'd call Dr. Bush.

16                **JERRY BUSH, M.D.,**

17   a witness, having first been duly sworn to speak the truth,

18   the whole truth and nothing but the truth, was examined and

19   testified as follows, to-wit:

20                **DIRECT EXAMINATION**

21   BY MR. FUNDERBURK:

22   Q.   Good morning, Dr. Bush.

23   A.   Good morning.

24   Q.   If you would, please tell the jury your full name and

25   your present business address?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

257

1    A.    Dr. Jerry Bush, medical doctor.  I work at Eagle's

2    Landing Family Practice in McDonnough, Georgia, 50 Kelly

3    Road.

4    Q.    All right.  And you're licensed to practice medicine

5    in what states?

6    A.    Georgia and Alabama.

7    Q.    And have you practiced medicine here in Opelika, as a

8    matter of fact or the Auburn area?

9    A.    I have in the past.

10   Q.    All right.  If you would, just tell the jury your

11   medical training, what schools you went to and when you

12   went to them?

13   A.    Okay.  I went to Auburn University School of Pharmacy

14   and got a B.S. degree, and then went to the University of

15   Alabama School of Medicine in Birmingham, and then I did my

16   internal medicine residency training at Caraway Methodist

17   Medical Center in Birmingham.  And then I became board

18   certified in that internal medicine specialty.

19   Q.    All right.  And after you finished your internship and

20   so forth where did you begin practice?  Just start with

21   where you began practice and bring us up to date.

22   A.    Okay.  I first worked in Brundidge, Alabama for a year

23   to help pay off a scholarship commitment.  Then I practiced

24   in Tallassee, Eclectic area for approximately eleven,

25   twelve years.  And for the last three and a half years I've

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

258

1    been in Georgia, firstly at the Family Medical Center and

2    Urgent Care Center in Griffin.  They sold the practice to

3    somebody else and I was able to go work in another place,

4    Eagle's Landing Family Practice as I mentioned before in

5    McDonnough, Georgia.

6    Q.    All right.  So you've been practicing medicine now for

7    how many years?

8    A.    Over seventeen years.

9    Q.    And during that time have you had occasion to examine

10    patients of all ages and sexes for anything dealing with

11    family practice and internal medicine?

12    A.    Yes, sir.  I've treated children since I got my

13    license in 1984, along with adults.

14    Q.    Have you had occasion then to examine both, and today

15    we'll be dealing with the rectal and vaginal areas, are you

16    familiar with the kinds of examinations that you have to

17    make in those areas?

18    A.    Yes, sir.

19    Q.    And you've done that before?

20    A.    Yes, sir.

21    Q.    And I don't know if I asked you this before, but have

22    you testified before in cases like this?  Have you ever

23    testified in court as an expert before, such as what we're

24    doing today?

25    A.    I testified one time years ago, maybe twelve years ago

259

1   as a fact witness in a, I was working in the emergency room

2   and I testified in a rape case.  I believe it was in

3   Dadeville.  But I've never testified in court specifically

4   to this sort of an issue.

5   Q.   The other case you were actually one of the physicians

6   testifying as a fact witness?

7   A.   Right.  And I also, I forgot, I testified a couple of

8   years ago in a case that arose out of Family Medical Center

9   in Griffin.  I had gotten extra training in interpretation

10   of drug screens, and I was called by the, I guess Defax to

11   help explain a drug screen on one of the, it was a child

12   custody issue and one of the family members, the parents

13   had tested positive for drugs, and I testified regarding

14   that issue.

15   Q.   All right.   The, pharmacology is one of your

16   specialties as I understand, because of your training here

17   at Auburn?

18   A.   Yes, sir.

19        MR. FUNDERBURK:  Your Honor, we tender Dr. Bush

20      as an expert.

21        THE COURT:  All right.

22        MR. GLANZER:  Could I take him on voir dire

23      before we do that?

24        THE COURT:  All right.  Go ahead.

25

260

## VOIR DIRE EXAMINATION

BY MR. GLANZER:

Q.    It sounds to me like your, I guess your specialty training was internal medicine?

A.    That's correct.

Q.    Correct?    And have you ever had any pediatric training?

A.    In medical school I did rotations in pediatric surgery, pediatrics and in internal medicine you get to do some electives and I've done some of, you know, pediatrics in that regard.

Q.    As part of that training did they include the identity of sexual injuries, sex abuse injuries on children?

A.    Yes, sir.

Q.    Since your graduation, since you're in practice have you had the opportunity to do many examinations for child sex abuse injuries?

A.    I have done -- you mean, brought to the doctor's office by a family member to be checked for that?

Q.    Yeah, brought to your office and claimed that there was possible abuse or identified it yourself?

A.    Yes, that's happened.    That's not an infrequent of a request by a patient's parents.

Q.    Are there cases in which you've actually identified sex abuse when there was no claim of it or no history?

261

1    A.    I don't believe so.

2    Q.    So you wouldn't identify it, or you haven't identified

3    any unless it was brought to your attention?

4    A.    Well, that hasn't, that hasn't happened yet.

5    Q.    When children are brought in -- let me do it this way:

6    How many, just as a rough estimate, how many physical exams

7    have you actually conducted on children, total physical

8    exams?

9    A.    Total over seventeen years?

10   Q.    Just a rough estimate?

11   A.    A thousand.

12   Q.    Out of that roughly a thousand how many times would

13   you estimate that you actually had a need to check the, I

14   guess the vagina or the anal area of a child?

15   A.    Approximately a hundred.

16   Q.    A hundred, ten percent?

17   A.    Yes.

18   Q.    You would find cause to do that?

19   A.    Or part of the physical examination.

20   Q.    Okay.   You're talking if you conducted a complete

21   physical?

22   A.    Yes, sir.

23   Q.    That would be part of the exam?

24   A.    Yes.

25              THE COURT:  All right.  Go ahead.  He's qualified

262

1          as an expert.

2                    <u>DIRECT EXAMINATION RESUMED</u>

3   BY MR. FUNDERBURK:

4   Q.    Dr. Bush, you've had occasion to examine some of the

5   records in this case and I'll go over the records you've

6   examined.  But you have had occasion to examine some of the

7   medical reports and examinations in this case?

8   A.    Yes, sir.

9   Q.    And let me show you these three.  This is State's

10  exhibit six which is a medical examination conducted on

11  Autumn McLees by Dr. Starling looks like on 13th of April,

12  I believe of this year.

13  A.    Yes, sir, I've looked at it.

14              THE COURT:  You're going to need to talk a little

15          louder for us, Doctor, or I'm going to have to hook

16          you up to that microphone.

17              THE WITNESS:  Whatever you want, Judge.

18              THE COURT:  Now if you can talk louder, that's

19          fine.

20              THE WITNESS:  Okay.

21  Q.    All right.  Then I have a report here on Lillian

22  McLees from the Children's Hospital in Virginia, again

23  dated April 13, '91 done by Dr. Starling, looks like

24  Suzanne Starling.  That's State's exhibit five.  Have you

25  reviewed that report?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

263

A.    Yes, sir.

Q.    And then I have Defendant's exhibit number one which is the record of Pediatric Clinic regarding Autumn McLees, and that one is dated, well, it's dated July 5, 2001, in reference to an examination conducted on June 25, 2001, and has apparently the record of that office going back to 19, I think it goes back to, looks like it goes back to 1998 and forward.    Have you had a chance to review those documents?

A.    Yes, sir.

Q.    Now Doctor, first let me ask you to look at that Defendant's exhibit one where it has some records about an incident which occurred in March of 1999.

A.    Yes, sir.

Q.    First of all, in looking through that can you, it looks like the first report, and they're not in order, but it seems like the first report may be March 5, 1999, do you see that?

A.    Yes, sir.

Q.    All right.    And does that refer to an incident which occurred on Wednesday, is that what the report says?

A.    It says Friday here.

Q.    All right.    Friday is March 5, then reading up here does it not refer, the date of the report is March 5 which I represent to you is a Friday.    And it refers to an

264

1    incident which occurred on a Wednesday, and that's what it

2    says.

3    A.    Yes, sir.

4    Q.    All right.  If you would, just tell the jury what

5    that, I'm not sure I can read all that writing there, what

6    does that report say in regard to what happened?

7    A.    Do you want me to just read the report?

8    Q.    Yes, if you don't mind.

9    A.    "Fell on playground on Wednesday at school.  Mom noted

10   blood on toilet seat and on her panties this morning.  Mom

11   examined child.  A bruise was noted in the vaginal rectal

12   area.  Child denies pain.  Mom did not see any cuts,

13   scratches or any reason for her to bleed.  Appointment made

14   with G. Hallam" I believe.  The next part too?

15   Q.    Yes, go ahead and --

16   A.    Okay.  "Fell on balance beam and is bleeding."

17   There's a rough diagram here and it says "Large bleeding

18   left," I guess that's the abbreviation for laceration,

19   "still bleeding.  Refer to Dr.", I guess that's Litsey, I

20   can't --

21   Q.    Laceration, now what does that mean?  I know some of

22   these jurors know but does that mean a cut or a bruise or

23   what does that mean, laceration?

24   A.    That's a cut.

25   Q.    All right.  So that means based on that he saw a cut?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

265

1    A.    Yes, sir.

2    Q.    Which he's noted on the diagram?

3    A.    Yes, sir.

4    Q.    All right.  Go ahead.  Have we covered everything on

5    that page?

6    A.    Yes, sir.

7    Q.    All right.  Let's go to the next page if you don't

8    mind.  All right.  Which one did we just read from?

9    A.    This one.

10   Q.    To make sure.  Okay.  That was the 5th, okay, this

11   would be the next page, the 8th?

12   A.    Okay.

13   Q.    All right.  That says March 8th, I believe, and if you

14   would just tell us what that page says?

15   A.    Well, it's the temperature as 101 degrees, age 6

16   years, weight 41 and 1/2 pounds.  "Recheck private area.

17   Still bleeding.  Fever x 2 days.  No purulence", which

18   means drainage, pus, that sort of a thing.  "Physical exam,

19   alert, Tympanic membrane, eardrum," looks like normal.

20   "Left eardrum dull.  Nose," and I can't make out the part

21   after nose.  Then it has a diagram of the rectal vaginal

22   area.  "Deep cleft, small amount of dried blood, also but

23   has an odor.  Assessment:  Long viral illness/vaginal

24   laceration" or cut.  "Plan:  Augmentin, 400 milligrams

25   twice a day for ten days."  That's an antibiotic.  "Sitz

266

1  baths twice a day," which is sitting in a tub of warm water

2  to help the healing process.  "Bactraben ointment twice a

3  day," which is an antibacterial ointment.  The writing is

4  not very great the last sentence, but it appears to be

5  "Follow up in the office."

6  Q.   Okay.  And I believe there's a nurse's note somewhere.

7  And again, this is all part of the Anz documents.   This

8  looks like a duplicate, is this not a duplicate, these two

9  pages here?

10  A.   Yes, they are.

11  Q.   Okay.  Let's look at one of them.  One, is that a

12  nurse's note or something?

13       MR. GLANZER:   Judge, we'd object to him just

14       reading someone else's report.  If there's a question

15       here --

16       THE COURT:  Is it in evidence?

17       MR. FUNDERBURK:  Yes, sir.

18       THE COURT:  If it's in evidence it can be read.

19       Overrule your objection.

20  Q.   First, the date of that is what?

21  A.   March 7th, 1999.

22  Q.   March 7th, and just read the history part there in the

23  notes of the -- you don't want to read it all, let me get

24  you to read it.  I mean not to the jury.  This part here

25  where it says nursing assessment.

267

1    A.    "Mom states the child fell on a balance beam Friday

2    and has had some vaginal bleeding ever since.  They are

3    aware of this at the office and child has a return visit

4    tomorrow.  Mom states that the bleeding has not increased

5    in intensity, just worried because the child now has a temp

6    of 103.  Wonders if it would be okay to give her APAP,"

7    which is fever medicine, "child has no other new symptoms

8    to note."

9    Q.    All right.  And this may be obvious, but I'm going to

10   ask anyway, the injury was on the 3rd as we just went over

11   and she's still bleeding on the 8th.   In other words,

12   apparently she, based on this, was bleeding from the 3rd to

13   the 8th?

14   A.    Yes, sir.

15   Q.    We've verified from Friday to the 8th, but based on

16   history of the mother the injury occurred on the 3rd, which

17   would have been a Wednesday.

18   A.    Yes, sir.

19   Q.    So that's several days of bleeding with a laceration.

20   Now based on that can you determine what kind of injury the

21   office of Dr. Anz determined that to be in March of 1999?

22   A.    They determined it to be a straddle type injury.

23   Q.    All right.  And a straddle type injury is what kind of

24   injury?

25   A.    It is an injury where the rectal vaginal area comes

268

1   down with a full force of weight of the child onto some

2   long object, like a balance beam, a monkey bar, certain

3   forms of bicycles, attachments, things of that nature.

4   Q.   Now Doctor, I have a series of questions to ask you

5   based on a reasonable medical certainty and let me go

6   through these and let me do this predicate question though.

7   In addition to reviewing the medical exams which I have

8   shown you, you've also had occasion to review some

9   documents I've given to you that were provided to me of

10  statements made by the girls, you've also had that?

11  A.   Yes, sir.

12  Q.   Now in that reference could you tell the jury the

13  importance of a medical history, particularly when relating

14  it to what children may be telling you in regard to these

15  kind of injuries?

16  A.   Well, anytime a physician sees a patient the history

17  is very important.  It helps to focus the examination if

18  something needs immediate attention.  It helps to see if

19  the physical examination is consistent with what the

20  history is from any patient, child, adult, either one.

21  Q.   All right.  So one purpose is to figure out if what

22  they're telling you with their mouth is supported by what

23  the physical evidence may show?

24  A.   Yes.

25  Q.   Dr. Bush, based on your training and experience and

269

1    your review of the medical report of Dr. Starling on

2    Lillian McLees, which is, excuse me for not remembering

3    that number, that's State's number five, and assuming that

4    the testimony before this jury is by Lillian that during

5    the time frame of 1998 and '99 that Mr. Kirby penetrated

6    her on almost a bunch of times, both rectally and in the

7    vagina, can you state with a reasonable degree of medical

8    certainty that the physical exam which you are reading

9    supports or does not support her history?

10   A.    It does not support that history.

11   Q.    Is there any, based on what you've seen, is there any

12   physical evidence that she was penetrated vaginally or

13   rectally repeatedly?  I'm speaking of Lillian now.

14   A.    No, sir.

15   Q.    Now if you would, let's look at Autumn's and there are

16   two on Autumn, one is by Dr. Starling and one by Dr. Anz.

17   And I'll ask you the same kind of questions, except I'm

18   going to separate it as to the anus and as to the vagina.

19   Dr. Bush, based on your training and experience, your

20   review of the medical examination reports of Dr. Starling

21   and Dr. Anz, and I'll add to that and the history, which we

22   have of the office history of Dr. Anz's Pediatric Clinic,

23   and assuming that the testimony of Lillian is that during

24   1998 and part of 1999 that Mr. Kirby penetrated her a bunch

25   of times in the anus.  Can you state with a reasonable

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

270

1    degree of medical certainty that the physical exams

2    conducted either support or do not support that history of

3    the anus?

4    A.    That's on Autumn?

5    Q.    On Autumn.

6          THE COURT:  You said Lillian.

7    Q.    Excuse me, Autumn.  I've already asked you on Lillian.

8    Shall I repeat that again on --

9    A.    The physical regarding the anus does not support the

10   history of repeated sexual penetration.

11   Q.    Is there any physical evidence that would support the

12   history and her statements that she was penetrated anally,

13   and I'm speaking of Autumn?

14   A.    No, sir.

15   Q.    Now Doctor, based on the medical records you have seen

16   and which we have gone over, regarding the injury to Autumn

17   in March of 1998, can you state with a reasonable degree of

18   medical certainty that the medical records you see and the

19   history you see of this injury in 19, I believe it's '99,

20   I've got the wrong date, 1999, that that history and those

21   physical findings are more consistent from a reasonable

22   medical point of view, more consistent with a straddle

23   injury or penetration to the vagina?

24   A.    They're more consistent with a straddle type injury.

25   Q.    Doctor, based on your training and experience and your

271

1  history as a doctor for seventeen years, is there any way
2  in your mind that a, assuming the history given by Autumn
3  on this stand was that Mr. Kirby was trying to do it in the
4  rear and it slipped and hit her in the vagina but he didn't
5  mean to, taking that history, is there any way in your mind
6  that such physical damage could have been caused that she
7  would have bleed for, it looks like six days we know of,
8  and had a laceration and a scar?  Is there any way that
9  what she said can be true based on the physical evidence?
10  A.   No, sir.
11  Q.   That's all I have, Your Honor.
12          THE COURT:  Cross examination.
13              CROSS EXAMINATION
14  BY MR. GLANZER:
15  Q.   I think you indicated you never made a finding of sex
16  abuse where sex abuse not claimed?
17  A.   That's true.
18  Q.   So let's first of all look at the injury, the straddle
19  injury.  In that case was there any claim of sexual abuse
20  by that doctor from what you read?  Was there any family
21  claim that Autumn had been sexually abused before that
22  examination?
23  A.   In March of '99?
24  Q.   Right.
25  A.   No, sir.

272

1    Q.    No indication of a claim of sexual abuse.    So in

2    essence, if that doctor found no finding of sexual abuse

3    that would be consistent with the history that was given to

4    him?  The history was it was an injury, straddle injury or

5    a fall on a beam?

6    A.    Yes, sir.

7    Q.    So the history is very important, right?    In every

8    case?

9    A.    Yes.

10   Q.    Do you ever try to determine what's wrong with

11   somebody without determining what the claim is?    I feel

12   sick, I have a fever.

13   A.    Well, usually not, but if somebody comes in there in

14   a coma or something we use physical exam more than anything

15   else.

16   Q.    Okay.  If you have a child come in there and there's

17   no claim of physical abuse do you look for it?

18   A.    Well, during a general pediatric examination it's, we

19   check the rectal vaginal area, but --

20   Q.    So in a thousand kids you've looked at and the hundred

21   claims or the hundred incidents when you've looked at

22   vaginal areas and sexual areas you've never found an

23   instance when the history didn't indicate sexual abuse;

24   right?

25   A.    That's correct.

273

Q.    So had the child, I mean you didn't do the physical exam back in '98 or '99 when that happened; right?  You didn't --

A.    No, sir.

Q.    You weren't part of that.  You don't know what that injury actually looked like; correct, other than what's written in that report?

A.    That's correct.

Q.    Okay.  You have no personal knowledge of it?

A.    That's correct.

Q.    So let's say that now it's 2001 and the history changes, the history is a claim now that that child was sexually abused.  And let's say there's doctors in Virginia that look at it, that injury.  And they draw a conclusion, and I believe you reviewed that report, their assessment is based on another history, "Autumn has a very abnormal genital examination.  She has complete lack of hymenal tissue at the base, additionally there's a vascular area consistent with a scar that extends from the distal vagina into the posterior fourchette.  This injury is consistent with a penetrating injury to the genitals.   It is consistent with her stated history of penile vaginal penetration."  Different history; correct?

A.    Yes, sir.

Q.    Different result.   Would you dispute the Virginia

274

1    result?  You didn't examine her then either; correct?

2    A.    That's correct.

3    Q.    Would you dispute it?

4    A.    The examination?

5    Q.    The results, assessment?

6    A.    The conclusion?

7    Q.    Any reason to dispute that?

8    A.    With a reasonable degree of medical certainty it's my

9    opinion given the information that I have that it's most

10   consistent with a straddle type injury.

11   Q.    Given the information you have.  So you're trying to

12   say that that injury back in '99, that that first

13   examination based on a different history is more accurate

14   than an updated history?  You would prefer that one there

15   that was back in '99?  That's the history you want to go

16   by?

17   A.    Yes.

18   Q.    Despite the fact that the family comes in and the

19   child comes in and says I lied about '99.  I lied.  I was

20   told to say that story.  Does that make a difference to

21   you, as far as the history?

22   A.    It doesn't change my impression given the information

23   that I have.

24   Q.    Okay.  In regard to Lillian's report would you

25   dispute, say there's no physical injury, correct?

275

Therefore, the history you would dispute.  But would you dispute Lillie has a normal genital examination and a normal exam neither confirms nor excludes the possibility of sexual contact.  Would you agree with that?  Neither confirms or excludes.

A.    A normal exam neither confirms nor excludes the possibility of sexual contact.  I'll agree with that.

Q.    Okay.  So if someone comes in and claims a history of sexual abuse would that open your mind to the possibility of sexual abuse despite there being no physical evidence?

A.    Yes.

Q.    When, and I don't know whether you can tell from that report, there's, we're talking about the vaginal laceration, was that internal or external?

A.    Given the information that I have it appeared to be more toward the outside.

Q.    Okay.  If we've had previous testimony that it was internal as opposed to external, would that change your opinion about the validity of a straddle injury?

A.    It would depend on the exact location in that regard.

Q.    Well, tell me if I'm right or wrong, does a straddle injury, you were talking about falling on a beam, is blunt, a blunt injury; right?

A.    Well, it's blunt to some extent, depending on how wide the beam is or whatever it is that the person is falling

276

1    on.

2    Q.    Would you acknowledge there's a difference between a

3    straddle injury and a penetration injury?

4    A.    Yes.

5    Q.    If we previously had a pediatrician that testified

6    that the injury that Autumn has is an internal penetration

7    injury, would that give you some additional information to

8    question the straddle conclusion of '99?

9    A.    given, excuse me for repeating, but given another

10   physician's opinion based on what they've looked at?

11   Q.    That has done an actual physical exam of Autumn and

12   located the location of the injury to be internal, would

13   that give you cause to question the straddle conclusion

14   knowing the history is different than reported?

15   A.    It would give me cause to look at it further.

16   Q.    I think one question the Defense asked you, they asked

17   you about the no sign of physical injury in Lillian and

18   asked you about the no sign of vaginal, of anal injury, but

19   is there a sign of vaginal injury in Autumn?

20   A.    Yes.

21   Q.    Yes.  Okay.  Just, that question wasn't asked.  I was

22   just asking it.

23            I have nothing further at this time.

24            THE COURT:  Redirect?

25                    REDIRECT EXAMINATION

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

277

BY MR. FUNDERBURK:

Q.    I believe I asked you if it was a straddle injury and
you agreed it was, just to clarify whether I asked you that
question.

A.    Yes.

Q.    You spoke of a straddle injury.  Now reviewing the two
doctors whose reports you have reviewed, and I'll ask this
on Autumn since we have two doctors.  First of all, in
reviewing the report of Dr. Starling in Virginia, there are
certain things that this report contains in detail that are
not really contained in detail in Dr. Anz's report, isn't
that true?  One being a very particular noting of the
results of the examination in Starling's and no such
information in Dr. Anz's.

A.    Dr. Anz's relating of the description of the vaginal
area is not as detailed as the one Dr. Starling did.

Q.    Okay.  And Dr. Starling, as a matter of fact, he used
-- well, just tell the jury what methodology he used in his
very particular examination?  She, excuse me, it's a she,
in her examination?

A.    Dr. Starling?

Q.    Yes, Dr. Starling?

A.    Do you mean the position that the --

Q.    Yes, I mean they have an examination report that goes
what, almost a page of all the particular findings?

278

A.    Right.  She was examined in what they call the supine frog leg position, which is on, the child on her back with their legs spread apart and their feet together.  That's the most common initial position.  And they used a colposcopy, which is a, kind of a magnifying glass to see better any damage to the vaginal rectal tissue area.

Q.    Is that one of the instruments that's more accurate than just a visual eyeball examination?

A.    Yes.

Q.    And apparently if Dr. Anz used such a thing it's not noted in her report?

A.    That's correct.

Q.    So in terms of just knowing, Doctor, having a better idea of the details of the physical examination Dr. Starling's is far more detailed and provides you far more information than Dr. Anz, is that true?

A.    Yes, sir.

Q.    Now let me follow with the question from the State regarding the importance of history.  If Autumn came in to you with two stories and she comes in with a laceration that is shown in the history and the records of Dr. Anz's office, she came in, she had a laceration and she was bleeding for several days and had bruises in the area of the vagina and the rectum, and she came in and told you on one day that I fell on a balance beam and hurt myself.  And

1    then later in the week she decided well, that's not true,

2    what happened is that somebody was trying to do it to me

3    from the rear and slipped and hit my vagina but it wasn't

4    on purpose.  Which of those two stories would be supported

5    by the physical evidence?

6    A.    The straddle injury balance beam history.

7    Q.    That's all I have.

8                    <u>RECROSS EXAMINATION</u>

9    BY MR. GLANZER:

10   Q.    Even though you had indicated a minute ago that if it

11   was an internal injury you might question that conclusion?

12   A.    Sir, depending on to what extent it was internal, yes.

13   Q.    And in this case you haven't seen the injury?

14   A.    I have not seen the injury.

15   Q.    Thank you.

16              THE COURT:  Anything else of Dr. Bush?

17              MR. FUNDERBURK:  That's all I have.  May he be

18   excused?

19              THE COURT:  All right.  You're excused, you may

20   go.

21                  Next witness?

22              MR. FUNDERBURK:  We call Ms. Kirby to the stand.

23   May I go get her, Your Honor, or --

24              THE COURT:  We'll go get her.

25                  <u>ERICKA KIRBY,</u>

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

280

1    a witness, having first been duly sworn to speak the truth,

2    the whole truth and nothing but the truth, was examined and

3    testified as follows, to-wit:

4                        DIRECT EXAMINATION

5    BY MR. FUNDERBURK:

6    Q.    Good morning, Ms. Kirby.

7    A.    Good morning.

8    Q.    If you would, tell the jury your full name?

9    A.    Ericka Joy Kirby.

10   Q.    And you're married to William?

11   A.    Yes, sir, I am.

12   Q.    Do you call him William or Lee or how do you refer to

13   him?

14   A.    Lee.

15   Q.    All right.  So I'll call him Lee.

16              And how long have you and Lee been married?

17   A.    A year and two and a half months.

18   Q.    And during that time have ya'll had any children or

19   not?

20   A.    Yes, sir.

21   Q.    You have a child now?

22   A.    Yes, sir, I do.

23   Q.    How old is that child?

24   A.    She is six months.

25   Q.    All right.  So tell me the birth date?

281

1    A.    May 30th, 2001.

2    Q.    All right.  Now do you recall a trip that you and Lee

3    made to Virginia?

4    A.    Yes, sir, I do.

5    Q.    Will you tell the jury when that may have been?

6    A.    It was January of 2001.

7    Q.    Do you recall if it was the first part or the last

8    part of January?

9    A.    Around the middle.

10   Q.    All right.  If you would, at that time were you

11   pregnant?

12   A.    Yes, sir, I was.

13   Q.    And were you, in other words you were showing?

14   A.    Somewhat.

15   Q.    All right.  If you would just tell the jury where you

16   went and what ya'll did?  In other words, you went to

17   Virginia to see his child by Dawn?

18   A.    Yes, sir.

19   Q.    And I won't try to pronounce her last name.  Do you

20   know what her last name is?

21   A.    I can't pronounce it either.

22   Q.    And Lee has a child by her; right?

23   A.    Yes, sir.

24   Q.    And do you know that child's name?

25   A.    Yes, sir, it's Elizabeth.

282

1    Q.    And do you know how old she was when ya'll visited in

2    January of this year?

3    A.    She was four.

4    Q.    All right.  And do you know how long it had been since

5    Lee had seen his daughter prior to that time?

6    A.    It was about two and a half years.

7    Q.    And were involved in making the arrangements to go up

8    or not?

9    A.    Yes, sir, I was.

10    Q.    Did you talk to Dawn in any way?

11    A.    No, sir.

12    Q.    All right.  So ya'll drove up, you and Lee drove up to

13    Virginia?

14    A.    Yes, sir.

15    Q.    Do you know what part of Virginia?

16    A.    Chesapeake.

17    Q.    And when you got there what did ya'll do?

18    A.    We met Dawn at the mall and then the girls, they came

19    later.

20    Q.    All right.  The girls, now meaning?

21    A.    Autumn and Lillie and Elizabeth.

22    Q.    All three girls met you at the mall?

23    A.    Yes, sir.

24    Q.    And do you recall what time of day that was?

25    A.    About lunch time.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

283

1   Q.   Now Dawn showed up; right?   Or who brought the

2   children, is what I'm been artfully trying to ask you?  Who

3   brought the children?

4   A.   The grandmother and the grandfather.

5   Q.   All right.  And so they brought the children.   Was

6   Dawn already there or did Dawn come later?

7   A.   She was already there.

8   Q.   All right.  So you met her first and then the children

9   apparently were with the grandparents?

10  A.   Yes, sir, they'd just left from church.

11  Q.   All right.  And then they brought them to the, all

12  three of them to the mall.  And then what did ya'll do?

13  A.   We went to lunch and then we went shopping.   Then

14  after that we went and got some cookies, and then we were

15  going to go watch a movie but the girls couldn't, Autumn

16  and Lillie could not stay because they had to go home and

17  do homework.

18  Q.   All right.  And had you ever met Autumn before this

19  day?

20  A.   No, sir.

21  Q.   And if you would, just tell the jury how ya'll got

22  along when you met, what she did and what you did?

23  A.   Well, they came and ran up to Lee and gave him a big

24  hug.   And then they asked him who I was and he had

25  explained to them that I was his wife.   And they didn't

284

1    really like that too much, so --

2    Q.    What about Dawn?

3    A.    She started crying when she --

4    Q.    When you got there and you were introduced?

5    A.    Yes, sir.

6    Q.    And after that little episode did the girls get along

7    fine?  Did ya'll all get along fine?

8    A.    Yes, sir.  I just kind of stayed back out of the way.

9    Q.    And Lillian and Autumn, did they seem to get along

10   with Lee all right?

11   A.    Yes, sir, they did.

12   Q.    Did they seem to have a good time?

13   A.    Yes, sir.

14   Q.    Could you tell if there was any problem between them

15   at all?

16   A.    No, sir.

17   Q.    Other than them being concerned as you just said?

18   A.    No, sir.

19   Q.    And how long were you there now?

20   A.    We were there just that day.

21   Q.    All right.  Now did Dawn stay with you, did she go to

22   the show with you?

23   A.    Yes, sir, she did.

24   Q.    She went to the show with Pookie or Elizabeth; right?

25   A.    Yes, sir.

285

1  Q.  Do you call her Pookie or do you call her Elizabeth?

2  A.  Elizabeth.

3  Q.  All right.  So she stayed with you the whole time,

4  Dawn did?

5  A.  Yes, sir.  She and the grandmother.

6  Q.  And the child.  Do you know any reason why they stayed

7  with you the whole time?

8  A.  No, sir.

9  Q.  All right.  And you came back, of course, to Alabama?

10  A.  Yes, sir.

11  Q.  And since that time have you either seen or talked to

12  or gotten messages from Dawn?

13  A.  I haven't but Lee has.  He got messages on the phone

14  saying things --

15        MR. GLANZER:  We'd object to it, it's hearsay.

16        THE COURT:  Sustained.

17  Q.  Let me ask you a question before you come forward.

18  A.  Yes, sir.

19  Q.  Were these messages that were on an answering machine

20  or something that you heard or did, in other words, how do

21  you know he got messages?

22  A.  I checked the voice mail.

23  Q.  All right.  So these were messages left on the voice

24  mail?

25  A.  Yes, sir.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

286

Q.   And you got those messages off the voice mail?

A.   Yes, sir.

Q.   And could you recognize or identify that voice as being Dawn's?

A.   Yes, sir, because she stated that it was Dawn.

          MR. GLANZER:  We'd object to what was said, it's hearsay.

          THE COURT:  Sustained as to what was said.

Q.   Okay.  All right.  So I just, you got a lot of those?

A.   Yes.

Q.   Or you tell me whether it was a lot or a few or one?

A.   It was more than one.  It was about five or six.

Q.   Okay.  Now before the trip to Virginia had there been any contact to your knowledge between yourself or between her and Lee?

A.   Yes, sir, between her and Lee.

Q.   All right.  But you were not involved in those contacts?

A.   No, sir.

Q.   But in terms of you talking to her, you have not personally talked to her, you've just seen the messages?

A.   Yes, sir.

Q.   Is that essentially it?  And did I ask you, excuse me, what is your child's name?

A.   It's Veronica Jeanette Kirby.

287

1    Q.    Veronica?

2    A.    Veronica.

3    Q.    Thank you, Ms. Kirby, that's all I have.

4                THE COURT:  Cross examination.

5                      CROSS EXAMINATION

6    BY MR. GLANZER:

7    Q.    If I understand the story right everything went okay

8    while you were in Virginia; correct?

9    A.    Pretty much, yes, sir.

10   Q.    The children were brought out?

11   A.    Yes, sir.

12   Q.    Nobody said anything and everybody went home?

13   A.    Dawn started crying.

14   Q.    Other than that?  I mean you indicated you had no

15   conversations with her?

16   A.    Well, you know, obviously like she told me that she --

17   Q.    But I mean did you talk to her or not?

18   A.    A little bit but just to be social.

19   Q.    Okay.  Nothing further.

20               THE COURT:  Anything else?

21               MR. FUNDERBURK:  Not of her, Your Honor.

22               THE COURT:  All right.  You can step down.

23               MR. FUNDERBURK:  We call Carol Kirby.

24

25                      CAROL KIRBY,

288

1    a witness, after having been first duly sworn to speak the

2    truth, the whole truth and nothing but the truth, was

3    examined and testified as follows, to-wit:

#### DIRECT EXAMINATION

5    BY MR. FUNDERBURK:

6    Q.    Good morning, Ms. Kirby.

7    A.    Good morning.

8    Q.    If you would please tell the jury your full name and

9    your present address?

10    A.    Carol Smith Kirby, 1701 India Road, Opelika.

11    Q.    If you would, just tell us, I believe you're related

12    to Lee here?

13    A.    His aunt.

14    Q.    All right.  And just tell us who you're related to.

15    Are you related to his father or his mother or what?

16    A.    His mother.

17    Q.    Okay.  And so I guess you've known him then all of his

18    life; right?

19    A.    All of his life, yes.

20    Q.    And Ms. Kirby, there's testimony here by Autumn that

21    at some point in '98 or '99 that there was a fight between

22    William or Lee and Dawn that you had to come stop.  Is that

23    true?

24    A.    No, sir.

25    Q.    Have you ever been to their house to interfere or get

289

1  involved in any argument, if there was an argument, between

2  Dawn and Lee?

3  A.   No, sir.

4  Q.   And so that incident just didn't happen, period?

5  A.   No.

6  Q.   Now you've known Lee all of his life, you're familiar

7  with his reputation in the community where he lives at this

8  time?

9  A.   Yes, sir.

10 Q.   And is that reputation for truth and veracity good or

11 bad?

12 A.   He's a good boy.

13 Q.   Thank you, ma'am, that's all I have.

14          THE COURT:  Cross?

15                    CROSS EXAMINATION

16 BY MR. GLANZER:

17 Q.   Do you know anything about what went on at their home

18 when you weren't there?

19 A.   No.

20 Q.   Do you know what went on when his wife wasn't there?

21 A.   Well, as far as I know she was always there.

22 Q.   Do you know what happened at nighttime after everybody

23 was in bed?

24 A.   As far as I know Lee worked and she was with the

25 children.

290

1    Q.    Did he ever sleep?

2    A.    Did he ever what?

3    Q.    Sleep?

4    A.    Well, I'd hope so.

5    Q.    Do you know what went on during the period that people

6    were asleep?

7    A.    No, sir.

8    Q.    Nothing further.

9                    REDIRECT EXAMINATION

10   BY MR. FUNDERBURK:

11   Q.    Well, let me just ask you a couple of follow up

12   questions.  Do you know or have any knowledge of Lee's work

13   schedule?

14   A.    Let's see, I just know he did a lot of working with

15   several different people at the same time, working at night

16   at one of the companies was Capitol Dial and working with

17   the Radio World, and Jimmy's Car Stereo.  He just always

18   seemed to work a lot.

19   Q.    Do you have any knowledge of Dawn's work?

20   A.    As far as I know I've never known her to work.  Now

21   like I said, I wasn't there at their home twenty-four hours

22   so I really don't know but I've never heard her talk about

23   work.

24   Q.    Thank you, ma'am, that's all I have.

25              MR. GLANZER:  Nothing further.

291

1        THE COURT:  All right.  You're excused.  You can

2    step down.

3        MR. FUNDERBURK:  Let me call, is it Ferrell, Mr.

4    Ferrell?  Mr. Ferrell.

5        THE BAILIFF:  He's not here.

6        MR. FUNDERBURK:  That's all right.

7        THE COURT:  Raise your right hand.

8                JOSEPH KIRBY,

9  a witness, having first been duly sworn to speak the truth,

10  the whole truth and nothing but the truth, was examined and

11  testified as follows, to-wit:

12             DIRECT EXAMINATION

13  BY MR. FUNDERBURK:

14  Q.   If you would, tell the jury your full name and your

15  present address?

16  A.   My name is Joseph Kirby.  I live at 1215 North Dawson,

17  Waverly, Alabama.

18  Q.   And is William or Lee, do you refer to him as Lee or

19  William?

20  A.   Yes, sir.

21  Q.   Lee?  Is Lee kin to you?

22  A.   Yes, sir, he's my son.

23  Q.   And you live at Dawson, Georgia?

24  A.   No, Dawson Street, Waverly, Alabama.

25  Q.   Oh, Dawson Street, excuse me.  Now the last two or

292

1  three years, let's just say '98 and '99, be the last four

2  years, have you had any knowledge of Lee's work schedule

3  and Dawn's work schedule, for that matter?

4  A.   Yes, sir.

5  Q.   If you would, just tell the jury how you became

6  familiar with their schedules?

7  A.   They lived with me for a while.

8  Q.   All right.  Can you give us your best judgment of when

9  that was?

10  A.   It was in, Lee moved down in '97 from Virginia, and

11  they moved back down, he went up there with a truck and

12  moved them back down in '98, the first part of '98,

13  February, '98, somewhere in there.  February or March.

14  Q.   All right.  They actually lived with you in your

15  house?

16  A.   Yes, sir.

17  Q.   And did they live there with the children, with Dawn

18  and Lillian and Pookie?

19  A.   Elizabeth, yes.

20  Q.   Okay.  So you had an opportunity to see how they

21  interacted with each other?

22  A.   Yes, sir.

23  Q.   And got along or didn't get along?

24  A.   They seemed like they got along.

25  Q.   All right.  The two girls, Lillian and Autumn seemed

293

1    to respond okay to Lee?

2    A.    Yes, sir.

3    Q.    And as between Lee and Dawn, which one had the duty of

4    disciplining the children to make sure they did what they

5    were supposed to?

6    A.    Well, when Lee got home she would tell Lee what they

7    had done, but he would give them time out, make them go to

8    their room.  But I've never seen him put his hand on either

9    one of them.

10    Q.    All right.  If you would, just tell me what, to the

11    best of your knowledge, Lee's work schedule was during that

12    time frame, '98 and '99, which is the period we're speaking

13    of here, what his work schedule was and what Dawn's work

14    schedule was, if you know?

15    A.    Well, Lee's work schedule was he went to work and then

16    when he got home he took back off to go work on the side,

17    on side jobs to make extra money so they could, you know,

18    move on out and get their own place.  And Dawn just stayed

19    at the house.

20    Q.    All right.  Did he, was he working at the mill at that

21    time or do you recall?

22    A.    I can't recall right now.  I just, I know he was

23    working and he was what you call it, on the side, he was

24    building boom boxes and stuff like that for stereo

25    equipment.

294

1    Q.    So he had a regular job and then side jobs during the

2    day?

3    A.    Yes, sir.

4    Q.    Now when they moved out did you keep up with them in

5    any way?

6    A.    I tried to.

7    Q.    Let me ask you this because it might make it easier

8    for me to understand.  Do you know when Dawn took the girls

9    and moved to Virginia?  Did you know that they did that?

10   A.    Yes, sir, I found that out later.

11   Q.    All right.  So if you can, from the time they were

12   living with you up to that time, can you recall where

13   William was working or where Lee was working?

14   A.    I think Capitol Dial, if I'm not mistaken.

15   Q.    And if you don't know it's fine too.  Do you know what

16   if anything Dawn was doing for work?

17   A.    I have no idea, sir.

18   Q.    All right.  But the main period of time where, when

19   they came back from Virginia, apparently they went to

20   Virginia and came back and lived with you for a period of

21   time in 1998, '97 to '98?

22   A.    Yes, sir.

23   Q.    And then they moved out?

24   A.    Yes, sir.

25   Q.    And during the time they were with you -- let me ask

295

1    you this:  Have you had occasion after then to visit in the

2    home or have any occasion to be around Lillian and Autumn

3    and the children and Dawn and Lee?

4    A.    After they moved out?

5    Q.    Uh-huh.

6    A.    No, sir, I think I've went one time over there and

7    visited.  But Dawn was kind of sociably withdrawn from --

8    Q.    Okay.  You just -- okay, so that's good.  I appreciate

9    your testimony.  If you would, please answer the D.A.'s

10   questions.

11            THE COURT:  Cross?

12                      CROSS EXAMINATION

13   BY MR. GLANZER:

14   Q.    So you really, you can't tie down when they lived with

15   you?  You said something about February, February or March

16   of '98; correct?

17   A.    Yes, sir.

18   Q.    After that they moved out?

19   A.    No.  They moved out in July or June of that year.

20   Q.    When did they move to 98 Jeanette Street?

21   A.    What's that, sir?

22   Q.    When did they move to 98 Jeanette Street in Opelika?

23   A.    I think it was in '98, sir.

24   Q.    Okay.  In '98.  Did you move with them?

25   A.    No, sir.

296

1    Q.   How many miles was that from your house?

2    A.   About twelve.

3    Q.   And did you only visit one time after they moved out?

4    A.   I only visited one time because I got the feeling that

5    she didn't want me around.

6    Q.   Do you have any idea what went on day to day at 98

7    Jeanette Street?

8    A.   No, sir.

9    Q.   What they did, where they were, their comings and

10   goings?

11   A.   No, sir, I tried to stay out of my son's business.

12   Q.   Nothing further.  Thank you.

13         MR. FUNDERBURK:  Thank you, Mr. Kirby.

14         THE COURT: All right.  You may step down, you're

15   excused.  Next witness?

16         MR. FUNDERBURK:  Mr. Ferrell.

17               ROY J. FERRELL,

18   a witness, having first been duly sworn to speak the truth,

19   the whole truth and nothing but the truth, was examined and

20   testified as follows, to-wit:

21             DIRECT EXAMINATION

22   BY MR. FUNDERBURK:

23   Q.   Good morning, Mr. Ferrell.

24   A.   Good morning.

25   Q.   If you would, tell the jury your full name and your

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

297

1    present address?

2    A.    Roy James Ferrell, F-E-R-R-E-L-L, 2003 Executive Park

3    Drive, Opelika.

4    Q.    And what kind of work do you do, Mr. Ferrell?

5    A.    I'm retired.    Formerly I was, worked in the textile

6    industry, product manager for a chemical company.

7    Q.    All right.    And do you know Lee Kirby?

8    A.    Yes, sir, I do.

9    Q.    And where do you primarily have contact with Mr.

10    Kirby?

11    A.    Lee has been coming by to see us for probably about

12    eight years now, and he's come over and visited with us and

13    the times when I had surgery he came over and helped us out

14    to do some things that I wasn't able to do.

15    Q.    And the last four years has he continued to do that?

16    A.    Yes, sir.

17    Q.    And you see him on a regular basis?

18    A.    Fairly regular.

19    Q.    Do ya'll go to church together by any chance?

20    A.    We have in the past.

21    Q.    And what church would that have been?

22    A.    First Baptist Church in Opelika.

23    Q.    Now based on your knowledge of Lee, let me make sure

24    now that I -- do you know his work schedule by any chance?

25    A.    I know that he works one of the off shifts, the second

298

1    or third shift, he has in the past, I'm not sure if he

2    still is working that at this time or not.

3    Q.    And do you know if he did any work in addition to

4    working at the mill and working the night shift?

5    A.    Most of the time that I've known Lee he's been working

6    two jobs.  He's been working on radios, installing radios,

7    selling radios, pretty much whatever he could get to do.

8    Q.    All right.  Do you know Dawn his former wife or former

9    person he lived with?

10   A.    I know of Dawn, I do not personally know her.

11   Q.    All right.  Do you know the, do you know any of his

12   children, let me put it that way?

13   A.    Yes, sir.  Lillie and Autumn and Elizabeth.  Elizabeth

14   being the youngest one.

15   Q.    And how do you know Autumn and Lillie?

16   A.    Because Lee occasionally when he would come to see us

17   would bring the children with him.  And I would have an

18   opportunity to talk to them and play with them at that

19   time.

20   Q.    Mr. Ferrell, based on your knowledge of Lee and your

21   knowing him for many years in the community, do you know if

22   his reputation for truth and veracity is good or bad within

23   the community?

24   A.    So far as I know it's good.  Lee has always been

25   honest with me.  I've never known him to tell a lie to me

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

299

1   or to my wife.

2   Q.   Thank you, Mr. Ferrell.

3         THE COURT:  Cross examination.

4                    CROSS EXAMINATION

5   BY MR. GLANZER:

6   Q.   Let me try to nail down this community you know him

7   in.  He comes over to your house; correct?

8   A.   Yes, sir.

9   Q.   And occasionally went to your church?

10  A.   Yes, sir.

11  Q.   Did you work with him?

12  A.   No, sir.

13  Q.   Do you know what his reputation at work was?

14  A.   Yes, sir.

15  Q.   You didn't work with him and you know that?

16  A.   Well, I helped Lee get his job and the personnel

17  manager was a friend of mine and whenever I would run into

18  her I would ask her how Lee was doing and she said he was

19  doing an outstanding job.

20  Q.   So one person, you know one person in that community?

21  A.   No, I also knew his plant manager and the people that

22  --

23  Q.   What were the specific dates that he worked at the

24  plant?  From when to when?  What years?

25  A.   The first time Lee went to work there I would say was

300

1  approximately 1995, 1996, in that range.

2  Q.  What did he do between February of 1998 and July of

3  1999?  Where did he work?

4  A.  I do not know.  I cannot remember specifically.

5  Q.  Okay.  Socializing.  Did you socialize with the same

6  group of friends that he ran with?

7  A.  No, sir.  Lee was a lot younger than I am.  And --

8  Q.  So you didn't socialize with him, so you weren't in

9  that community either?

10  A.  No, I was only involved with him when he would come

11  see me and we worked to encourage Lee, be an encouragement

12  to him to better himself.

13  Q.  How many times did you go over to his house, socialize

14  with him there or invite him to dinner?

15  A.  I never socialized with him at his house.  I have been

16  to his house.

17  Q.  You indicated that he brought children to see you.

18  How many times was Dawn with the children?

19  A.  To my knowledge none.

20  Q.  So he was alone with the children on the occasions you

21  saw them?

22  A.  Yes, sir.

23  Q.  So he had opportunity to be alone with the children

24  because they showed up at your place, correct?

25  A.  Yes, sir.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

301

Q.    Nothing further.

          MR. FUNDERBURK:    That's all I have of Mr.
Ferrell.  Thank you, Mr. Ferrell.

          THE COURT:  All right.  You can step down.

          All right.  Let's take about a five minute
recess before we go for about twenty or thirty minutes
until lunch time, ladies and gentlemen.  So I'll let
you step back in the jury room.

          (WHEREUPON, proceedings were in a brief
          recess, after which the following occurred,
          to-wit:)

          THE COURT:  Okay.  Everybody ready to go?

          MR. FUNDERBURK:  Yes, sir, Your Honor.

          (WHEREUPON, the jury returned to the
          courtroom and the following proceedings
          were had and done in its presence and
          hearing, to-wit:)

          THE COURT:  Raise your right hand, please.

                    **JACKIE LEWIS,**
a witness, having first been duly sworn to speak the truth,
the whole truth and nothing but the truth, was examined and
testified as follows, to-wit:



                    **DIRECT EXAMINATION**

302

BY MR. FUNDERBURK:

Q.    Mr. Lewis, if you would, tell the jury your full name and your present address?

A.    Jackie D. Lewis, 1715 Opelika Road, Auburn, Alabama.

Q.    And what kind of business are you in, Mr. Lewis?

A.    Electronics.

Q.    And do you have a place of business here in Opelika or Auburn?

A.    In Auburn.

Q.    And what's the name of your business?

A.    It's Radio World.

Q.    And do you know Lee Kirby?

A.    Yes, sir.

Q.    Who is seated here at the table?  And would you just tell the jury how you know Lee?

A.    The first time I met Lee he was working at Morrison's, my wife and I was eating there and I noticed that he was helping some of the other people work there.  So I asked my wife about possibly hiring him and give him some extra money.  So I approached him and he decided to come to work for us.  I think he was sixteen at the time.  He worked for me for a couple of years and then he went to work I think for Westpoint Stevens or something like that.  And during that time Lee made a lot of deposits there, he was extremely proactive, always excelled as far as, especially

303

1    in cleaning and straightening up and stuff like that.  He

2    built boxes for me for a few years and did a good job with

3    that also.  He was always on time and even in fact when he

4    was working at Morrison's I think he was walking to work

5    and doing things like that to be on time.  And then he come

6    back and worked for me again, I think he left about, I

7    don't remember the dates, but he left about six months ago,

8    I think.  And he worked for me prior to that about two

9    years and did an excellent job.  He was a salesman, he

10   actually run the store, did a real good job, had a lot of

11   friends and like I said he was very proactive.  He did an

12   excellent job.

13   Q.   Okay.  Just time-wise, he worked with you up until six

14   months ago?

15   A.   Yes, sir.  I think he went back to Westpoint Stevens

16   at that time.  We don't offer insurance to the employees

17   unless they participate and things like that and I think he

18   wanted to get some coverage.  At that time he had gotten

19   married I think and he was expecting a baby too, so he

20   needed that coverage.

21   Q.   All right.  During most of the time he's worked for

22   you during the last four years or so has he had more than

23   one job, in other words, yours and other jobs, or just --

24   A.   Yes, sir, he, in fact while he was working with me he

25   was, he was always doing stuff on the side too at his house

304

1    and things like that.  He would build boxes for people and

2    that wasn't a conflict with my business.  Actually it

3    enhanced our business because it allowed us to sell more

4    merchandise.  And he did installs, he was very diversified,

5    he could do a lot of different things at Radio World.  He

6    could window tint, he could install radios, he was a good

7    salesman and he was very cooperative too, very respectful,

8    everything was always -- one thing that I liked about him

9    it was always yes, sir and no, sir.  And that's one thing

10   that we teach in our staff meetings to be, you know, to

11   show discipline and respect towards our customers.

12   Q.   Mr. Lewis, based on your knowledge of Lee over these

13   years in the last years when he's worked for you, do you

14   know if his reputation in the community for truth and

15   veracity is good or bad?

16   A.   Well, explain the definition of the word?

17   Q.   In other words, is he known to tell the truth or known

18   to not tell the truth?

19   A.   Well, I never caught him in anything that has been

20   dishonest or he's never lied to me.  One reason is I have

21   made --

22            MR. GLANZER:  I object to any narrative.  It was

23       a yes or no answer.

24            THE COURT:  Sustained.

25   Q.   Okay.

305

1    A.   He hasn't lied to me.

2         THE COURT:  Hold on a minute.  Ask the next

3    question.

4    Q.   All right.

5    A.   I'm sorry.

6    Q.   Now was he working, when he worked for you was that

7    during the daytime?

8    A.   Yes, sir.

9    Q.   And during that time do you know he also had work at

10    nighttime?

11    A.   Yes, sir, there was times he worked at night too.

12    Q.   Okay.

13    A.   He would hold two jobs.

14    Q.   All right.  Thank you, Mr. Lewis.  I believe that's

15    all I have.

16         THE COURT:  Cross examination.

17                CROSS EXAMINATION

18    BY MR. GLANZER:

19    Q.   What were the specific dates he worked for you?

20    A.   I don't have that on hand.  I can give you

21    guesstimations.  I apologize for that.  I can get that,

22    that's not a problem.  I maybe can just kind of give you

23    the length of time if that will help you.

24    Q.   No, I need specific dates.

25    A.   Okay.  I'd have to get that.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

306

1    Q.    So you can't say?

2    A.    No, sir.

3    Q.    You said he worked other jobs when he worked for you

4    but it doesn't sound like he worked for another employer,

5    it was just doing things on the side?

6    A.    I know that when he worked for me he was doing stuff

7    for me also on the side and he --

8    Q.    But you can't say that he worked for another employer?

9    He didn't work for the mill at the same time, he didn't

10   work for --

11   A.    Yes, sir, he worked for the mill at the same time he

12   was working for me.

13   Q.    Same time?  Okay.

14   A.    He worked third shift there and worked first shift for

15   me.  He did that for almost a year.

16   Q.    And first shift started for you when?

17   A.    I would say at the beginning of 2000.

18   Q.    No, what time of day, hours?

19   A.    Oh, I'm sorry.  Nine o'clock in the morning.

20   Q.    Nine o'clock?

21   A.    Yes, sir.

22   Q.    Every day?  And do you know what his hours were on the

23   third shift?

24   A.    He worked from eleven until seven.

25   Q.    And do you have any idea what years that was?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

307

1    A.   Yes, sir.  I think he started working for me the

2    second time around the year 2000 and worked for me for

3    about a year and a half.

4    Q.   So this is all during the year of 2000?

5    A.   Yes, sir.

6    Q.   When --

7    A.   And part of this year too.

8    Q.   Okay.  When was the prior time that he worked for you?

9    A.   Well, he was sixteen then and that was, oh, I'm

10    guessing now, so I can't be accurate.  It was probably, I

11    don't know, five or six years ago I would think.

12    Q.   So if, when he was sixteen, I think you said that he

13    worked for you for two years, when he was sixteen?

14    A.   Yes, sir.

15    Q.   So that would have been eighteen.  If his wife

16    indicated that she didn't meet him until he was nineteen,

17    then you really don't know what happened between when he

18    was nineteen years of age and when he went to work for you

19    in 2000?

20    A.   No, sir, I don't know any of that that's personal.  I

21    don't --

22    Q.   You don't know any of that?

23    A.   I don't get involved in my employees' personal life

24    unless they just --

25    Q.   Okay.

308

1  A.    -- want to talk, but --

2  Q.    And you talked about his, you know, his, I guess truth

3  and veracity or something like that, is only as it relates

4  to you, that's all you know, about his work?

5  A.    Yes, sir.  I mean there again, I don't --

6  Q.    You don't know anything about his social live or --

7  A.    His personal business, we don't --

8  Q.    -- anything that went on at home, you don't know

9  anything about him there either?

10 A.    The only thing that I remember --

11 Q.    Were you there, put it this way?

12 A.    Yes, sir, I was there.

13 Q.    At his home?

14 A.    You asked me something about his home, I can tell you

15 how he, I mean --

16 Q.    Okay.  Tell me, when were you there?  What was the

17 occasion?

18 A.    Each Christmas, you know, he would scrap around to get

19 enough money to send stuff.  I remember one year he

20 scrapped around and I think over extended his credit card

21 so he could buy a bunch of gifts for his kids I think he

22 mailed off.  I think he ended up not having enough --

23 Q.    When were you at his house?

24 A.    The house he lives now?

25 Q.    When were you at his house?

309

1    A.    Recently, oh, about a few months ago.

2    Q.    Were you ever at his house when he was married to

3    Dawn?

4    A.    No, sir.

5    Q.    Nothing further.

6          MR. FUNDERBURK:  That's all I have, Mr. Lewis,

7    thank you.

8          THE COURT:  All right.  You're excused, you can

9    step down.

10         Next witness.

11         MR. FUNDERBURK:  Judy Allen.

12                    **JUDY ALLEN,**

13   a witness, having first been duly sworn to speak the truth,

14   the whole truth and nothing but the truth, was examined and

15   testified as follows, to-wit:

16                 **DIRECT EXAMINATION**

17   BY MR. FUNDERBURK:

18   Q.    Ms. Allen, if you would, just tell the jury your full

19   name and your present address?

20   A.    My name is Judy Allen and I live at 97 Jeanette Street

21   in Opelika, Alabama.

22   Q.    All right.  Have you ever been in court before?

23   A.    Yes, sir.

24   Q.    All right.  Not in this case though.  Let me ask you

25   this now, do you know Lee Kirby here?

310

1    A.    Yes, sir, I do.

2    Q.    And how long have you known him?

3    A.    I met Lee about three and a half years ago.  I bought

4    a mobile home next door to him.

5    Q.    All right.  Were you living next door to him when he

6    was living there with Dawn and the children?

7    A.    Yes, sir.

8    Q.    Do you recall, and I know you wouldn't have marked

9    this date down, but do you remember they lived together and

10    then at some point Dawn moved out?

11    A.    Yes, sir.

12    Q.    And you remember that happening?

13    A.    Yes, sir.

14    Q.    Now, did you ever have occasion to visit in the home

15    with Lee and Dawn and the children?

16    A.    No, sir, I did not.

17    Q.    Okay.  I might need to ask you this:  How close

18    physically was the place where you lived to the place where

19    he lived?

20    A.    Well, I talked with Lee on many occasions, like I say,

21    I was his neighbor.  He was very nice.  Seemed to be very

22    concerned.  I know that his wife had a bout with cancer and

23    he was real concerned about her health.  I did meet her and

24    I had invited her over at one point in time but she never

25    came.  I saw the children out playing in the yard several

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

311

1    times.  But I always talked to Lee and he worked a lot.  I

2    know that.  And I would see him in the mornings when I

3    would be on my way out.

4    Q.   Okay.  And what time normally would you be on the way

5    out?

6    A.   About eight o'clock.

7    Q.   All right.  Do you know what time he normally would

8    get home from work in the mornings?

9    A.   I think it was probably around 7:30, eight o'clock,

10   somewhere in there.

11   Q.   In the mornings?

12   A.   Yes, sir.  I know he worked at night.

13   Q.   All right.  And the girls, do you know if they caught

14   the school bus?  Were you there, could you see that, in

15   other words?

16   A.   I think that they did ride the bus.

17   Q.   And do you know if he had other jobs other than the

18   one at night?

19   A.   Yes, sir, he worked two other jobs.  He worked in

20   Auburn for the guy that builds speakers, it was for Radio -

21   - I'm not familiar with the name, I think maybe Jimmy's.

22   But I do know that he was doing three jobs.

23   Q.   Okay.  Now do you have any idea whether or not Dawn

24   worked during that time that she was living next door to

25   you?

312

1    A.    No, sir, she didn't.  She was home.

2    Q.    All right.  So she'd be home and Lee would be working

3    at night and then have one to three jobs during the day?

4    A.    Yes, sir.

5    Q.    Now in that community where ya'll lived, and you still

6    live there if I understand right now, ya'll, you still live

7    next door to Lee?

8    A.    Yes, sir.

9    Q.    So you know his present wife?

10   A.    Yes.

11   Q.    And his child?

12   A.    Yes.

13   Q.    Now based on what you know about Lee and knowing him

14   there in the community where he lives and you live, do you

15   know if his reputation for truth and veracity, that is

16   telling the truth, is good or bad?

17   A.    I think it's good.  I think Lee is a really nice

18   person.  A very caring person.

19   Q.    All right.  Thank you, ma'am.  Please answer the

20   D.A.'s questions.

21         THE COURT:  Cross examination.

22                      CROSS EXAMINATION

23   BY MR. GLANZER:

24   Q.    You indicated you've lived next to Lee for about three

25   and a half years?

313

1    A.    Yes, sir.

2    Q.    Can you put any definite years on that?  What time

3    frame are we talking about?

4    A.    I think I moved in in, this is what, 2001?  I've been

5    there, like I say, almost four years.

6    Q.    Can you put a year on it?

7    A.    I moved in, I think in the fall, but I can't, I just

8    can't remember what month and date that I did move in.

9    Q.    Can you put a year on it?

10   A.    Sir?

11   Q.    Can you put a year?

12   A.    '96.

13   Q.    '96?  Okay.  And so you lived there until mid '99?

14   A.    No, sir, I still live there.

15   Q.    So, could it be somewhere around '98 that you moved

16   in?

17   A.    It could be.

18   Q.    And you were there between '98 and '99?

19   A.    Yes, sir.

20   Q.    At the last break was there a group in the hallway out

21   there talking?  Were you part of that group?

22   A.    Yes.

23   Q.    Who was in that group?

24   A.    Just family, I think, I don't know everybody out

25   there.

314

1   Q.   Was the Defendant in that group?

2   A.   Yes.

3   Q.   And I didn't mean to eavesdrop but I walked by there

4   and reaffirm me here, did I hear somebody say something

5   about there's a question about where he worked in '98 and

6   '99?  Did I hear that?

7   A.   I don't know.

8   Q.   You don't know?

9   A.   No.  I had just come up.  I was kind of late getting

10  here, so I sort of stood over there a little bit --

11  Q.   You missed that part?

12  A.   -- before his brother told me to come on over.

13  Q.   Nothing further.

14                    REDIRECT EXAMINATION

15  BY MR. FUNDERBURK:

16  Q.   And you had never talked to me at all or know who I

17  am, do you?

18  A.   No, sir.

19  Q.   Thank you.

20          THE COURT:  Okay.  You're excused.  You can step

21      down.

22              Next witness?

23          MR. FUNDERBURK:  Ellen Howell.

24

25                    ELLEN HOWELL,

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

315

1    a witness, having first been duly sworn to speak the truth,

2    the whole truth and nothing but the truth, was examined and

3    testified as follows, to-wit:

### DIRECT EXAMINATION

5    BY MR. FUNDERBURK:

6    Q.   Good morning, Ms. Howell.

7    A.   Good morning.

8    Q.   If you would, tell the jury your full name and your

9    present address?

10   A.   My full name is Ellen Vecornie Howell.  My address is

11   1535 Randall Drive, Opelika.

12   Q.   All right.  And do you know Mr. Kirby here, Lee Kirby?

13   A.   Yes.

14   Q.   Would you tell the jury how you know him?

15   A.   I have known Lee since he was probably thirteen or

16   fourteen.  He used to watch my children for me.  I have

17   two, a boy and a girl.  They are now eleven and fourteen.

18   And when I was going to college he used to come and watch

19   my kids for me.

20   Q.   Baby-sit for you?

21   A.   Yes.

22   Q.   All right.  Now in recent years, the last four years

23   or so, let me ask it this way:  Do you recall when he was

24   living with Dawn?

25   A.   I never got to know Dawn.  One reason is is she really

316

1   didn't seem to be friendly, I guess I would say. She

2   didn't want Lee to really have anybody coming around. He

3   worked with me in, I want to say 1995 at Capitol Dial, and

4   he would walk home a lot of times from work at seven

5   o'clock in the morning. And one day I took him home at

6   seven o'clock in the morning because that's a long walk

7   from Capitol Dial to Windsor Village where he was residing

8   at the time. And when I dropped him off she about chewed

9   him out for getting a ride home with another woman. And so

10   from then on I really didn't associate with her at all. I

11   really didn't know her.

12   Q. All right. Now what about -- oh, excuse me for

13   interrupting you. Now in the last -- well, let me just ask

14   it this way: After that time have you continued to have

15   any contact with him, either at work or --

16   A. At work and around town and stuff, yes, I've seen Lee.

17   Until he moved away for a little while, he moved to

18   Virginia, I guess it was she's from. That was the only

19   time I didn't see him, was when he left town for a little

20   while. But other than that I've always seen him.

21   Q. Well, when he came back from Virginia have you, did

22   you continue to have the opportunity to see him?

23   A. Yes.

24   Q. Or know where he was working at that time?

25   A. Yes, I've always known where he was working.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

317

1    Q.    All right.  If you would just tell the me, and this is

2    after he came back from Virginia, whatever year that was.

3    A.    Uh-huh.

4    Q.    With Dawn?  To the best of your knowledge where was he

5    working during that time up to this time if you know?

6    A.    He worked at West Point Pepperell for a while, Radio

7    World and -- quite a few, there's a couple more places.

8    Q.    All right.  Do you know if he worked the night shift -

9    -

10   A.    There was an ink print place, I remember he worked

11   there at some place in ink.

12   Q.    Do you know if he held more than one job at a time?

13   A.    Oh, yeah.  Quite a couple of times, because I'd wonder

14   when he'd have time to sleep, because he would work third

15   shift, get off, and go and work first shift.

16   Q.    And that's been since he came back from Virginia?

17   A.    Yeah.

18   Q.    Do you know at some point that the girls, including

19   his little girl, Elizabeth, went back to Virginia?  Are you

20   familiar with that?

21   A.    I'm not real familiar with that at all.

22   Q.    Okay.  Basically you're just familiar when he came

23   back with his work history?

24   A.    Right.

25   Q.    And you've known him since he was thirteen?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

318

1   A.    Yeah.

2   Q.    Has he --

3   A.    My daughter will be twelve in February.  I've known

4   him since she was in diapers.

5   Q.    All right.  Does he, has he done any baby-sitting for

6   you in the recent years?

7   A.    He has.  Just this past year he watched Matthew and

8   Brittany for me a couple of times.  They've even spent the

9   night with him.

10   Q.    All right.  And how old are they now?

11   A.    Now they're twelve and fourteen.  They'll be, I mean,

12   eleven and fourteen now.  They'll be twelve and fifteen

13   February 6th.

14   Q.    Now based on what you know does Lee have a good

15   reputation for truth and veracity in the community?

16   A.    Based on what I know, yes.

17   Q.    Thank you, ma'am.  Please answer the D.A.'s questions.

18          THE COURT:  Cross examination.

19                    CROSS EXAMINATION

20   BY MR. GLANZER:

21   Q.    Do you have, can you tell us, I guess exactly when he

22   worked anywhere?

23   A.    He worked with me at Capitol Dial in 1995, '96

24   probably, somewhere around '95, '96.  I worked on the M&M

25   line and --

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

319

1    Q.    Where did he work in '97?

2    A.    Let me see, that was West Point Pepperell, I'm not

3    really sure.  I know he --

4    Q.    Where did he work in '98?

5    A.    1998?  I'm not really sure.  He worked at Radio World

6    a long time, because he was working up there last year.

7    Q.    Okay.  If there was testimony that he didn't work at

8    Radio World during '98 or '99, would you have any reason to

9    dispute that?

10   A.    I'm not --

11   Q.    You're not sure?

12   A.    -- positive.  Right.

13   Q.    Okay.  And --

14   A.    He's, I've known he's always had a job.

15   Q.    Did you go to school with him?

16   A.    No.

17   Q.    Did you socialize with him, run around with his

18   friends?

19   A.    Yes.

20   Q.    Okay.  When was that?

21   A.    Oh, goodness.

22   Q.    That was prior to him marrying Dawn?

23   A.    Right.

24   Q.    Do you didn't socialize with him after that?

25   A.    Once he moved in with Dawn I really --

320

1    Q.    Lost contact with him?

2    A.    Right.  Other than at work.  That's the only time we

3    saw each other pretty much was at work or when he was with

4    some of his friends at the mall or he came for a haircut.

5    Q.    But the work was back in '95 and '96?

6    A.    Uh-huh.

7    Q.    Okay.  So you don't know really what was going on in

8    his personal life or his work life --

9    A.    When he came for haircuts then yeah, I would see him.

10    Because I worked at Regis in Gayfer's.

11    Q.    But you had no contact with his friends or family or

12    anything?

13    A.    With his friends, yes.  But with his --

14    Q.    But you didn't socialize after '96?

15    A.    -- immediate family, with his wife and children, no.

16    Not when he was living with Dawn.

17    Q.    So you --

18    A.    Other than outside the household.

19    Q.    You don't know what he was doing or anything during

20    that time?

21    A.    Other than working, I didn't know they were having

22    problems or anything --

23    Q.    You didn't --

24           THE COURT:  Whoa, whoa, whoa.  Now don't talk on

25        top of the witness's answer.  Wait until she gets

1     through and then ask your next question.

2  A.    When they were living together I did not know they

3  were having any problems other than she really did not want

4  his friends coming around.  And so I respected that because

5  I assumed they were going to get married, you know, they

6  had a child and all, so I respected that and stayed away.

7  Q.    Have you heard what this trial is all about?

8  A.    I've heard some, but not a whole lot.

9  Q.    Now having heard that does that change your opinion in

10 any way?

11 A.    Not really.  Not of Lee's character.  Now, I would

12 leave my children with him any day.  Anytime.

13 Q.    Nothing further.

## REDIRECT EXAMINATION

15 BY MR. FUNDERBURK:

16 Q.    Ms. Howell, it's my fault, I failed to ask you, you

17 cut his hair, don't you?

18 A.    Yes, sir.

19 Q.    I failed to ask you that.

20 A.    Uh-huh.

21 Q.    And have been cutting his hair for how many years?

22 A.    Many years now.  I've been cutting hair for thirteen

23 years.  I've probably been cutting Lee's for a good, I

24 don't know, since I was in school.

25 Q.    Thank you, Ms. Howell.  That's all I have.

322

### RECROSS EXAMINATION

1

2 Q.   But again, that's just limited contact in the barber

3 shop or a hair place?

4 A.   When Lee would come to get his hair cut --

5 Q.   Is that a yes or a no?

6 A.   -- he would --

7 Q.   That's the limit of the contact?

8 A.   Yes.  But he would stay for hours at a time a lot of

9 times.

10 Q.   Nothing further.

11         MR. FUNDERBURK:  That's all I have of her, Your

12 Honor.

13         THE COURT:  Okay.  You can step down.

14             I think we'll break for lunch at this point.

15         MR. FUNDERBURK:  Thank you, Your Honor.

16         THE COURT:  All right.  Ladies and gentlemen,

17 I'll let you turn your pads in to the bailiff and go

18 to lunch and ask you to be back here at one o'clock

19 and when you come back come back to the same jury room

20 and we'll see you back here then.

21             (WHEREUPON, proceedings were in a luncheon

22             recess from 11:35 o'clock a.m. until 1:00

23             o'clock p.m., after which the following

24             occurred, to-wit:)

25         THE COURT:  Everybody ready to go?

323

1          MR. FUNDERBURK:  Ready, Your Honor.

2                    (WHEREUPON,  the  jury  returned  to  the

3                    courtroom  and  the  following  proceedings

4                    were  had  and  done  in  its  presence  and

5                    hearing, to-wit:)

6          THE COURT:  Good afternoon, ladies and gentlemen.

7     All right.  Raise your hand and I'll swear you in.

8                         **BILLY BECKWITH,**

9     a witness, having first been duly sworn to speak the truth,

10    the whole truth and nothing but the truth, was examined and

11    testified as follows, to-wit:

12                    <u>**DIRECT EXAMINATION**</u>

13    BY MR. FUNDERBURK:

14    Q.    Mr. Beckwith, if you would, please tell the jury your

15    full name and your present address?

16    A.    William Felder Beckwith.  I live at 3172 Lee Road 40,

17    Salem, Alabama.

18    Q.    Mr. Beckwith, where are you employed?

19    A.    Westpoint Stevens, Opelika Finishing.

20    Q.    Excuse me for interrupting you.

21              How many years have you worked there?

22    A.    I went there in '75, left in '79, in '89, and came

23    back in '90 and I've been there ever since 1990 this time.

24    Q.    All right.  Do you know Lee Kirby here?

25    A.    Yes, sir.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

324

Q.   Has he worked for you as, or under you may be a better way of saying it?

A.   Yes, sir.  He was, I was his supervisor from 1998 to 2000, for about two years.

Q.   And before you were a supervisor do you know that he was also employed with Westpoint, just not under your supervision?

A.   Yes, sir.

Q.   And you work the third shift?

A.   Then I did, yes, sir.

Q.   All right.  And I guess that would mean he worked the third shift?

A.   Yes, sir.

Q.   And I'm sure the jury knows what the third shift is, but if you would just tell me what hours the third shift is?

A.   Eleven o'clock to seven o'clock in the morning.

Q.   So at least in '98 when he was working under your supervision and before, I mean you knew he was also on the third shift before he came under you?

A.   He was the first shift out in the supply room, I believe.

Q.   All right.  And then he came to you.

A.   He came to me on third shift, yes, sir.

Q.   On the third shift.  And your department was, is that

325

1    the dye department?

2    A.    Yes, sir.

3    Q.    Okay.  Now do you know -- that was '98 and 2000.  Now

4    during that time do you know that Lee also had other jobs?

5    A.    I know he worked at Radio World most of the time that

6    he was working for me.

7    Q.    And that would have been during the daytime?

8    A.    Yes, sir.

9    Q.    Did you actually buy things for him, would he actually

10   do work for you there at Radio World?

11   A.    I'd go down there and, I bought a stereo for my truck

12   when I bought a new truck and you know, a few small things,

13   nothing real big.  And I went in there a couple of times

14   just checking on things and he was in there working.

15   Q.    So you know he was holding two jobs during that time?

16   A.    Yes, sir.

17   Q.    Thank you, Mr. Beckwith, that's all I have.

18         THE COURT:  Cross?

19                    CROSS EXAMINATION

20   BY MR. GLANZER:

21   Q.    Okay.  And when is that he was actually working these

22   two jobs, when are you talking about?

23   A.    When he was working for me, he worked for me, I think

24   from what, April of '98 to March of 2000.  And then he left

25   and went to, I think Radio World.  And then they hired him

326

1   back back in July of this year.

2   Q.   Okay.  If the owner of Radio World has previously

3   testified that the Defendant worked there when he was

4   sixteen years old and it looks like that would have been

5   about '92, and worked there for two years until '94, and

6   then he didn't hire him back until 2000, then he didn't

7   work there at Radio World during the period you're saying

8   he did, right?

9   A.   Well, I went in there probably I know in '99 and I saw

10  him working in Radio World.   He was there behind the

11  counter and he took my credit card from me, I mean, you

12  know --

13  Q.   So if the owner of Radio World said that then he's

14  obviously mistaken?

15  A.   Well, he was there for something and they were letting

16  him in the cash register, so you know --

17  Q.   Could you be wrong about the date that you went in

18  there?

19  A.   I don't think so because I bought a new Chevrolet

20  pick-up truck in February of 2000 and I went in there a

21  while before I bought that pick-up truck.  So that would

22  have been in '99, anyway.

23  Q.   Okay.  So the owner of Radio World is wrong?

24  A.   I would imagine so, that's what I remember.

25  Q.   Okay.  Did the Defendant work seven days a week?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

327

1    A.    We worked some seven day weeks down there.  We mainly

2    worked, back then, six days a week.

3    Q.    Did he ever get any vacation time off?

4    A.    The only vacation time he ever took off was, and back

5    there you've got to be there five years before you can take

6    anything but vacation shut-down week.  You know, which is

7    the week of the 4th of July.

8    Q.    So you get one week a year?

9    A.    You get one week a year and that's the only time that

10    --

11    Q.    So he got off at seven every morning?

12    A.    Yes, sir.

13    Q.    And if the guy from Radio World said he didn't work

14    there until 2000 that means probably in the '98 to '99 time

15    frame he didn't work from seven in the morning until what,

16    coming to work at eleven that night?

17    A.    He didn't work probably the whole time, but I mean,

18    you know, I did go down there a few times, you know,

19    probably in '99, I know of, because it was a little while

20    before I bought my Chevrolet pick-up truck I bought, and it

21    was a base truck, so I wanted a better radio in it, so --

22    Q.    But he didn't work for you after seven o'clock in the

23    morning?

24    A.    He didn't work for me after seven o'clock, no, sir.

25    Q.    Okay.  Nothing further.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

328

1          MR. FUNDERBURK:  Thank you, Mr. Beckwith.

2          THE COURT:  All right.  You can step down.

3               Next witness?

4          MR. FUNDERBURK:  We call Matthew Howell.

5                  <u>MATTHEW HOWELL</u>,

6  a witness, having first been duly sworn to speak the truth,

7  the whole truth and nothing but the truth, was examined and

8  testified as follows, to-wit:

9          THE COURT:  How old are you, Matthew?

10         THE WITNESS:  Fourteen, sir.

11         THE COURT:  Fourteen?  Okay.  Go ahead.

12             <u>DIRECT EXAMINATION</u>

13  BY MR. FUNDERBURK:

14  Q.   Matthew, would you tell the jury your full name and

15  your present address?

16  A.   My name is Matthew Clark Howell and my address is 1535

17  Randall Drive.

18  Q.   All right.   Now  I  believe  your  mother  was  here

19  earlier,  she  may  be  out  here  --  yeah,  she's  over  here.

20  This is your mother who testified earlier; right?

21  A.   Yes, sir.

22  Q.   And do you remember how long you lived in the area or

23  next door to or in the same place that Lee lived in?

24  A.   I do not remember but when I met him I was three.

25  Q.   All right.  And ya'll lived in the same place up until

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

329

1    recently?  I say the same place, I mean in the same area?

2    A.    Yes, sir.

3    Q.    And recently ya'll, I believe you moved and maybe

4    you've moved back, I mean, can you help me out there?

5    A.    We moved right up the road, but not far from Lee.

6    Q.    All right.  So you've known him since you were three

7    years old?

8    A.    Since I was three, yes, sir.

9    Q.    And he's baby-sitted with you and your, you've got a

10   sister?

11   A.    Yes, sir, I do.

12   Q.    All right.  And so you know him well, don't you?

13   A.    Yes, sir.

14   Q.    Now my question to you is about the school bus.  You

15   catch the school bus every morning, don't you?

16   A.    Yes, sir.

17   Q.    And that's the school but that ran by and picked up,

18   you know Lillian and Autumn?

19   A.    Yes, sir, I do.

20   Q.    You know that they were living with Lee and --

21   A.    Yes, sir.

22   Q.    All right.  And they would get -- would they get on

23   the -- let me back up.

24             Were there two school buses running close

25   together there or just one?

330

1     A.    There was two and one would come and then another one
2     come maybe a minute later.
3     Q.    All right.  And would you, when you were out there
4     waiting on the school but would Lillian and Autumn be out
5     there also waiting on the school bus?
6     A.    Yes, sir, they would.
7     Q.    If I understand what I asked you, they took the first
8     one and you took the second one?
9     A.    Yes, sir.
10    Q.    Is that the way it went with the older kids and the
11    younger kids?
12    A.    Yes, sir, it did.
13    Q.    All right.  Now tell the jury, and this is still true
14    if I understand, the school bus is still coming the same
15    time out there?
16    A.    Pretty much so, yes, sir.
17    Q.    All right.  Tell the jury when you were there and
18    Lillian and Autumn were there at the school but stop, what
19    time the school bus came every morning?
20    A.    The school buses usually came at 7:10 to about 7:15
21    and everybody would get up there maybe at 7:05 or 7:00
22    o'clock, right around that way, and they would wait up
23    there.
24    Q.    Thank you, Matthew.  I appreciate it.
25    A.    Yes, sir.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

331

```
1              THE COURT:  Cross examination.
2                     CROSS EXAMINATION
3    BY MR. GLANZER:
4    Q.    What time did school start?
5    A.    School started at 7:45.
6    Q.    7:45?  What time did it get out?
7    A.    At, the little kids got out at 2:30 and the older kids
8    got out a little bit later.
9    Q.    Which group were you in?
10   A.    The older kids.
11   Q.    The older kids?
12   A.    Yes, sir.
13   Q.    So you got out after 2:30?
14   A.    After 2:30, yes, sir.
15   Q.    Okay.  How old were you, you think you were three
16   years old when you met Lee; right?
17   A.    Yes, sir.
18   Q.    And when was that?  How old are you now?
19   A.    I'm fourteen.
20   Q.    Fourteen?  That's eleven years ago?
21   A.    Yes, sir.
22   Q.    How old was he then?
23   A.    How old was Lee?
24   Q.    Yeah.
25   A.    I did not ask him his age.
```

332

1    Q.    Take a guess, just a teenager, something like that?

2    A.    No, sir.  Maybe grown.

3    Q.    He was a grown person when you were three years old?

4    A.    Grown to me.

5    Q.    Huh?

6    A.    He was a grown up to me.

7    Q.    Okay.  What do you remember about when you were three?

8    Do you remember much about that first meeting with him?

9    A.    My mom knew him and she said this is my little boy,

10   Matthew, and my little girl, Brittany, which my sister was

11   one at the time.  And Lee would baby-sit us and we'd play

12   video games with Lee.

13   Q.    Was there some point you'd moved next door to him?

14   A.    We did live right next door to him before.

15   Q.    Okay.  Do you remember how old you were then?

16   A.    I was maybe five.

17   Q.    Five?  Do you remember anything about living next door

18   to him?

19   A.    I would go over there sometimes and his wife, I guess,

20   Dawn, would, I would ask if Lee was there and she would go

21   no, he's sleeping or else she would tell me that he's not

22   there.

23   Q.    But you remember that, right?

24   A.    Yes, sir.

25   Q.    Okay.  Did you ever get to go inside?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

333

1    A.    Not very often, rarely.

2    Q.    Okay.  Did you ever talk to Dawn or Lillian?

3    A.    No.  No, sir.  My sister talked to Lillian.

4    Q.    But they were younger than you, right?

5    A.    Yes, sir.

6    Q.    But you do remember things from five years old?

7    A.    A little bit.

8    Q.    Things that were said?

9    A.    No.  No, sir.

10   Q.    When you lived next door and had left for school at

11   seven or 7:15 or whatever it was, do you know what happened

12   between seven and three when you came home?

13   A.    No, sir.

14   Q.    And somewhere around 2:30 Autumn and Lillie came home,

15   right?  You weren't there when they got home?

16   A.    No, sir.

17   Q.    And they would usually go inside, right?

18   A.    Yes, sir.

19   Q.    Do you have any idea what would go on when they were

20   inside?

21   A.    No, sir.

22   Q.    You never talked to them?

23   A.    Never talked to them.

24   Q.    And you were never over there during the nighttime,

25   spent the night or anything like that?

334

1     A.    I spent the night a couple of times.

2     Q.    And who did you spend the night with?

3     A.    Lee.

4     Q.    Were any of the girls or family there?

5     A.    I'm not sure.  I never did really see them.

6     Q.    How old were you then?

7     A.    I was maybe six or seven.

8     Q.    And you remember spending the night?

9     A.    I remember spending the night.

10    Q.    Okay.  So you in essence don't know what was going on

11    day to day in that house?

12    A.    No, sir.

13    Q.    And but you do remember things from when you were five

14    to seven years old, don't you?

15    A.    A little bit.

16    Q.    Nothing further.

17          MR. FUNDERBURK:  Thank you, Matthew.

18          THE COURT:  Okay.  You can step down.

19          MR. FUNDERBURK:  Your Honor, at this time the

20    Defendant rests.

21          THE COURT:  All right.  Any rebuttal by the

22    State?

23          MR. GLANZER:  No, sir.

24          THE COURT:  All right.  Ladies and gentlemen,

25    I'll need to send you out to the jury room while I go

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

335

1    over the jury charges and things with the lawyers.

2    And we'll come back and hear the final arguments.  So

3    I'll let you go right out that door.

4                    (WHEREUPON,  the  jury  retired  from  the

5                    courtroom  and  the  following  proceedings

6                    were had and done out of its presence and

7                    hearing, to-wit:)

8            THE COURT:  All right.  Any requested charges by

9    either side?

10           I'm going to charge on rape in the first

11   degree and sodomy in the first degree.

12           MR. GLANZER:  The State would not be opposed to

13   any lesser charged like sex abuse one if the Court

14   felt that there is an indication of evidence of that.

15           THE COURT:  Well, I don't believe the evidence is

16   such that any other charge would be appropriate, do

17   you?

18           MR. GLANZER:  I didn't hear any.

19           THE COURT:  Huh?

20           MR. GLANZER:  I didn't hear any.

21           MR. FUNDERBURK:  And I don't think so either.  I

22   mean, it's --

23           THE COURT:  All right.  How much time do you need

24   for closing arguments?

25           MR. GLANZER:  Thirty?

336

1         MR. FUNDERBURK:  Thirty minutes ought to do it,

2   Your Honor.

3         THE COURT:  Thirty minutes per side?  All right.

4   Thirty minutes per side.

5         MR. FUNDERBURK:  Judge, could I ask, I probably

6   shouldn't assume this, but just the usual charge on

7   presumption of innocence?

8         THE COURT:  Oh, yeah, I do that.

9         MR. FUNDERBURK:  I mean, I thought you would.

10        THE COURT:  All right.  Anything else?  Here's

11  some jury verdict forms.  Look these over.  I've got

12  four forms, one for each case.  Look those over and

13  see if they meet with your approval.

14        MR. FUNDERBURK:  The form looks all right to me,

15  Your Honor.

16        THE COURT:  All right.  We'll take about five or

17  six minutes and then we'll come back and begin the

18  arguments.

19        MR. FUNDERBURK:  Thank you, Judge.

20           (WHEREUPON, proceedings were in a brief

21            recess, after which the following occurred,

22            to-wit:)

23        THE COURT:  All right.  Everybody ready to go?

24        MR. FUNDERBURK:  Yes, sir, Your Honor.

25           (WHEREUPON,  the  jury  returned  to  the

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

337

courtroom and the following proceedings were had and done in its presence and hearing, to-wit:)

THE COURT: Okay. We'll hear the closing arguments now, ladies and gentlemen.

Mr. Glanzer?

### CLOSING ARGUMENTS

MR. GLANZER: I mentioned at the beginning that what we're dealing with is a crime of secrecy. It's interesting in this case it even came out through the children themselves, it's a secret. And when each one of them was asked who is it a secret from, it's a secret from my mother. Because who else would probably respond the most than the mother of a child that's been sexually abused by the boyfriend or the father? Who the most doesn't need to know what's going on? Who does it need to be kept from? It's our secret. And Autumn indicated that when Lillian revealed in Virginia she thought it was a secret and she told them, but it's a secret. But now Autumn you have to tell the secret too. And she did.

You've got two children, the same family that the same things were happening to. Keeping a secret, but not ever observing what was happening to the other one. Because again, it's a secret, it's

338

1    behind closed doors.  It's in the bedroom, the bedroom

2    of the sort of parents, the mother and the live-in

3    boyfriend.  But it's significant when you look at

4    Lillian.  Lillian didn't say it was always the

5    bedroom, said it's the living room and the bedroom.

6    And the difference that Lillian said was it was in the

7    dark or nighttime.  And that's been a big issue.  It's

8    been a big issue.

9         Autumn says during the daytime.  Lillian

10   says both, in essence, because she says I can't tell

11   dark from dark.  Dark from dark.  But I do know it

12   happened two places.  And why does it happen in two

13   places?  Because it's a different time of dark.

14        If the wife is in the bedroom asleep and the

15   other children are asleep and Autumn says well, I

16   don't know, he used to come in and take Lillian out

17   every once in a while.  Where do you go?  You don't go

18   back to your bedroom where your wife is asleep.  You

19   go to another part of the house.  And there's the

20   difference.  And it's explainable and it's consistent.

21        The medical.  The Defense doctor without

22   having looked or done an exam on either child would

23   come before you and say yeah, I've just read this 1998

24   or '99 medical record where there's a claim of falling

25   of a balance beam and it's consistent, because there

339

was vaginal damage. And then he also, before, before we got anywhere with this, before he was qualified as an expert I asked the question how many children, since you're an internist, how many children have you ever examined? Well, one thousand, about. Out of those how many have you ever done a physical exam to the point of examining the, either the vagina or the anal area, and he says about a hundred. And out of those hundred how many on your own volition based on the evidence that you see you ever saw which you believed to be sexual abuse, with no indication from any of those people? In other words, the history did not indicate sexual abuse, did you ever see something that you suspected sexual abuse? No.

So, we've got a report here that has a history tied to it, a history of, parent comes in, says child falls on a balance beam. So put it in this same doctor's terminology, here's a history, and he's probably going to follow it, because he never suspects sexual abuse or has suspected sexual abuse when there was a different history. The only time he would suspect it is if somebody comes in and says there's sexual abuse. So, the next question is, now that you know that the history has changed, because the child said I was told by him to make this claim, now would

340

you look at that case differently? Yes. Because now the history indicates it. So, then the next step is, in Virginia where both kids are looked at by doctors. And the history is a claim of sexual abuse. In one case Lillian they say, we find no physical evidence but that does not rule out sexual abuse. And what did Dr. Anz tell you? It's very rare if ever in sexual abuse cases she's seen any anal injury at all.

In Autumn's case, and read, read -- you will. Read the medical line. It is a very strong statement about sexual abuse. And what we're talking about is a difference between a straddle injury and a penetration injury. And when Dr. Bush was asked about straddle injuries he was trying to skirt and he said well, you know, I don't know how hard it hit, but wouldn't it make a difference if it's a penetration injury versus a straddle injury? Yes it would. Would it make a difference where the location of the injury would be? Yes it would. If it was an internal injury as Dr. Anz said would that lead you to believe that it was a penetration injury rather than a straddle injury? Yes it could. But he never did the examination. He didn't know where the injury was. So how can he make an opinion on it? He can't. But he's trying to.

341

That's your evidence. Ask yourself, I think we asked the question out of all the jurors how many of you never had kids? And there was, I think there was three people and I'm not sure if any of them are on the jury, but I don't know. But if you're experienced with kids how does a child, five, six, seven, eight, how do not only one, two of them come up with this story? Now you can have all the innuendo questions you want to ask. Well, it's it true somebody wanted custody? It's it true, this was a battle? But how many wrote down an answer that came from this stand that said that anybody did anything to motivate these children to make this story? Anybody. Was there any proof of it other than innuendo? If so, ya'll talk it out, I didn't hear it. I apologize if I didn't hear it. I heard questions. I heard question, question, question, innuendo, innuendo, but nobody got on there and said I know for a fact that one of these people out there that are part of the family triggered these kids to do this, influenced these kids to do it, told them what to say or anything else. It's not there. It's not there.

What is real is two kids came forward and they told their story. That's real.

Let's talk about character witnesses. Let's

342

talk about the first Mrs. Kirby. I think what we wanted to do is get to hearsay there, but it was, she made a trip to Virginia. The bottom line was everybody went to a movie or something, they came home. Is there anything that -- what did we get out of that? The second Kirby, she admitted she didn't know what was going on over at the house and all that kind of stuff, don't know exact dates of employment, the Defendant is a good guy, all that kind of stuff. Nothing tangible, nothing about the children or anything else. Nothing to do with why we're here. Joseph Kirby. Lived in Waverly, they lived with him, he never saw anything while they lived with him. Okay. How many people are going to do something in front of their parents? How many sexual abusers are going to do anything in front of anybody? It's a crime of secrecy. How many bankers are going to do it in front of somebody? It doesn't happen. It's a crime of secrecy. So I didn't see my kid do anything.

Let's do James Ferrell. Retired textile, brought the kids by, he was a good guy, he worked second or third shift. I can't tie it down to any dates, can't tell you anything definitely. I did see him with the children, the three girls alone. I took that as being positive. Here he's running around with

343

the three girls when he comes to visit him several times. Access to them. He had access all the time. Access daily.

Jackie Lewis. Electronics, Radio World. He worked for me two years when he was sixteen years old. He didn't work for me again until 2000. I really can't tell you anything else that's going on. I don't know him, I don't socialize with him. Nothing to do with the time frame we're talking about. No help.

Judy Allen. Lived next door. Did not visit in the home. He worked a lot. I don't know anything about went on inside the house.

Ellen Howell. I worked with him in '95 and '96 and he worked three jobs a day and all this kind of stuff. Well, when did he do this stuff? What did he do between '98 and '99? I don't know. I don't know. Once he got married I don't know what he was doing.

Billy Beckwith. Westpoint Stevens. He worked with me from '98 to 2000 and he was third shift. Came home at seven in the morning, but he also worked for Radio World, which wasn't true according to the guy that owned Radio World. So what good is he? None. He gets off at seven. Now he has access to the kids, access all day long. They come home from school, he's there all day long now. Not counting weekends,

344

1    holidays, vacation time or whatever.

2        Matthew Howell. The buses leave at seven, 7:15.

3    Fine. He comes home at seven. What's he doing the

4    rest of the day? Now the only one, the only one that

5    told you he went to work at nine was Dawn. But his

6    own employer said he didn't work for me then. And

7    that was the Radio World job. He didn't work for him

8    '98 to '99.

9        What's the evidence? The evidence is he

10   came home at seven. He might have worked something

11   else but nobody could tell us what it was. All day

12   long until eleven at night. That's what the evidence

13   is.

14       Four counts, sodomy, rape. The evidence is

15   there. Have the courage to convict. Have the

16   courage. Those two little girls are relying on you

17   having that courage.

18       THE COURT: Mr. Funderburk?

19       MR. FUNDERBURK: May it please the Court, Mr.

20   Glanzer. Ladies and gentlemen, we need to have the

21   courage to follow the law which requires the State to

22   prove beyond a reasonable doubt that these things

23   occurred before anybody convicts. Not out of emotion.

24   Not out of those kind of things, but the testimony

25   from this stand.

345

1       Now let me answer one question before I try
2  to read my notes which are not all that good, but he
3  asked the question, how do two children come up with
4  a story like this?  Well, now we want to fly over the
5  problem with time in this case.  Now these documents
6  and I'll refer to them in a minute, it's very clear
7  that one of the girls claims that it happened, always
8  happened during the daytime.  And the other one
9  claimed, Lillian, that it always happened at the
10 nighttime.  And then they both claimed essentially
11 that the mother worked all the time and that Lee was
12 home taking care of them.  Well, we know that's not
13 true.

14      Then you will recall that when I asked
15 Lillian about that time problem, she got a little
16 upset and had to admit that she and the sister got
17 together this morning, if I remember it right, and
18 came up with their story because they knew there was
19 a time problem.  After talking to their mother and
20 going over it, I suggest going over the testimony,
21 they knew that the mother didn't work on the night
22 shift.  See, Lillian had said that the mother was
23 working on the night shift and this always happened
24 when he was home keeping them at night.  But it's
25 perfectly obvious by now that Lee worked from eleven

346

1    o'clock to seven in the morning and had one or two

2    jobs during the day.  So she knew the story that she

3    had told about the night shift and this happening at

4    night didn't make any sense so she came up with well,

5    we got together and this must have happened when I

6    thought it was night before we went to school.  Now

7    that's, that's what the little girl testified to.

8    Because obviously, you know, when you're making

9    stories up sometimes you just can't weave it together

10   and since it had to be a night when she didn't know it

11   was a night in her mind it had to be before she went

12   to school and before the sun came up.  That's

13   essentially what she said.

14          So her testimony is when you put it all

15   together that these things occurred that she and

16   Autumn were gotten out of bed and these things

17   occurred and it had to therefore have occurred not at

18   night as she said, but essentially before school.  Now

19   that's the reason time is important in this case.

20          Now you know from Billy Beckwith that he

21   didn't get off until seven o'clock in the morning.

22   And you know from little Matthew that they were

23   standing out there waiting on the school bus at 7:05

24   every morning.  And you know that from Billy's

25   testimony, Beckwith, that he worked six days a week at

347

1    night.  So it is totally impossible that the story of

2    these girls is true.

3            Now  what  is  the  importance  of  physical

4    evidence in this case and the use of words?  Dr. Anz

5    used  the  word  that,  well  some  things  there's  no

6    physical  evidence  of  sexual  abuse.   However  when  I

7    asked the technical questions about reasonable medical

8    certainty certain things occur.  She never used that

9    term with these charges.  Now what do the girls say

10   happened?   Well,  we  can't  make  those  stories  jive

11   either.  Little Autumn when she gave her statement in

12   Virginia, you recall me asking her about that, because

13   she broke down when she had to admit that she forgot

14   that there was oral sex involved.  Now did she forget

15   it was involved or she simply forgot the story like

16   they forgot to get their stories straight until this

17   morning on when these things happened.

18           So what they really say is that almost every

19   day repeatedly both girls, that he penetrated them

20   anally and penetrated them vaginally, every day, many

21   times.  Apparently before they got up in the morning

22   to go to school when he was at work.  Now, the doctors

23   do not say if you'll read what they've got in these

24   reports, that one who is penetrated anally and one who

25   is  penetrated  vaginally  on  a  repeated  basis,  they

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

348

don't say that this, that that cannot be proved or disproved by physical evidence. Now there's some sexual abuse you cannot prove or disprove by physical evidence. There's no doubt about that. But here we've got specific things being charged that are subject to medical examination and you have the medical opinion on those examinations.

Now ladies and gentlemen, I suggest to you that, and I believe the doctors essentially, Dr. Bush testified essentially that you can't have somebody being repeatedly raped of this age, of these ages and the hymen still be in place and there still be a normal vaginal exam. That's not possible. It's the same thing if you believe what they said about the anal stuff, that this happens to both of them all the time. There's no physical evidence of that at all. It is not possible.

So what the State has to prove is that these things happened beyond a reasonable doubt, and I'm telling you with that testimony, with the testimony in this case that can't be proved and has not been proved beyond a reasonable doubt. Quite the contrary.

Now I asked the doctor the questions in a technical sense which is the way you're supposed to do it. Now when I asked Dr. Anz the same questions in a

349

1    technical sense she like you will recall the business

2    of the straddle injury.  Her office is the one that

3    did the examination and you'll recall that Dawn claims

4    that she told one of Dr. Anz's cohorts to check them

5    carefully.  So we've got to assume they were checked

6    carefully when the doctor checked the child carefully

7    and concluded it was a straddle injury.

8            Now when I put that question to her based on

9    a reasonable medical certainty she hedged about

10   whether it's more consistent with the last story

11   Autumn told or the first history.

12           And the importance of history, we slid over

13   that a little bit.  History in a case of this nature,

14   as a matter of fact as some of you know, in any

15   medical case is important.  For example, if somebody

16   is in a car wreck or let me say it another way.

17   Somebody comes in to the doctor or to the emergency

18   room and says I was in a car wreck this morning, a

19   tractor trailer hit me and my head went through the

20   windshield.  And the doctor examines that person and

21   there are no bruises and there are no lacerations and

22   not even any red marks.  Do you think the doctor is

23   going to believe that story?  And I guarantee you

24   somewhere in the notes you'll see that he said, much

25   like what Dr. Bush said, well, they claim they were in

350

1    a wreck and their head knocked the windshield out but

2    I find no lacerations, no bruises, no blah-blah.  So

3    you've got to compare, the reason for the history is

4    to determine how somebody is to be treated but it also

5    has another leg to it, especially when you're dealing

6    with children and these kind of cases where you don't

7    know what's going on and you're a doctor and there's

8    no physical evidence, even though they claim that they

9    had been raped and sodomized on a regular basis.  When

10   you look at them and examine them and there's no

11   physical evidence that happens then you have to

12   question if it happened.  And the reason you've got to

13   question it happens, if that happened or not if

14   there's no physical evidence and taking what they are

15   saying, they said, you know, good and well there would

16   be some physical evidence.  Then you've got to figure

17   that somewhere or other they had been influenced by

18   one force or another and that's something we'll never

19   know because we don't have enough time in court and

20   not enough investigators to go figure out and

21   determine how it is and why it is that these children

22   were influenced the way they were influenced.  But I

23   suggest that you listen and observed the mother of

24   these children and what she didn't know and what she

25   testified to and the children who would not even be